[No. S004719. Crim. No. 25577. Dec. 30, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
CURTIS FLOYD PRICE, Defendant and Appellant.

**COUNSEL**

Mark E. Cutler, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald E. Niver and David H. Rose, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

KENNARD, J.—After a year-long trial,[1] a jury convicted defendant Curtis Floyd Price of the first degree murders of Elizabeth Ann Hickey and Richard Barnes (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated), and it made special circumstance findings, as to

---

[1] Jury selection began in June 1985. The jury returned guilt verdicts in May 1986 and a penalty verdict in July 1986. The lengthy proceedings yielded an appellate record of over 44,000 pages of transcript, apparently the largest appellate record this court has received in a death penalty case. The briefing has been similarly gargantuan. The appellant's opening brief alone is 900 pages, with 690 footnotes.

the Hickey murder, of multiple murder (§ 190.2, subd. (a)(3)) and burglary-murder (§ 190.2, subd. (a)(17)(vii)). The jury also convicted defendant of one count each of robbery (§ 211) with the use of a firearm (§§ 1203.06, 12022.5), burglary (§ 459), receiving stolen property (§ 496), and conspiracy (§ 182). The jury further found that defendant had twice previously been convicted of serious felonies (§ 667, subd. (a)), and had completed two prior separate prison terms (§ 667.5, subd. (a)).

The jury fixed the penalty for the murder of Hickey at death. The trial court denied the automatic motion to modify the verdict of death (§ 190.4, subd. (e)), and it sentenced defendant on the noncapital counts to imprisonment for a determinate term of 10 years, consecutive to an indeterminate term of 25 years to life. Defendant's appeal from the judgment is automatic. (§ 1239, subd. (b).)

The sentence for the offense of burglary shall be stayed, but the judgment shall otherwise be affirmed.

## I. FACTS

### A. Summary of Facts Relating to Guilt

Defendant was released from prison in September 1982. On January 23, 1983, the gun collection of Richard Moore disappeared from his residence, apparently having been stolen in a burglary. On February 13, 1983, the body of Richard Barnes was found in his residence. He had been shot in the back of the head three times. On the morning of February 19, 1983, Berlie Petry found the body of Elizabeth Ann Hickey in the residence they shared. Hickey, the stepdaughter of burglary victim Moore, had been beaten to death with a blunt instrument; guns belonging to her and to Petry were missing from their residence. That same evening, a gunman robbed employees of the Triplex Theater. The Barnes killing occurred in Los Angeles County. The Moore burglary, the Hickey killing, and the Triplex Theater robbery all occurred in Humboldt County.

The police arrested defendant for the Triplex Theater robbery. After a lengthy investigation, he was also charged with the Barnes and Hickey

murders, receiving stolen property (the Moore weapons), and robberies at three other commercial establishments in Humboldt County during January and February of 1983.

At trial, the prosecution presented evidence that defendant belonged to the Aryan Brotherhood (AB), a prison gang, and had committed the charged offenses in furtherance of a conspiracy originating with the gang leadership. The principal objective of the conspiracy was the murder of Richard Barnes, who was the father of an AB member who had testified against other gang members. Defendant obtained the stolen Moore weapons, possibly with the knowledge or assistance of Hickey, to use in the killing of Barnes or for other AB assignments. Hickey was killed to obtain the guns in her residence and/or because she could incriminate defendant in the theft of the Moore weapons and/or the murder of Barnes. Defendant committed the Triplex Theater robbery to obtain funds with which to carry out his AB assignments.

The defense denied that defendant had committed any of the offenses. It offered alibi evidence to show that defendant was not in Humboldt County at the time of the Hickey killing and the Triplex Theater robbery. It attempted to cast doubt on the identification testimony of the robbery victims and the veracity of the prosecution's AB witnesses, and it sought to cast suspicion on Petry for Hickey's murder.

The jury convicted defendant of two counts of first degree murder (one with special circumstances) and one count each of robbery, possession of stolen property, burglary, and conspiracy. The jury acquitted defendant of one count of robbery, and it was unable to reach verdicts as to the remaining robbery counts. The description of the evidence that follows omits evidence of the charges that did not result in convictions.

## B. *Prosecution Evidence*

### 1. *The Conspiracy and Barnes Murder*

Before this case arose, Steven Barnes, an AB member, had testified as a prosecution witness against other AB members and against several non-AB members. During the summer of 1982, the AB leadership, which included Michael Thompson and Clifford Smith, decided to retaliate. The decision was made during a series of meetings at Palm Hall, an area inside the state prison at Chino. Prison authorities had placed Steven Barnes in protective custody, so the AB leaders decided to kill members of his immediate family instead. They selected defendant to do the killing.

Defendant was then serving a sentence in the Montana state prison, but he was scheduled for release from prison soon without parole supervision. One of the AB leaders brought defendant to Palm Hall in August 1982 by subpoenaing him to testify at the leader's trial. After defendant arrived at Palm Hall, AB leaders offered him the "contract" to kill Richard Barnes. Defendant accepted. The AB leaders instructed him to procure weapons in Northern California before returning south to kill Richard Barnes.

Janet Myers visited Smith regularly in prison. She was an AB "runner," relaying messages to and from other AB members. Smith instructed Myers to take care of defendant. Defendant went to Myers's house on the day he was released from prison. Joseph O'Rourke, an AB leader who normally supplied weapons to AB members in Southern California, picked defendant up there. Defendant spent about one month working for O'Rourke.

After O'Rourke was arrested in October 1982, defendant went to Humboldt County, where he spent most of the next three months. Defendant returned to Southern California in late January 1983. He stayed at the Santa Ana home of Michelle Scarborough, another AB runner, for approximately a week. He then stayed with Myers in Claremont. Defendant had a blue airline bag in which he kept a sawed-off shotgun and a revolver. While staying with Myers, defendant made a weekend trip to Auburn, near Folsom Prison, where he stayed with Rebecca Williams.

One night Myers drove defendant to different addresses he wanted to see. One of the addresses was the Temple City residence of Richard Barnes. On February 12, 1983, at 11 p.m., defendant left Myers's house with Tammi Shinn, another AB "runner." He returned early the next morning, collected his belongings, and left.

On February 13, 1983, sheriff's deputies discovered the body of Richard Barnes in the bedroom of his residence. The body was on the bed. The cause of death was three contact-range gunshot wounds to the back of the head inflicted by a .22-caliber handgun.

After the murder, Myers brought Smith a note signed by defendant. It stated: "That's took care of. Everything went well. I am going back north. I will be in touch with you later." Myers destroyed the note after showing it to Smith.

The evidence against defendant on the conspiracy and Barnes murder counts consisted primarily of the testimony of Michael Thompson, Clifford Smith, and Janet Myers. In addition, the prosecution introduced evidence

that defendant had testified in an earlier, unrelated trial that he was an AB member. Credit card receipts showed that defendant had purchased gasoline in Pomona on February 12 and in Anaheim on February 13, 1983. In the room defendant had occupied in his mother's house in Eureka, police found a slip of paper on which Richard Barnes's address had been written, together with the name "Nate," a nickname for Steven Barnes, and the words "send subpoena to him." In defendant's wallet, which they obtained from defendant's mother, police found another note with a reference to an address and telephone number for "Steve Barnes' step-father in Fountain Valley."

### 2. *The Moore Residence Burglary and the Hickey Murder*

On January 23, 1983, William Eaton reported an apparent burglary at the Humboldt County residence of Richard and Dottie Moore, Eaton's stepfather and mother, who were away from their residence for the weekend. The only items missing were the firearms in Richard Moore's collection, which included two rifles, three shotguns, and a .22-caliber handgun. The house had not been ransacked.

On February 18, 1983, Berlie Petry had been living with Elizabeth Hickey and her two minor children for three or four years. Hickey was the daughter of Dottie Moore and the stepdaughter of Richard Moore. Petry worked the night shift as a security guard at a lumber company. Both Petry and Hickey owned guns, including rifles, shotguns, and handguns. They kept the guns locked in a bedroom closet, except for a revolver that Hickey kept in a trunk. Petry left for work as usual at 11:30 p.m. As was his custom, he called the residence every hour on the hour. He spoke to Hickey at 1 a.m. and at 2 a.m., but he received no answer at 3 a.m. The line was busy at 4 a.m. and thereafter.

When Petry returned home at 8:30 a.m., the telephone receiver was off the hook. In the bedroom, he found Hickey's nude and lifeless body on their bed. Both the bedroom closet and Hickey's trunk had been ripped open. The guns were gone. Also missing was a combination radio and tape player that Petry had recently given Hickey. In Hickey's trunk, officers found a note in Hickey's handwriting that said "Call Curt at [telephone number of Rebecca Williams] about money for guns."

Hickey had been killed by blows to the head with a bar like a tire iron or crowbar. There were five or six depressed skull fractures that left brain tissue exposed. Bruises on the upper right chest and each shoulder indicated Hickey had been forcibly held down. There were defensive wounds on the

back of the hands. Two small knife incisions in the chest near the sternum were apparently inflicted after death.[2]

A day or two after Hickey's murder, defendant arrived at his stepfather's residence in Reno, Nevada.[3] He had two bundles wrapped in blankets. Defendant said they were guns that might have been stolen. Defendant's stepfather gave him permission to leave the guns at the residence. On February 28, 1983, defendant returned to Reno and moved the bundles to a ministorage unit.

A search of defendant's automobile yielded a product manual for one of Petry's rifles, a knife that had belonged to Hickey and had the name "Liz" written on it in fingernail polish, and a notebook in which someone had written, "Elizabeth, weapons, corner of Simpson and Pine [the location of Hickey's residence]." Hickey's telephone number was written on the same page. Another note with the name "Liz" and Hickey's telephone number was found in defendant's room at his mother's residence in Eureka. A third note with Hickey's name, address, and telephone number was found in defendant's wallet. Defendant's mother gave police a combination radio and tape player that had been in defendant's room. It was identical to the one taken from the Hickey residence. In a suitcase in the garage of defendant's mother's residence, the police found a shotgun like one taken from the Moore residence. The barrel and stock had been sawed off.

On March 31, 1983, law enforcement authorities searched the ministorage unit in Reno, Nevada. They found all of the guns taken from the Moore residence except one shotgun (apparently the one found in defendant's mother's garage) and the handgun. They also found all the guns belonging to Hickey and Petry, and over 1,000 rounds of various kinds of ammunition. Most of the guns were loaded. Moore's handgun, which was one of only four makes that could have fired the bullets that killed Richard Barnes, was never found.

### 3. *The Triplex Theater Robbery*

A man entered the Triplex Theater on February 19, 1983, at approximately 6:30 p.m. He had long, thin blond hair and was wearing sunglasses, a watch cap, and gloves. During the movie, he came out into the lobby, pointed a

---

[2]The prosecution theorized that defendant had made the incisions to verify, by the absence of bleeding, that he had succeeded in killing Hickey.

[3]Defendant's stepfather testified that defendant arrived on February 18, the day before the Hickey killing, but the prosecution presented a variety of evidence from which the jury could conclude that this testimony was inaccurate and that defendant must have arrived on February 19 or, even more likely, on February 20.

revolver at the manager, and directed him into the office. At the man's direction, the manager put $7,000 in a bag and gave it to the man, who ran out of the theater.

A month earlier, on January 16, 1983, an employee of the theater had seen a man with thin blond hair, wearing sun glasses, a large coat, a watch cap, and gloves, who came out into the lobby several times during the movie. The man's behavior seemed so unusual that she eventually decided to report it to the police, but the man had left before the police arrived. This employee selected defendant's photograph from a photo lineup, but she was unable to identify defendant at a live lineup.

The theater employees assisted the police in preparing a composite sketch of the robber. Five of the employees selected defendant's photograph from a photo lineup as being similar to the robber, although none of them made a positive identification.

Defendant bought an automobile for $1,602 in cash on February 25, 1983. Later that day, defendant was involved in an automobile accident. He paid the other driver $100 in settlement, taking the cash from a box that contained stacks of currency. When he rented the storage locker in Reno, Nevada, defendant paid $150 for six months' rental in advance. Although defendant used credit cards to purchase gasoline in January and February of 1983, including three purchases on February 18, he did not use the credit cards after that day.

In a suitcase in defendant's mother's garage, the police found a blond wig, black gloves, a watch cap, a handgun, and various items of theatrical makeup (including spirit gum, liquid latex, derma wax, and nose putty). In the room defendant occupied in his mother's house, the police found a note that was apparently a list of defendant's expenses and debts. On it defendant had written "need mucho dinero" and "$1,000.00 I owe Mom means it's all about 'movie time.'" In the room, the police also found $400 in cash in a plastic container.

### 4. *Investigation and Additional Evidence*

Defendant was arrested in Humboldt County for the Triplex Theater robbery on March 3, 1983. His mother visited him in jail on March 27, 1983. Defendant asked her to move the guns and ammunition from the storage locker in Reno and to dispose of them so they would never be found. He referred to the guns as "Brand business." "The Brand" is another name for the AB.

In September 1983, Michael Thompson agreed to cooperate with law enforcement on the Barnes killing. Thompson persuaded Janet Myers to cooperate also. In October 1985, after testifying as a defense witness at defendant's preliminary hearing, Clifford Smith renounced the AB and agreed to testify for the prosecution.

At trial, Tina Ransbottom, one of Hickey's neighbors, testified she had seen a man with Hickey on two occasions shortly before Hickey was killed. When police showed her a photographic lineup, she selected a photograph of defendant as the man she had seen with Hickey.

C. *Defense Evidence*

The defense called three prison inmates, Wendall Norris, John Stinson, and Robert Rowland, who testified that the AB existed only as an outlook, a way of life, or a loose social club rather than an organized criminal gang. They also said it was a label that prison authorities used to justify restrictive confinement.

The defense adduced evidence to show that Petry had the motive and the opportunity to kill Hickey. As part of his job, Petry was required to patrol the lumberyard each hour with a punch clock and put special keys in it at each of 33 key stations. Petry's tape for the morning of February 19, 1983, showed that no keys were punched between 5:35 and 6:15 a.m. Petry explained, however, that he missed some of his key stations because he had to attend to a boiler breakdown, and because he had gate duty. Also, Petry's telephone log showed he had received telephone calls at 6 a.m. from security guards at other locations.

Petry's relationship with Hickey was troubled. Hickey frequently visited bars while Petry was at work and brought men home with her. A neighbor testified Hickey had brought over 100 men to her home. Petry once came home from work and found another man in bed with Hickey. Hickey infected Petry with venereal disease at least twice. Petry testified that Hickey was the first and only woman with whom he had been sexually intimate. A cab driver testified that Petry began hitting Hickey once while they were riding in his cab. Friends recalled seeing Hickey with black eyes and bruises on her face a couple of times. A defense expert, psychiatrist Martin Blinder, testified about domestic homicides and the kinds of relationships that are most often associated with the killing of a spouse or lover. He said that mutilation of the victim's face indicated a close personal relationship between the killer and the victim.

Rebecca Williams testified that defendant arrived at her home in Auburn on February 13 or 14, 1983. He stayed there until February 17. He borrowed

her car that day and returned the next day, February 18, with long bundles. He left again in her car the same day. Defendant's stepfather testified that defendant arrived in Reno, Nevada, with two long bundles on February 18 and remained there until February 20, 1983.

Defendant's brother testified that he had purchased the radio and tape player found in defendant's mother's residence, and that he had given it to defendant as a present.

## D. *Facts Relating to Penalty*

In 1967, defendant was convicted of possessing marijuana and of escape from Tehama County jail. He was released on parole in 1971. Defendant violated his parole by going to Montana, where he attempted to rob a small grocery store with a gun. Defendant was placed in a drug program, but he escaped from custody. Defendant robbed a store in Humboldt County in September 1971. He was later arrested in Florida and brought back to Montana to complete his sentence.

In December 1971, while being transported in Montana, defendant grabbed a gun from one of the two transporting officers. After forcing the officers to drive to a remote location, defendant locked them both in the trunk of their patrol car and used the gun to force his way into the car of a passing motorist, John Digalis. Defendant told Digalis to drive to Idaho. Law enforcement officers stopped the car. Defendant pointed the gun at Digalis's head and threatened to kill him if the officers approached. At defendant's order, Digalis again began to drive, but the officers shot out a tire. Defendant eventually surrendered. He was convicted of inmate holding a hostage, a Montana felony.

Defendant was in San Quentin Prison in May 1978. Defendant came to the cell of fellow inmate Ricky Carpenter. He told Carpenter he was going to kill Leroy Banks, an African-American inmate, because Banks had been disrespectful to an AB member. Carpenter pointed out Banks. Defendant stabbed Banks 10 to 15 times in the chest. Banks died of his wounds.

Prison authorities found defendant in possession of stabbing instruments in October 1978 and May 1980. While in jail awaiting trial in this case, defendant struck jail guards on two occasions, and on another occasion he violently resisted being taken to court, hitting and biting the guards who were escorting him.

Testifying in his own behalf at the penalty phase, defendant said he had not testified at the guilt phase because the trial court had ordered him

shackled in the courtroom. Because he had not yet been convicted, he had refused to appear before the jury in chains. He denied he was guilty of any of the charged offenses. He admitted that he knew Hickey. He said Hickey had asked him to sell her guns for her on consignment. The final arrangements were made during a telephone call from Hickey to the home of Rebecca Williams in Auburn. He said he received the guns on February 18, 1983, in Lakeport from a man named Kenny. He said he had supported himself between October 1982 and March 1983 by selling marijuana.

Defendant presented evidence of the harsh conditions of his imprisonment in Montana. A woman who had visited defendant during that time testified that he was a valuable friend. Joseph O'Rourke testified that defendant had been a valuable employee in his handyman business during the one month he had worked for him; O'Rourke refused to answer any questions about the AB or his relationship to it.

The defense presented evidence about the conditions of defendant's confinement in jail pending the trial in this case. Defendant was confined apart from other prisoners. Because he refused to eat meat, a special diet was necessary. Defendant found the food unappetizing and lost 20 pounds. A nutritionist testified that the food provided was monotonous and nutritionally inadequate. A counselor appointed to meet with defendant each week testified that defendant found the conditions of his confinement humiliating and stressful, and that these conditions made him seriously depressed and adversely affected his ability to communicate. Fred Rosenthal, a psychiatrist, testified that defendant's isolation in a dimly lit area caused sensory deprivation, leading to anxiety, depression, and hostility.

Defendant's mother, sister, and brother testified that they loved defendant and did not want him to die.

Three officers who worked at Humboldt County jail and one who worked at San Quentin testified that defendant had been a respectful and cooperative inmate.

## II. Guilt and Special Circumstance Issues

### A. *Territorial Jurisdiction and Vicinage*

Defendant contends that Humboldt County Superior Court lacked territorial jurisdiction to try him for the murder of Richard Barnes, that trial of that offense in Humboldt County violated his right under the state and federal Constitutions to be tried by a jury drawn from the locality where the crime

occurred, and that in any event the convictions for conspiracy and for Richard Barnes's murder are invalid because the jury failed to find the required jurisdictional facts. We reject each of these contentions.

■ Defendant maintains that territorial jurisdiction to try him for the murder of Richard Barnes existed only in Los Angeles County, because it was there that Richard Barnes was fatally wounded and died, and there that his body was discovered. Defendant relies on section 790, which provides that a charge of murder may be tried in a county where the fatal injury occurred, the victim died, or the victim's body was found. Defendant argues that section 790 gives him a state entitlement to be tried in Los Angeles County for the Barnes murder, and that deprivation of that entitlement denied him the due process of law guaranteed by the Fifth and Fourteenth Amendments to the federal Constitution.

Defendant recognizes that many cases have held that section 790 is not exclusive and that section 781 also applies to a charge of murder. (E.g., *People* v. *Douglas* (1990) 50 Cal.3d 468, 493-494 [268 Cal.Rptr. 126, 788 P.2d 640].) Under section 781, a public offense may be tried in a jurisdiction in which the defendant made preparations for the crime, even though the preparatory acts did not constitute an essential element of the crime. (*People* v. *Powell* (1967) 67 Cal.2d 32, 62 [59 Cal.Rptr. 817, 429 P.2d 137].) Defendant urges us to overrule decisions applying section 781 to the crime of murder because they failed to consider the argument that section 790, as a special statute providing for trial of the offense of murder, should take precedence over a statute of general application like section 781.

The rule of statutory construction cited by defendant applies only when two statutory provisions are inconsistent. (See Code Civ. Proc., § 1859 ["when a general and particular provision are inconsistent, the latter is paramount to the former"]; *International Assn. of Fire Fighters Union* v. *City of Pleasanton* (1976) 56 Cal.App.3d 959, 976 [129 Cal.Rptr. 68].) Two statutes dealing with the same subject are given concurrent effect if they can be harmonized, even though one is specific and the other general. (*Acco Contractors, Inc.* v. *McNamara & Peepe Lumber Co.* (1976) 63 Cal.App.3d 292, 295 [133 Cal.Rptr. 717]; see also *People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 487-488 [204 Cal.Rptr. 897, 683 P.2d 1150].) Because sections 781 and 790 are not inconsistent and can be harmonized, we decline to overrule, and instead reaffirm, the decisions of this court holding that both sections are proper sources of territorial jurisdiction for trying the crime of murder.

Under section 781, the courts of Humboldt County had territorial jurisdiction to try defendant for the murder of Richard Barnes. The prosecution's

evidence showed that defendant was instructed to go to Northern California to procure a weapon or weapons with which to kill Barnes, that defendant went to his former home in Humboldt County a month after his release from prison, and that he returned three months later with a revolver and a sawed-off shotgun. He arrived in the Los Angeles area with these weapons just days after the Moore weapons were stolen. Meyers testified that the shotgun found in defendant's mother's garage appeared to be the same one defendant brought with him to Los Angeles. This shotgun was the same model as the one taken from Moore. The jury could reasonably infer that the shotgun was Moore's and that the revolver defendant brought back to Los Angeles was the one taken from Moore and never found. The jury could reasonably infer from these facts that defendant committed acts in Humboldt County that were preparatory to the murder of Barnes.

■ Defendant next argues that trial of the Barnes murder in Humboldt County deprived him of the right to be tried by a jury drawn from the locality or "vicinage" where the crime was committed, a right he contends is constitutionally guaranteed at both the federal (U.S. Const., Amends. VI, XIV) and state (see *People* v. *Powell* (1891) 87 Cal. 348, 355-360 [25 P. 481]; but see also *People* v. *Guzman* (1988) 45 Cal.3d 915, 938 [248 Cal.Rptr. 467, 755 P.2d 917]) levels. The issue is not preserved for appellate review, however, because no objection on this ground was made in the trial court. (Code Civ. Proc., § 225, subd. (a); former § 1060; *People* v. *Hernandez* (1988) 47 Cal.3d 315, 340 [253 Cal.Rptr. 199, 763 P.2d 1289].)

■ Defendant contends that his trial counsel's failure to object in the trial court on vicinage grounds constituted ineffective assistance in violation of his right to effective counsel under both the federal (U.S. Const., Amends. VI, XIV) and state (Cal. Const., art. I, § 15) Constitutions. We disagree.

A defendant seeking relief on the basis of ineffective assistance of counsel must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; see also *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699, 104 S.Ct. 2052].) Here, a reasonably competent attorney would have been aware that a Court of Appeal had held in 1974 that trial of a murder charge in a county in which the defendant performed preliminary acts did not violate the defendant's vicinage rights even though the defendant completed the crime in a different county. (*People* v. *Powell* (1974) 40 Cal.App.3d 107, 123 [115 Cal.Rptr. 109].) We have no occasion here to consider the soundness of that

holding, but we conclude that a reasonably competent attorney might well have determined that an objection on vicinage grounds would have been futile in light of this precedent. Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile.

■ Defendant next argues that we must set aside his convictions for conspiracy and the murder of Richard Barnes because the jury failed to make express findings of the jurisdictional facts. He asserts that the lack of such findings renders the guilt verdicts unreliable, thereby violating the Eighth Amendment to the federal Constitution.

A charge of conspiracy may be tried in "any county in which any overt act tending to effect such conspiracy shall be done." (§ 182, subd. (a).) The information charged defendant with conspiring to commit robbery, grand theft, and murder "at and in the County of Humboldt." The information alleged that defendant committed specified overt acts in Humboldt and Los Angeles Counties, and in Washoe County, Nevada. The jury found defendant guilty of the crime of conspiracy as charged in the information. It made no findings as to the commission of particular overt acts.

Because the information charged defendant with committing the crime of conspiracy in Humboldt County, the jury's general verdict convicting defendant of conspiracy as charged necessarily encompasses a finding that defendant committed the offense in Humboldt County. This in turn implies a finding that defendant committed at least one overt act in Humboldt County in furtherance of the conspiracy. Thus, the jury made a sufficient finding of the required jurisdictional fact.

Defendant disputes this conclusion, arguing that the general verdict convicting defendant of conspiracy did not establish the required jurisdictional fact because the jury was not instructed on the need to determine jurisdictional facts, and so it may not have focused on whether the conspiracy occurred in Humboldt County. Defendant cites no authority for this argument, and we are not persuaded that the court was required, absent a request, to instruct on the determination of jurisdictional facts, or that the lack of instructions provides a basis to challenge the verdict as a finding of territorial jurisdiction. (See *People v. Sering* (1991) 232 Cal.App.3d 677, 687 [283 Cal.Rptr. 507].)

The information charged defendant with the murder of Richard Barnes in the County of Los Angeles, and the jury found defendant guilty as charged. This verdict by itself does not establish territorial jurisdiction of the murder

charge in Humboldt County. As we have seen, however, the jury also convicted defendant of conspiracy to commit murder. The evidence showed that the object of the conspiracy was the murder of Barnes, not the murder of Hickey. Because the jury found that defendant committed an overt act in furtherance of the conspiracy in Humboldt County, it necessarily found that defendant committed acts preliminary to the murder in that county, and thus it found the facts necessary under section 781 to establish territorial jurisdiction in Humboldt County for the Barnes murder.

### B. *The Motion to Sever*

Defendant contends the trial court abused its discretion when it denied his pretrial motion to sever the conspiracy and Barnes murder counts from the Hickey murder and burglary charges. He further contends that the denial resulted in unreliable guilt verdicts in violation of the Eighth Amendment to the federal Constitution.

As defendant concedes, the offenses charged in the information satisfied all statutory requirements for joinder. (See § 954.) Therefore, to establish abuse of discretion in the denial of the severance motion, defendant must make a clear showing of prejudice. (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699].) To determine whether the court abused its discretion in denying severance, we examine the record before the trial court when it ruled. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 171 [222 Cal.Rptr. 184, 711 P.2d 480].)

The first step in the analysis is to determine whether evidence of the conspiracy and the Barnes murder would have been admissible in a separate trial of the Hickey counts. (*People* v. *Walker* (1988) 47 Cal.3d 605, 622 [253 Cal.Rptr. 863, 765 P.2d 70].) If evidence of these offenses would have been so admissible, it is very unlikely defendant could have been prejudiced by their joinder. (*Ibid.*)

When it denied the motion to sever, the trial court said it had concluded that the evidence presented at the preliminary hearing supported a finding that defendant committed the Hickey and Barnes murders to further a single complex conspiracy. Defendant disputes this conclusion. He maintains that the evidence presented at the preliminary hearing was sufficient to establish only a simple conspiracy to kill Barnes, and that the Hickey offenses, because they occurred after the killing of Barnes, were necessarily unrelated to that conspiracy.

The preliminary hearing evidence supports the trial court's conclusion that a single conspiracy linked all the charged offenses. Michael Thompson

testified that after the AB council decided to give defendant the contract to kill Richard Barnes, he and two other council members told defendant of the decision. They instructed defendant to "go to Northern California and by means of robbery, burglary or association with drug dealers, procure the weapons necessary to carry out the contracts in Southern California." Although the only murder contract given to defendant at that time was for the killing of Barnes, the council intended that the weapons defendant was to steal would be available for other contracts as well. After defendant was released from prison, but before he killed Barnes, the council decided to give him two other murder contracts. A courier informed defendant of these additional contracts.

This evidence provided proof of an ongoing conspiracy to kill perceived enemies of the AB, or their relatives, and to commit robbery and other crimes for the purpose of obtaining money and weapons with which to accomplish these killings. This evidence would have been admissible in the trial of the Hickey counts to show motive. (Evid. Code, § 1101, subd. (b).) The jury could reasonably have inferred that defendant killed Hickey because she knew how he came into possession of the Moore weapons, which might have been used in the Barnes killing, and also to obtain additional firearms from her residence. Evidence of the Barnes murder would have been admissible in a separate trial of the Hickey offenses to confirm the existence of the conspiracy and defendant's participation in it, and thereby to further establish the motives for the Hickey offenses. The trial court could reasonably have concluded that the probative value of the conspiracy and Barnes murder was substantial enough to outweigh the prejudice to defendant resulting from evidence of these other crimes. (*Id.*, § 352.)

Were we to conclude that evidence of the conspiracy and Barnes murder would not have been admissible in a trial of the Hickey burglary and murder, it would not follow that severance was required. ■ Cross-admissibility of evidence in separate trials is but one of the factors the trial court must consider in determining whether potential prejudice requires severance. (*Frank* v. *Superior Court* (1989) 48 Cal.3d 632, 641 [257 Cal.Rptr. 550, 770 P.2d 1119].) To discharge his burden of showing prejudice, defendant must show, for example, that one of the offenses was substantially more inflammatory than the other or was supported by significantly stronger evidence. (*Ibid.*) ■ Defendant has made neither showing here. The evidence that defendant killed Barnes was not significantly stronger than the evidence he killed Hickey. No eyewitnesses testified to either killing, nor did defendant confess to either. The prosecution's case as to each was strong but not overwhelming. Nor was the Barnes murder significantly more inflammatory than the Hickey murder. The Barnes murder was an execution-style slaying

of a person whose only offense was fathering a son believed to have betrayed a prison gang; the Hickey murder was an exceptionally brutal slaying of a young mother. Although different in their particulars, the two killings were equally abhorrent.

We conclude that defendant did not make a sufficiently compelling showing of prejudice to require severance. Therefore, the trial court did not abuse its discretion in denying the motion to sever the conspiracy and Barnes murder counts from the other charges in the information.

## C. *The Motion for Change of Venue*

■ Defendant contends the trial court erred in denying his pretrial motions to change venue away from Humboldt County. He asserts that the error deprived him of these rights under the federal Constitution: his Sixth and Fourteenth Amendment right to a fair and impartial jury, his Fifth and Fourteenth Amendment right to a fair trial consistent with due process of law, and his Eighth Amendment right to a reliable guilt determination in this capital case.

When a defendant shows a reasonable likelihood that a fair trial cannot be had in the county of original venue, a motion for change of venue must be granted. (§ 1033; *People v. Coleman* (1989) 48 Cal.3d 112, 133 [255 Cal.Rptr. 813, 768 P.2d 32].) ■ The most significant factors to be considered are the gravity and nature of the crime, the size and nature of the community, the extent and nature of the publicity concerning the crime, the status of the victim, the status of the accused, and "any indication from the voir dire of prospective and actual jurors that the publicity did in fact have a prejudicial effect." (*Coleman, supra,* at p. 133.) On appeal from a conviction after denial of a motion to change venue, a reviewing court makes an independent appraisal of these factors. (*Ibid.*)

■ The charges against defendant included two counts of first degree murder, one with special circumstance allegations. Humboldt County is predominantly rural and is one of the state's smaller counties, with a 1984 estimated total population of 108,024. Therefore, the first two factors favor a change of venue. Examination of the other factors and the voir dire, however, indicate that defendant failed to demonstrate a reasonable likelihood that, as a result of pretrial publicity, a fair trial was not obtainable in Humboldt County.

The record shows that publicity in this case began with accounts in April 1983 that defendant had been charged with the Hickey murder. Newspaper

articles described Hickey as "a 22-year-old mother of two," mentioned that her children were sleeping in another room of the house when she was killed, and related that she died "of multiple skull fractures from numerous blows to the head." After these initial articles, there was a six-month hiatus in publicity until the first preliminary hearing in October 1983.

Accounts of the preliminary hearing, in addition to noting evidence implicating defendant, related that defendant's fingerprints were not found in the Hickey residence; that defendant's stepfather placed him in Reno, Nevada, on the night of the Hickey murder; that Petry, described as Hickey's "live-in boyfriend," had "admitted his anger at Hickey's promiscuous behavior"; and that the defense was contending it was Petry who had killed Hickey. The accounts also mentioned that a cab driver said he frequently drove Hickey to two local bars, and that a truck driver remembered seeing her in one of these bars at midnight on the night she was killed.

In January 1984, the media reported on hearings on a habeas corpus petition through which defendant sought changes in the conditions of his confinement. They noted his successful request for a special diet because of a stomach condition and his complaints that his frequent shackling was unnecessary because he had "never assaulted any jail employee or police officer."

In February 1984, the media reported that the prosecution was seeking to expand the charges against defendant to include allegations that he killed Richard Barnes "as part of a conspiracy he formed with other members of a prison gang called the Aryan Brotherhood." They related allegations in a prosecution news release that the conspiracy included plans to steal weapons and to kill four people. In March 1984, the media reported that the prosecution had filed new charges against defendant, requiring a new preliminary hearing. These accounts mentioned that defendant's prior preliminary hearing "was reputed to be the longest and most expensive in Eureka Municipal Court history" and that two supervisors had temporarily blocked payment of court costs "in what has become the most expensive criminal action in Humboldt County."[4]

The media reported on the second preliminary hearing in April and May of 1984. They related Michael Thompson's testimony that the AB was "one of many prison gangs in which inmates of the same race band together" and

[4]Defendant maintains he was severely prejudiced by publicity about the extraordinary length and cost of the proceedings against him, yet he fails to explain how such publicity would jeopardize his chances of receiving a fair trial. We doubt that jurors would be more likely to convict defendant because the trial was costly.

" 'just short of being a white supremist [*sic*] organization,' " and that defendant was chosen to carry out murder contracts because of his " 'calculating nature,' his past criminal record and 'his mentality in general.' " They also related the testimony of defense witnesses Wendell Norris and Merlin Forbes that defendant was not an AB member, that the AB was more like a social club than a gang, and that the AB was never involved in any conspiracy to kill relatives of persons who had acted against the AB.

An article appeared in a Eureka newspaper in August 1984, based on an article printed in a San Francisco newspaper, alleging that the AB had become "a national crime organization with links to the Mafia," and that it was "involved in criminal activities outside the prison system, including loan-sharking, wholesale narcotics dealing, extortion, arson and murder." The article did not mention defendant or make any reference to the crimes charged in this case.

Coverage of the case by local radio and television stations, like the newspaper coverage, was intermittent rather than continuous. A Eureka television station, KIEM-TV, carried stories about defendant on its newscasts on just 10 days between March 3, 1983, and January 4, 1985. The average length of the broadcasts was less than one minute. Viewed as a whole, the media coverage was restrained and balanced, prominently featuring the defense evidence and arguments, and it abated almost entirely after the preliminary hearings.

The remaining factors, the community status of the victim and the defendant, do not demonstrate a necessity to change venue. Defendant was not a minority group member, nor was he a friendless outsider. Although the first newspaper articles described defendant as an Oregon resident, the media later reported that defendant's mother lived in Humboldt County and that defendant had lived with her. Richard Barnes was not a resident of Humboldt County and was apparently unknown there. Elizabeth Hickey lived in the community, but she was not prominent. As a young mother she was undoubtedly a sympathetic figure, but there is nothing in the record to indicate that her death caused unusual emotion in the community. (See *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1002 [254 Cal.Rptr. 586, 766 P.2d 1].)

The defense filed its original motion for change of venue in January 1985. On March 12, 1985, before jury selection had begun but more than two years after the Barnes and Hickey killings, the trial court denied the motion without prejudice. As the court remarked, there had been at that time "a nine-month span of near media blackout."

Jury selection began on June 11, 1985. The defense filed a second motion for change of venue on August 21, 1985, in the midst of jury selection.

Attached to the motion as an exhibit was an analysis of potential jurors' responses to a questionnaire they were required to complete. According to this analysis, 76 percent of the potential jurors said they had not heard of defendant, 78 percent had not heard of Hickey, 94 percent had not heard of Richard Barnes, and 78 percent had not learned anything about the case from the media.

Jury selection was completed on October 30, 1985. The trial court heard and denied the second venue motion the next day. In denying the renewed motion, the court said that more than 730 prospective jurors had been examined on exposure to pretrial publicity. Of these, 484 said they had no knowledge of the case and no knowledge of the AB. Another 48 to 50 had knowledge of the AB but no knowledge of the case and could be fair. Thus, over 530 prospective jurors, or more than 72 percent, said they had no previous knowledge of the case. This is hardly the picture of a community in which knowledge of the case had become so deeply imbedded as to preclude a fair trial.

The record does not support defendant's assertion that the jurors who determined the verdicts had significant pretrial familiarity with the case. Juror Stovall was familiar with the names of Price and Hickey, and recalled some discussion of the case at Arcata Redwood, where both she and Petry had worked, but she said she did not know much about the case and had not formed an opinion. Juror Olivieri said that a coworker told him defendant had sued "the City," and that it had "something to do with mistreatment when he was taken into custody," but he was sure this would not affect his ability to be fair. Juror Gustafson said he had heard of defendant, but he apparently confused this case with another. Juror Kramer's husband was a psychologist and was appointed by the court to examine defendant for competency, but there is no indication she discussed the case with her husband. Some jurors indicated acquaintance with one or more of the witnesses, but none said this would interfere with credibility determinations. None of the actual jurors demonstrated significant recall of the charged offenses.

Defense counsel was able to select a jury while using only 18 of his 26 peremptory challenges, and 6 of his 8 peremptory challenges to alternate jurors. The failure to exhaust peremptories is a strong indication "that the jurors were fair, and that the defense itself so concluded." (*Balderas, supra*, 41 Cal.3d at p. 180.)

Apart from the traditional factors, defendant maintains that a change of venue was required in this case because Juror Southworth was acquainted

with the prosecutor's wife and was herself prosecuted during the trial by the local district attorney's office, Juror Kramer (as previously mentioned) was married to a psychologist appointed by the court to examine defendant for competency, and the local jail had inadequate facilities to house an inmate of defendant's reputed dangerousness for an extended period of time. None of these facts was urged as a ground for changing venue, and none alters our conclusion that defendant has failed to demonstrate error in the denial of his motions to change venue.

## D. *The Threatened Sanctions Against Defense Counsel*

During jury selection, the trial court issued a written order denying without hearing a defense motion to dismiss the case for violation of defendant's statutory speedy trial rights (§ 1382). In this order, the trial court criticized the two attorneys representing defendant for making repetitive motions and for including misleading and incomplete factual statements in their motion papers. The court cited specific instances of such conduct and said they were grounds for sanctions under Code of Civil Procedure section 128.5.[5] The court said it would hold a hearing after the trial to determine whether to impose sanctions under this section and would consider compliance with its ruling as a factor at that hearing.

Defense counsel moved to advance the date for the hearing regarding sanctions. Counsel requested a prompt resolution of the sanctions issue because, in counsel's words, "[t]he mere knowledge that at the end of the trial the Court will impose financial sanctions, as well as perhaps other sanctions, against defense counsel is . . . so threatening and intimidating that it reduces defense counsel's ability to fully protect [defendant's] rights, knowing that to protect those rights or vigorously defend [defendant] will only result in stronger sanctions."

The trial court denied the motion at the next court session. In doing so, the court said its previous order meant only that there was a possibility of a posttrial hearing on sanctions, and that the court now believed a hearing might not be necessary. The court explained that it had referred to sanctions only to remind counsel of their ethical duties, not to curb vigorous advocacy. The court ordered counsel not to allow concern about possible sanctions to interfere with their representation of defendant.

---

[5]"Every trial court may order a party, the party's attorney, or both to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay. . . ." (Code Civ. Proc., § 128.5, subd. (a).)

We have no occasion here to determine whether sanctions under this provision may be imposed in a criminal proceeding. (See *People* v. *Cook* (1989) 209 Cal.App.3d 404 [257 Cal.Rptr. 226] [holding the provision inapplicable to criminal cases].)

██ Defendant contends that the trial court erred in not promptly resolving the sanctions issue because the threat of possible sanctions may have inhibited counsel in forcefully advocating defendant's cause at trial. He contends that the error deprived him of these rights under the federal Constitution: his Sixth and Fourteenth Amendment rights to effective assistance of counsel, to present a defense, and to completely cross-examine witnesses; his Fifth and Fourteenth Amendment right to a fair trial consistent with due process of law; and his Eighth Amendment right to reliable guilt and penalty phase verdicts in this capital case.

We agree it is usually preferable for the trial court to promptly resolve any issue that arises regarding misconduct by counsel, rather than deferring hearing on possible sanctions until after the trial. Here, however, the trial court indicated it had not initiated sanctions proceedings and had mentioned sanctions only to impress upon counsel that certain practices, including making motions that duplicated motions already denied, were unacceptable. We do not find such warnings improper (see *People* v. *McKenzie* (1983) 34 Cal.3d 616, 632 [194 Cal.Rptr. 462, 668 P.2d 769] [attorney must respectfully yield to court's rulings, whether right or wrong]), particularly where, as here, the court also emphasizes counsel's duty to vigorously represent their clients by all legitimate and appropriate means. Counsel presumably knew that their due process rights to notice and hearing and their statutory rights to appellate review gave them effective protection against the unwarranted imposition of sanctions. We find no error and no prejudice.

## E. *Defendant's Competence to Stand Trial*

During jury selection, the court held a hearing in camera, in the absence of both prosecutors and defense counsel, to permit defendant to express concerns about his legal representation. Defendant explained that his primary problems were the conditions of his jail confinement and the court's rulings denying motions his counsel had made. He said the court's comments in rejecting defense positions suggested to him that the court believed his counsel to be incompetent. In the presence of the prosecutors and defense counsel, the court announced it would appoint another attorney to advise defendant. Defendant protested that he would not trust anyone the court appointed.

After defendant had left the courtroom, a prosecutor suggested the court might wish to comment on defendant's demeanor. The court replied that defendant was "extremely upset" and "[i]rritated with the whole process." Referring to the section of the Penal Code dealing with competence to stand trial, the court said that it was "unclear at this point whether we have a 1368

problem or not." The court said it might "appoint someone to attempt to interview" defendant and added that it was "not at this point expressing a 1368 doubt." The prosecutor commented that "defendant's voice was shaking, as well as his body, hands, legs." The court agreed that defendant was "apparently under a great deal of emotional stress." Defense counsel, who represented that she was a state-certified social worker, said she shared the court's concern about defendant's competence. She added that "there is some question as to whether or not he is having a psychotic episode," and that she had the impression he was suffering from delusions. Later that day, the court appointed Richard Kramer, a clinical psychologist, as a court's expert to examine defendant on his competence to stand trial.

The next day, Dr. Kramer met with defendant for 30 minutes, after which he submitted a confidential report to the court. In his written report, Dr. Kramer said he found defendant to be depressed and anxious, but defendant's thought processes were normal and there was no evidence of delusions or hallucinations. He found defendant to be "competent enough to comport himself in court," but said he had insufficient information to determine defendant's ability to rationally collaborate with his current counsel. The court noted that Dr. Kramer's report was inconclusive. The court did not commence formal proceedings under section 1368 to determine defendant's competence to stand trial.

■ Defendant contends that the court erred in failing to commence formal competency proceedings or, in the alternative, that it erred in failing to take further steps to determine whether such proceedings should be commenced. He contends that the error denied him his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution to due process of law, fair trial, trial by jury, confrontation and cross-examination of witnesses, presentation of a defense, effective assistance of counsel, and reliable guilt verdict. We find no error and no constitutional violation.

If "a doubt arises in the mind of the judge as to the mental competence of the defendant," the judge is required to state the doubt on the record. (§ 1368, subd. (a).) This is the first step in initiating formal proceedings to determine a defendant's competence to stand trial. Defendant does not contend that the record here contains substantial evidence of defendant's incompetence to stand trial, and he concedes that the trial judge did not say he had a "doubt" about defendant's competence. Indeed, the judge expressly said he was not expressing any such doubt. Defendant nonetheless argues that when the judge spontaneously raised the question of competence, this should be deemed the expression of a doubt. The law is otherwise. A trial

court's expression of preliminary concerns about competency does not require the commencement of competency proceedings. (*People* v. *Gallego* (1990) 52 Cal.3d 115, 159, 162-163 [276 Cal.Rptr. 679, 802 P.2d 169].)

Defendant next contends that the trial court failed to take appropriate steps to resolve its preliminary concerns. We disagree. The court appointed its own expert to examine defendant and it alerted counsel to the potential issue. After reviewing the expert's report, the court was apparently satisfied that there was no present incompetence and no need for further examination. The expert found no impairment of defendant's ability to think logically, to understand the case against him, or to express his views. He found defendant to be anxious and depressed, but these findings are hardly surprising in a defendant on trial for his life. At the expert's suggestion, the court appointed a counselor to meet with defendant at the jail each week to provide him with emotional support. The court proceeded reasonably and in accordance with the law. We find no abuse of the court's discretion.

F. *The Motion to Prohibit Reference to "Aryan Brotherhood"*

Before trial, the defense made two motions under Evidence Code section 352[6] to preclude the prosecution from introducing any evidence of the name "Aryan Brotherhood." The defense argued that the name was inherently prejudicial because the word "Aryan" was popularly associated with Nazism and other racist ideologies. The trial court denied the motion each time, ruling that the prosecution could not effectively present its case without using the name and that undue prejudice to defendant could be avoided by excusing for cause any potential jurors whose responses indicated they would be unduly prejudiced by the name.

▇▇▇ We reject defendant's contention that the ruling was an abuse of discretion and denied him his state and federal constitutional rights to an impartial jury, to due process of law, and to reliable verdicts in a capital case. In ruling on the pretrial motions, the court was guided by the preliminary hearing evidence. That evidence showed that defendant's membership in the AB was central to the prosecution's case, under which all of the charged offenses originated with a conspiracy by the AB leadership to murder the father of a defecting member. (See *People* v. *Frausto* (1982) 135 Cal.App.3d 129, 140-141 [185 Cal.Rptr. 314], and cases there cited.) The defense, on the other hand, appeared to dispute the AB's very existence, defendant's membership, and the AB's character as a gang rather than a mere social club. To

---

[6]"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

litigate the existence and character of an organization without naming it would have been a practical impossibility and might have caused the jury to speculate about why the name was being withheld. Also, voir dire provided an effective means to remove any jurors who might be so prejudicially influenced that they could not fairly try the case.

G. *The Sufficiency of the Pleadings and the Evidence to Support the Conviction for Conspiracy*

Count 12 of the information charged defendant with the crime of conspiracy "at and in the County of Humboldt," and it alleged that defendant committed 13 overt acts in support of the conspiracy. But the information alleged that defendant committed the conspiracy "on or about the months of April to September, 1982," whereas the earliest date on which it alleged defendant committed any overt act was January 15, 1983. ▆▆▆ Defendant contends that the information was fatally defective because it did not allege that defendant committed any overt act during the time of the conspiracy. Alternatively, he argues that there was no substantial evidence at trial that he committed any conspiracy in Humboldt County on the dates alleged in the information. These contentions are unavailing.

Any uncertainty caused by the wording of the information was dispelled by the verdict form, which recited that defendant was charged with a conspiracy "formed between April and September 1982, and ending in March 1983." The verdict of guilty entered on this form is supported by substantial evidence. Michael Thompson testified that the AB leadership decided during the summer of 1982 to kill disloyal AB members or their immediate family, including Richard Barnes; that this assignment was given to defendant; that he was instructed to prepare for the assignment by obtaining weapons in Northern California; and that defendant accepted the assignment. The prosecution introduced other evidence to show that defendant committed various acts in Humboldt County in January and February of 1983 to achieve the objectives of the conspiracy.

By not demurring to the information's conspiracy charge, the defense waived the claim that the conspiracy charge was ambiguous or uncertain. (*People* v. *Thomas* (1986) 41 Cal.3d 837, 843 [226 Cal.Rptr. 107, 718 P.2d 94]; *People* v. *Jackson* (1978) 88 Cal.App.3d 490, 500 [151 Cal.Rptr. 688].) Assuming the information was ambiguous, defendant could not have been misled. The preliminary hearing evidence gave defendant ample notice of the charge against which he was required to defend. (*People* v. *Paul* (1978) 78 Cal.App.3d 32, 43 [144 Cal.Rptr. 431].)

## H. *Juror-challenge Issues*

Defendant disputes various trial court rulings that denied defense challenges for cause, granted prosecution challenges for cause, and excused one sitting juror. He asserts that the rulings denied him these rights under the federal Constitution: the Sixth Amendment right to effective assistance of counsel, the Fifth and Fourteenth Amendment right to due process of law, and the Eighth Amendment right to reliable guilt and penalty determinations in a capital case. We find no error in these rulings.

### 1. *Juror Number Three*

In January 1986, in the midst of the guilt phase of the trial, the prosecutor informed the trial court he had recently learned that Juror Number Three had been "far less than candid" during voir dire. In December 1963, Juror Number Three had begun serving a sentence in the Oregon State Correctional Institution for assault with a dangerous weapon. In 1967, he had been paroled to California, where he was supervised by Dick Wild, a prosecution witness in the current proceeding. In October 1972, the Governor of Oregon had granted Juror Number Three a full pardon. In December 1976, Humboldt County District Attorney John Buffington had charged Juror Number Three by complaint with assault with a deadly weapon (§ 245). Juror Number Three had secured a dismissal of the Humboldt County charge before the preliminary hearing, after which he had filed an action, which the court eventually dismissed in 1983 for failure to prosecute, against District Attorney Buffington and others. Buffington was later appointed to the superior court; he was the trial judge in the current proceeding.

Juror Number Three had revealed none of this information during voir dire, even though all prospective jurors had been asked by questionnaire whether they had been involved in a criminal proceeding as a defendant or witness. Juror Number Three had responded to this question with the statement that he had once been a witness. When asked if he knew any of the prosecution witnesses, Juror Number Three said he knew Dick Wild through an organization called Toastmasters International; he never revealed that Wild had been his parole officer.

The trial court questioned Juror Number Three about the matter. The juror admitted he had been guilty of the Oregon offense, to which he had pleaded guilty, but he said he had relied on a legal interpretation he had received from the State of Oregon stating that a full pardon "totally obliterates" a conviction. He said he "saw no reason" to mention, when asked about his relationship with Wild, that Wild had been his parole officer because it was

"over and done." He said he was not guilty of the Humboldt County offense, and he had not thought it necessary to disclose the charge because it had been dismissed. He admitted that the Humboldt County charge had "ruined a military career" for him, but he denied harboring any grudges against the system. He said he could be fair and impartial to both sides in this case.

The prosecutor moved to disqualify Juror Number Three from the jury. Defense counsel opposed the motion.[7] The trial court excused Juror Number Three and substituted an alternate juror in his place, explaining that by concealing material information about the Oregon offense Juror Number Three had denied the prosecution the opportunity to intelligently exercise its peremptory challenges.

A sitting juror can be removed only for illness or other good cause. (§ 1089.) ■■■ An appellate court reviews a trial court's finding of good cause under the deferential abuse-of-discretion standard. (*People* v. *Abbott* (1956) 47 Cal.2d 362, 371 [303 P.2d 730]; *People* v. *Thomas* (1990) 218 Cal.App.3d 1477, 1484 [267 Cal.Rptr. 865]; *People* v. *Goins* (1981) 118 Cal.App.3d 923, 926 [173 Cal.Rptr. 655].)

■■■ When the trial court discovers during trial that a juror misrepresented or concealed material information on voir dire tending to show bias, the trial court may discharge the juror if, after examination of the juror, the record discloses reasonable grounds for inferring bias as a "demonstrable reality," even though the juror continues to deny bias. (*People* v. *Farris* (1977) 66 Cal.App.3d 376, 386-387 [136 Cal.Rptr. 45]; see also *People* v. *Hecker* (1990) 219 Cal.App.3d 1238, 1244-1245 [268 Cal.Rptr. 884].) Here, the information concealed[8] by Juror Number Three was material. When considered in light of the juror's conduct in concealing it during voir dire, that information established substantial grounds for inferring that Juror

[7]Defense counsel produced a card he had received from the prosecution during the jury selection process. The card was indexed in the name of Juror Number Three, with a post office box address. It said "This guy tried to sue the D.A.'s office." Defense counsel argued that the prosecution could not claim it was harmed by Juror Number Three's lack of candor because the prosecution was alerted to the situation and could easily have discovered Juror Number Three's background. The prosecutor responded that Juror Number Three's questionnaire had indicated an address different from that shown on the card, and that Juror Number Three's answers had led him to conclude that the information on the card referred to another person with the same name.

[8]We reject defendant's contention that Juror Number Three's Oregon pardon gave him a right to withhold all information that would tend to disclose the existence of the conviction. Although the pardon extinguished the conviction, so that Juror Number Three could truthfully answer he had not been convicted of the offense, he could not truthfully claim he had not been a defendant in the Oregon criminal proceeding, that he had never been incarcerated in Oregon, or that he had never served a term of parole.

Number Three was biased against the prosecution, despite his protestations to the contrary. (See *People* v. *Morris* (1991) 53 Cal.3d 152, 183-184 [279 Cal.Rptr. 720, 807 P.2d 949] ["Concealment by a potential juror constitutes implied bias justifying disqualification"].) The trial court did not abuse its discretion in discharging Juror Number Three and seating an alternate in his place.

### 2. *Denial of Defense Challenges for Cause*

Defendant contends the trial court erred in denying defense challenges for cause to 11 prospective jurors. Defendant is precluded from making this contention, however, by the failure to exhaust peremptory challenges.

The defense used peremptory challenges to remove 7 of the 11 jurors he now contends should have been removed for cause. Of the 4 remaining jurors, 2 were selected as regular jurors and 2 as alternates. When the defense accepted the jury, it had 8 peremptory challenges it could have used against the 2 regular jurors it had challenged for cause. When it accepted the alternates, the defense had 2 peremptory challenges it could have used against the 2 alternates it had challenged for cause. Because the defense had sufficient peremptory challenges remaining to remove each of the jurors unsuccessfully challenged for cause, defendant cannot have been prejudiced by the trial court's failure to sustain the challenges for cause. (*People* v. *Morris, supra,* 53 Cal.3d 152, 184; *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 103 [270 Cal.Rptr. 817, 793 P.2d 23]; *People* v. *Coleman* (1988) 46 Cal.3d 749, 770 [251 Cal.Rptr. 83, 759 P.2d 1260].)

Defendant argues that his failure to exhaust peremptory challenges is excused because the trial court used a jury selection system under which counsel knew the order in which prospective jurors would be called into the box. We rejected the same argument in *People* v. *Morris, supra,* 53 Cal.3d 152, reasoning that, regardless of the system used, "a party's failure to exercise available peremptory challenges indicates relative satisfaction with the unchallenged jurors." (At p. 185.)

As another excuse for the failure to exhaust peremptory challenges, defendant points out that the pool of 20 prospective jurors remaining after the jurors and alternates had been accepted included 6 more prospective jurors the defense had unsuccessfully challenged for cause. We reject this excuse for the same reason. Defendant has not shown that exhausting his remaining peremptories would necessarily have resulted in the seating of a juror who ought to have been removed for cause. In this situation, his failure

to exhaust peremptories waived the contention that defense challenges for cause were erroneously overruled.

### 3. *Granting Prosecution Challenges for Cause*

 Defendant contends the trial court erroneously excused two prospective jurors, on prosecution challenges for cause, because of the jurors' death penalty views.

In a capital case, a prospective juror may be excluded if the juror's views on capital punishment would "prevent or substantially impair" the performance of the juror's duties. (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851, 105 S.Ct. 844]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].)

During the voir dire, prospective juror Janet Ohligschlager answered "correct" when asked if her opinion concerning the death penalty was such that she would be unable to vote for it even though the evidence indicated it was a proper punishment. Under questioning by the defense, she said she could try to put aside her personal feelings about the death penalty and consider the evidence presented by both sides. When again questioned by the court, Ohligschlager said she did not think she could conceive of any situation in which she would vote for the death penalty.

Prospective juror Sandy Natt also expressed serious reservations about his ability to return a verdict of death. As he put it, ". . . to take a life, I don't know if I could handle that." Asked whether he would be able to vote for death, he said, "I don't think I could." He also indicated, in response to defense questioning, that he could consider the evidence presented by both sides. Asked by the prosecutor whether he could return a verdict of death, Natt said, "Might be—if he had enough real bad stuff about him, maybe I could. But I don't really think I could."

We find no error in the rulings sustaining the challenges for cause to these prospective jurors. Each juror gave answers showing substantial impairment of the juror's ability to fairly decide the issue of penalty. To the extent the jurors' other answers were conflicting or ambiguous, the trial court's implied determination as to their states of mind is binding upon this court. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 875 [277 Cal.Rptr. 122, 802 P.2d 906].)

### I. *Shackling of Defendant*

On November 21, 1985, shortly after the guilt phase of the trial had begun, the trial court ordered that during all further court proceedings

defendant would be secured to his chair in the courtroom by a single belly chain that would not be visible to the jury. The order followed a two-day hearing out of the jury's presence. Based on the evidence presented at that hearing, the court found that defendant had struck correctional officers at the jail on several occasions, that the frequency of the assaults had "increased dramatically within the last month for some unknown reason," and that this conduct had caused the court to have concern for the safety of court attaches, jurors, and witnesses.

 Defendant contends that the court's findings are not supported by the evidence received at the hearing and that by making the shackling order the trial court abused its discretion. He asserts that the ruling violated these rights under the federal Constitution: the Sixth Amendment rights to present a defense and to confront and cross-examine the witnesses against him, and the Eighth Amendment right to a reliable guilt verdict in this capital case.

 A criminal defendant may be shackled at trial only as a last resort and only upon a showing of manifest need. (*People* v. *Duran* (1976) 16 Cal.3d 282, 290-292 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].) A trial court's decision to require that a defendant be shackled is reviewed on appeal under the deferential abuse-of-discretion standard. (*People* v. *Stankewitz, supra*, 51 Cal.3d 72, 95.) Because the record adequately shows a manifest need to have defendant shackled during courtroom proceedings, we find no abuse of discretion in this case.

On October 26, 1985, about four weeks before the shackling order, two correctional officers went to an exercise and recreation area at the jail to escort defendant to his cell. Officer Silvia was standing near defendant as defendant was dressing. Defendant brought his face close to Silvia's face, blew cigarette smoke in Silvia's face, and flicked cigarette ash on Silvia's pants. Addressing Silvia with a derogatory racial epithet, defendant said Silvia owed him an apology, and he dared Silvia to report the incident. When Silvia said he would report it, defendant struck Silvia on the left side of the jaw.

On Sunday, November 17, 1985, at 9:30 a.m., Officer Silvia told defendant it was time for lock-down. Defendant told Silvia not to speak to him in an angry manner. Defendant said if Silvia met him in an angry manner, defendant would meet Silvia in an angry manner. If Silvia pushed him, defendant would push Silvia. Silvia told defendant he had already had 10 minutes over the allotted hour and said he was asking defendant to lock down. Defendant responded with a sexual taunt.

On November 19, 1985, at 7:45 a.m., Officer St. Denis gave defendant a notice of disciplinary violation relating to the incident that occurred two

days earlier. Shortly after 8 a.m., as he was taking his shower in an area near his cell, defendant called to Officer Wolf, asking him to get Sergeant Gray and Officer St. Denis. Officer Wolf entered the shower area because he was not able to hear defendant clearly from outside. Defendant asked Wolf to remain outside. When Wolf did not immediately comply, defendant rushed at Wolf and either struck him or pushed him out of the shower room. Defendant then called Wolf derogatory names.

About an hour later, correctional officers shackled defendant in the usual manner for transportation to the courtroom. The restraints consisted of handcuffs, belly chain, and leg irons. After walking about 20 yards, defendant turned his back to the wall and complained that one of the leg iron cuffs was too tight. The officers escorting defendant asked him to turn so his side was toward the wall.[9] Defendant refused three times. The officers then moved defendant across the hall so he faced the opposite wall. Defendant resisted, striking at the officers with his elbows and feet and biting one officer on the arm. The officers returned defendant to his cell. About an hour later, when Lieutenant Doane asked him whether he was willing to go to court, defendant responded with profanity and insults.

The evidence thus established that defendant had committed multiple acts and threats of violence against officers at the jail or while being transported to court. The two separate violent incidents on the morning of November 19 were particularly disturbing. The trial court could reasonably infer that defendant was experiencing increasing difficulty in controlling his violent impulses. Under these circumstances, the trial court had grounds for concluding that, unless restrained physically, defendant would resort to violence in the courtroom if he became irritated or frustrated with the proceedings.[10] Correctional officers testified that defendant is very strong, and that he is difficult to handle when violent. The hearing evidence thus established a manifest need for the trial court's order requiring that defendant be restrained in the courtroom by a single concealed belly chain.

## J. Waiver of Presence During Guilt Phase of Trial

After the court made its ruling that defendant would be chained in the courtroom during further proceedings, defendant said he would rather be

[9]As a result of the October 26 incident, Officer St. Denis had established a policy, effective November 12, that officers having contact with defendant should never place themselves in a compromising position. In particular, he directed officers to stand behind defendant when placing, removing, or adjusting defendant's leg irons.

[10]The trial court noted that on November 20, 1985, during the hearing on the need for shackling, defendant asked the prosecutor whether he was a "nasty person." Because defendant had engaged in the same kind of verbal provocation before his October 26 attack on Officer Silvia, and after his November 19 attack on Officer Wolf, this incident provided additional support for the trial court's assessment that unless physically restrained defendant would likely resort to violence in the courtroom.

absent from the trial than appear before the jury in chains. The trial court allowed defendant to leave the courtroom and return to the jail, after informing defendant that his leaving would be construed as a voluntary waiver of presence. After giving the matter further thought, the court directed jail officers to bring defendant back to the courtroom, but defendant refused to dress in civilian clothing for the court appearance. The court then concluded that defendant had effectively waived his presence. The remainder of the guilt phase proceeded in his absence.

We reject defendant's contention that the right of presence during the guilt phase of a capital trial is of such fundamental importance that, as a matter of state or federal constitutional law, it may not be waived. The United States Supreme Court has never held that a defendant cannot waive the constitutional right to be present at critical stages of even a capital trial, and this court has concluded, as a matter of both federal and state constitutional law, that a capital defendant may validly waive presence at critical stages of the trial. (*People* v. *Lang* (1989) 49 Cal.3d 991, 1026 [264 Cal.Rptr. 386, 782 P.2d 627]; *People* v. *Robertson* (1989) 48 Cal.3d 18, 59-62 [255 Cal.Rptr. 631, 767 P.2d 1109]; see also, *People* v. *Sully* (1991) 53 Cal.3d 1195, 1238-1240 [283 Cal.Rptr. 144, 812 P.2d 163].) We find no constitutional infirmity in the trial court's decisions in this case to accept defendant's actions as a voluntary waiver and to proceed with the guilt phase in defendant's absence.

Defendant also argues that the trial court, by holding the trial in defendant's absence, violated section 1043, subdivision (a), which provides that in a felony case the defendant "shall be personally present at the trial." Although section 1043 provides for certain exceptions to the presence requirement, defendant maintains that none applies in this case. The provision that a trial may proceed when a defendant is "voluntarily absent" is inapplicable, he argues, because this exception by its terms applies only in noncapital cases. (§ 1043, subd. (b)(2).) The provision that a defendant may "waive his right to be present in accordance with Section 977" (§ 1043, subd. (d)) is inapplicable, defendant argues, because section 977 by its terms does not permit a defendant accused of a felony to waive personal presence at "those portions of the trial when evidence is taken before the trier of fact." Finally, defendant recognizes that a trial may proceed in the absence of a defendant who has been removed for disruptive behavior (§ 1043, subd. (b)(1)), but he maintains that this did not occur.

The trial court did not violate section 1043. In addition to finding that defendant had voluntarily waived his presence, the trial court found that defendant's conduct "has disrupted and continues to disrupt the procedure of

this Court." The record amply supports this finding. After announcing that he would not appear before the jury in chains, defendant walked out of the courtroom and declined to dress in civilian clothes to be returned to the courtroom. Because defendant had recently assaulted officers during transportation to the courtroom, the trial court could reasonably anticipate that any effort to bring defendant to the courtroom against his will would endanger the safety of the transporting officers and of persons in the courtroom. A trial court need not wait until actual violence or physical disruption occurs within the four walls of the courtroom in order to find a disruption within the meaning of section 1043.

### K. *Presence at Other Hearings*

Defendant contends he was denied his statutory and constitutional right to be present at various hearings that occurred both before and after the events discussed in the preceding section. We conclude that defendant's presence was either validly waived or not required at each of these proceedings.

#### 1. *Voir Dire*

 Defendant was absent from jury voir dire during the morning of July 31, 1985, and again on August 5, 1985. Each time, defendant sent a note to the court explaining his absence and signed a waiver form. On July 31, defendant said in the note that he preferred to use the morning for a doctor's appointment and for court-ordered recreation at the jail. On August 5, defendant said in the note he preferred to use the time for exercise. Although the waiver forms were not executed in open court and did not use the precise language of section 977, they substantially complied with that provision. Accordingly, the waiver was valid under sections 977 and 1043, subdivision (d).

Defendant maintains the waiver was involuntary because recreation and exercise were necessary to his physical and mental health and he could obtain them only by waiving his right to be present in court. We find insufficient support in the record for these factual assertions. The trial court had previously ordered that jail authorities provide defendant with five hours of exercise or recreation each week. If jail authorities interpreted or implemented this order in a manner that unreasonably interfered with defendant's right to be present during critical stages of the trial proceedings, defendant's remedy was to apply to the trial court for a further order. Having failed to exhaust this avenue of relief, defendant cannot claim that his decision to remain absent from a small portion of the jury selection proceedings, a decision in which his counsel concurred, was other than voluntary.

### 2. *Requests to Relieve Defense Counsel*

On February 11, 1986, during the guilt trial and after defendant had waived his presence, defendant sent the court a memorandum purporting to be a motion to relieve Anna Klay, one of the two attorneys representing him. Defendant did not express any dissatisfaction with Klay's performance as his counsel. Rather, defendant sought to discharge her so she could testify to prior inconsistent statements of prosecution witness Clifford Smith without violating the rule that forbids an attorney to be both advocate and witness in the same proceeding (see rule 5-210 (formerly rule 2-111(A)(4)), Rules Prof. Conduct of State Bar; *Comden* v. *Superior Court* (1978) 20 Cal.3d 906 [145 Cal.Rptr. 9, 576 P.2d 971, 5 A.L.R.4th 562]). After an in camera hearing, the trial court deferred ruling on the motion. Ten days later, the trial court again discussed the motion with counsel, and it again declined to rule, finding the motion premature.

On March 6, 1986, the court recited certain events that had occurred off the record. The previous day, Bernard DePaoli, the other attorney representing defendant, had received a card signed by defendant that read, "You're fired." At the court's request, DePaoli attempted to discuss the matter with defendant, but defendant refused. The court then sent defendant a note saying he would have to give the court reasons before the court would discharge DePaoli. Defendant responded with a note that read, in relevant part: "I have no comment. If you . . . now or anytime in the future have need . . . , please feel free to, as you have in the past, set up court on my tier in front of my cell. I will never set foot in your court, jury or not, ever again of my own free will." Having recited these events, the court concluded that because defendant had never made a request to the court to substitute counsel, and because he had declined to state reasons for his apparent dissatisfaction with DePaoli, the court would proceed with the trial.[11]

Throughout this entire period, the trial court advised defendant daily by note that he was welcome to come to court and would be brought to court if he donned civilian clothing and agreed to be shackled in the courtroom. By his conduct and by his written replies, including the note quoted in the preceding paragraph, defendant waived his presence in a manner that substantially complied with section 977.

Moreover, a defendant does not have a right to be present at every hearing held in the course of a trial. "During trial, a defendant is not entitled

---

[11]The next day, the trial court had defendant brought to the courtroom and asked him to state his reasons for wishing to discharge Attorney DePaoli. Defendant said he had come to court against his will because the jail officers threatened to beat him physically if he resisted; he declined to give reasons for wanting to discharge DePaoli. When the court directed that defendant be returned to the jail, defendant said, "The next time you see me, they are going to have to use the force they threatened today if you ever do this to me again."

to be personally present at the court's discussions with counsel occurring outside the jury's presence on questions of law or other matters unless the defendant's presence bears a reasonable and substantial relation to a full opportunity to defend against the charges. [Citation.] A defendant claiming a violation of the right to personal presence at trial bears the burden of demonstrating that personal presence could have substantially benefited the defense. [Citation.]" (*People* v. *Lang, supra,* 49 Cal.3d 991, 1027; see also *People* v. *Medina* (1990) 51 Cal.3d 870, 902-903 [274 Cal.Rptr. 849, 799 P.2d 1282].)

■■■ At the hearings held on February 11 and 21, the court and counsel discussed a variety of legal issues posed by Attorney Klay's apparent knowledge of prior inconsistent statements by a prosecution witness. No evidence was taken and the court made no rulings. Defendant's presence at these hearings could not have assisted his defense. At the hearing on March 6, the court merely recited certain developments that had occurred and concluded these developments did not require any ruling or other action by the court. Because defendant expressly refused to comment on his reasons for wishing to discharge Attorney DePaoli, his presence could not have assisted his defense.

### 3. *Motion for Acquittal and Rulings on Exhibits*

■■■ On March 20 and 24, 1986, the court conducted a hearing outside the jury's presence on a defense motion for acquittal (§ 1118.1) and determined the admissibility of guilt phase exhibits. On June 26, 1986, the court conducted a similar hearing on the admissibility of penalty phase exhibits. Defendant was not personally present at these hearings. Because defendant has not shown that his personal presence at these hearings would have substantially benefited the defense, the trial court did not err in conducting them in his absence. (See *People* v. *Medina, supra,* 51 Cal.3d 870, 902-903; *People* v. *Harris* (1981) 28 Cal.3d 935, 955 [171 Cal.Rptr. 679, 623 P.2d 240].)

### L. *Probable Cause to Arrest*

Defendant brought a motion to suppress evidence (§ 1538.5) in superior court. One of the several grounds defendant urged for suppressing evidence was that it had been seized as a direct result of an illegal arrest. The parties stipulated the court could consider transcripts of testimony previously given in deciding this aspect of the motion. After reviewing the evidence, the court denied the motion to suppress in its entirety. The court concluded, among other things, that the officer who had arrested defendant had possessed

sufficient cause to do so. Defendant challenges this ruling on statutory and constitutional grounds.

Determining whether an officer had cause to arrest requires two analytically distinct steps, each with its own standard of review. First, the court ascertains when the arrest occurred and what the arresting officer then knew; second, the court decides whether the officer's knowledge at the time of arrest constituted adequate cause. On appeal, a reviewing court must accept the trial court's express or implied findings on disputed factual issues in the first step of the inquiry if they are supported by substantial evidence, but a reviewing court must use its independent judgment to review the second step of the inquiry. (*People* v. *Duncan* (1986) 42 Cal.3d 91, 97 [227 Cal.Rptr. 654, 720 P.2d 2]; *People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].)

David Douglas, a City of Eureka police detective, arrested defendant on March 3, 1983, for the armed robbery at the Triplex Theater on February 19, 1983 (hereafter the Triplex robbery). Douglas's knowledge at the time of the arrest determines its legality. Douglas obtained most of his information about the Triplex robbery from fellow Detective Pat Freese.

Freese was assigned to investigate the Triplex robbery on February 21, 1983. On that day, he reviewed the initial investigation report, which included composite drawings prepared by witnesses and a generalized description of the robber as a White male in his 20's, height 6 feet 2 inches, weight about 160 pounds, with blond hair. Freese also reviewed an officer safety bulletin prepared by Richard Walton, a Humboldt County deputy sheriff, about an incident on January 23, 1983.

Walton had been driving a patrol car in McKinleyville about 4:30 p.m. when he noticed a car parked diagonally in the middle of a parking lot. When he returned to the area 30 minutes later, the car was in the same location. Walton parked behind the suspect car. The sole occupant was defendant, who said he had stopped there because the wind was blowing too hard to drive. Walton was not satisfied with this explanation because the wind was only moderate in intensity and he had experienced no difficulty controlling his patrol car. Walton observed a pair of binoculars between the driver's seat and the front passenger seat. Defendant's car was facing a gas station located across the intersection and Walton suspected defendant might be planning to rob it. The bulletin prepared by Officer Walton described defendant as a White male, 35 years old, height 6 feet, weight 170 pounds, with brown hair. Attached to the bulletin were a Department of Corrections photograph of defendant and a copy of defendant's arrest and conviction record.

After reviewing these materials, Detective Freese concluded that defendant was a suspect in the Triplex robbery. He prepared a display card containing defendant's photograph along with those of five other men. He showed the display to six of the Triplex robbery witnesses. Although none of them positively identified anyone, five of the six made remarks to the effect that defendant's face was similar to the robber's and more like the robber's than anyone else portrayed in the photographs.[12]

Before he arrested defendant, Detective Douglas discussed the Triplex robbery with Detective Freese. He looked at the composites prepared by the Triplex robbery witnesses and reviewed the bulletin prepared by Officer Walton, including defendant's arrest and conviction record. He knew defendant was an AB member, had been charged with armed robbery in Humboldt County some years earlier, and had once disarmed and kidnapped two officers in their patrol vehicle. He learned from Detective Freese that several of the Triplex robbery witnesses thought defendant looked very similar to the person who committed that crime. When he arrested defendant, Douglas personally felt that defendant's features matched the composites prepared by the Triplex robbery witnesses.

▇▇ Cause to arrest exists when the facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that the person arrested is guilty of a crime. (*People v. Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632]; see also, § 836, subd. 3.) ▇▇ We conclude that Detective Douglas had adequate cause to arrest defendant.

Although none of the witnesses could positively identify defendant as the robber, the robber had concealed much of his face with dark glasses and a knit watchcap, and the photograph of defendant shown to the witnesses had been taken almost six years earlier. Allowing for the difficulty of making any identification under these conditions, it is significant that all but one of the witnesses remarked that defendant's facial features resembled the robber's and that he was more like the robber than any of the other men shown in the photographs. It is also significant that defendant's height and weight as shown on his driver's license were very close to the estimates given by the robbery witnesses. Although the robber was described as being in his 20's, whereas defendant was 35, witness Marcie Conn thought defendant looked

---

[12]The sixth person did not remark on any of the photographs. The lineup was also shown to another theater employee who had not witnessed the robbery but who had seen a man whose appearance and actions resembled those of the robber. This man had been in the theater one month before the robbery. He had so alarmed the employee that she had summoned the police, but the man had gone when they arrived. This employee remarked that defendant's facial features were similar to those of the man she had seen.

about 25 when she saw him in court in April 1984. Accordingly, it appears that defendant looked more youthful than he was, a fact that would have been apparent to Douglas at the time of arrest.

Defendant had been charged with robbery in the past, had disarmed and kidnapped two officers, and had served time in prison. An experienced officer had formed the opinion that defendant was planning a gas station robbery when observed about four weeks before the Triplex robbery. We conclude that the facts known to Detective Douglas were sufficient to cause a person of ordinary care and prudence to entertain an honest and strong suspicion that defendant was guilty of the Triplex robbery.

### M. *Exclusion of Defense Evidence Offered to Prove That Petry Killed Hickey*

Defendant contends the trial court erred in sustaining prosecution objections to various items of evidence offered by the defense to prove that prosecution witness Berlie Petry killed Elizabeth Hickey, and that the erroneous rulings denied him various rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. As we explain, none of these contentions is well founded.

#### 1. *Petry's Writings*

Before Petry testified, the prosecution made a general objection to all writings prepared by Petry. The trial court deferred ruling. During cross-examination, the trial court permitted defense counsel to question Petry about the documents and to read excerpts for the jury. Eventually, the trial court admitted two of the documents into evidence and excluded the rest. Defendant attacks the ruling on various grounds.

■■■ Defendant argues that parts of some excluded documents were admissible as prior inconsistent statements (Evid. Code, § 1235). In all but one of the instances defendant cites, the trial court permitted defense counsel to question Petry fully about the inconsistent statement and to read it for the jury. ■■■ ■ ■■ ■■■ Having concluded that these portions of the documents were admissible as prior inconsistent statements, the trial court erred in not admitting the relevant parts of the documents themselves.[13] The error was not prejudicial, however. Because the inconsistent statements were

---

[13]During a hearing on exhibits at the end of the guilt phase, the prosecutor remarked that those portions of the documents that the trial court had ruled to be prior inconsistent statements were already part of the record, and that the documents themselves were therefore cumulative. The prosecutor may have confused prior inconsistent statements with past recollection recorded. When a written statement is admissible as past recollection recorded,

read in open court, the jury was fully aware of them. It is not reasonably probable that placing the statements before the jury also in the form of exhibits would have resulted in a verdict more favorable to defendant. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

One inconsistent statement cited by defendant was not read to the jury. Petry said he did not remember that Hickey ever accused him of molesting or abusing her children. Defense counsel was not permitted to read a writing by Petry, apparently intended for Hickey, in which he said, "So mainly what I have gotten in-returned [*sic*] for my personal struggled [*sic*] from day to day for being myself a man is mainly cussed at, ignored, conned, scorned, left with the children then accused of child abuse and with the acusation [*sic*] of being a potential child molester." The trial court concluded that the statement should not be admitted because there was no evidence to establish when it was written.

As defendant correctly observes, this statement was inconsistent with Petry's testimony no matter when it was written and satisfied all requirements for a prior inconsistent statement. Yet the trial court has discretion to exclude impeachment evidence, including a prior inconsistent statement, if it is collateral, cumulative, confusing, or misleading. (*People* v. *Douglas*, *supra*, 50 Cal.3d 468, 509.) Defendant introduced ample evidence that Petry's relationship with Hickey was strained and painful for him, and that Petry's testimony was inaccurate and incomplete in many details. Absent evidence that Petry made the writing in question shortly before Hickey was killed, the trial court could reasonably conclude that its vague reference to accusations of child abuse was collateral and cumulative impeachment evidence. Moreover, even assuming that the trial court should have admitted this portion of the document, defendant was not prejudiced. Nothing in the document suggests that the accusation of child abuse and being a "potential child molester" was particularly upsetting to Petry in the context of the many other grievances he held against Hickey about which the jury was fully informed.

 Next, defendant contends that the trial court should have admitted Petry's writings as evidence of his mental condition. The only writings offered on this basis were two works of fiction, one handwritten and the other typed. They were offered to show that Petry was more intelligent than he appeared. Petry testified that the handwriting was his, but he denied typing any of his stories. The trial court admitted the handwritten document

---

"The writing may be read into evidence, but the writing itself may not be received in evidence unless offered by an adverse party." (Evid. Code, § 1237, subd. (b).) There is no similar limitation on admission of documents containing inconsistent statements.

and excluded the typewritten one. Exclusion of the typewritten document was correct because the defense did not authenticate it as a document written by Petry. (Evid. Code, § 1401.) Had the defense authenticated it, moreover, the trial court could properly have excluded it as cumulative.

Finally, defendant argues that all the writings should have been admitted because Petry's claimed inability to recall having written them was so inherently incredible as to undermine his general credibility as a witness. The argument, as we understand it, is that the writings displayed such intense emotion and morbid preoccupation that it would be impossible, in the space of a few years, to forget having written them. We are unpersuaded. Although the human mind often retains vivid memories of intense experiences, it may also block out memories of experiences that are painful. For this reason, Petry's credibility in this as in other matters was for the jury to determine. The trial court admitted enough of the writings to permit the jury to make this determination. For this purpose, the excluded writings were cumulative.

### 2. The Interview Tapes

The police interviewed Petry on the day he discovered Hickey's body and again a few days later. These interviews were recorded on tape and transcripts were prepared. During cross-examination of Petry at the trial, the defense asked the court to make a finding that Petry was being untruthful when he testified he did not remember many details about his relationship with Hickey. A finding to this effect would have permitted the defense to use the interview tapes as prior inconsistent statements whenever Petry claimed lack of memory of a fact he had related during the interviews, rather than only in those instances when he testified to facts inconsistent with his interview statements. (See *People* v. *Green* (1971) 3 Cal.3d 981, 988 [92 Cal.Rptr. 494, 479 P.2d 988].) ■■■ After reviewing the tapes and transcripts, and comparing them to defendant's testimony at trial, the trial court found that Petry's inability to recall was not feigned but genuine. Defendant challenges this finding.

■■■ When the admissibility of evidence depends upon determinations of fact, the trial court's findings, and in particular its credibility determinations, are reviewed under the substantial evidence standard. (See *People* v. *Leyba*, *supra*, 29 Cal.3d 591, 596.) ■■■ Here, substantial evidence supports the trial court's determination that Petry was truthful when he testified he could not remember many facts about his relationship with Hickey. As the trial court remarked, Petry's lack of memory was neither total nor suspiciously selective, and his testimony in general outline was consistent with the

interview tapes and with his testimony at the two preliminary hearings. Although his lack of memory of so many facts was unusual, the trial court attributed this to Petry's limited intellect and the emotional trauma he suffered as a result of Hickey's brutal murder. We perceive no basis to disturb the trial court's finding.

Eventually, near the end of the guilt phase, the trial court ruled that copies of the interview tapes, edited to remove references to polygraphs, would be received in evidence. The tapes were not played for the jury on the record, although portions of them were played by counsel during argument to the jury. When the jury requested the tapes during its deliberations, the court sent the tapes and a tape player into the jury room. ■■ Defendant contends the trial court erred in not playing the entire tapes on the record and in not notifying counsel of the jury's request for the tapes.

Under the facts presented here, the court was not required to have the tapes played on the record. During the cross-examination of Petry, defense counsel requested that the entire tapes be received in evidence and played for the jury, but the trial court properly denied this request because the defense had not then established that the entire tapes, as opposed to particular inconsistent statements, were admissible. At a later point, for reasons not clear from the record, the trial court placed edited copies of the tapes in evidence as court's exhibits. The record does not show that either party requested the playing of the tapes after they were received in evidence. Absent such a request, we infer that the procedure adopted was acceptable to the parties.

■■ When a jury during deliberations requests an exhibit, the trial court must notify counsel of the request before giving the exhibit to the jury, because the request "is a critical stage of the prosecution during which the right to counsel applies." (*People* v. *Hogan* (1982) 31 Cal.3d 815, 849 [183 Cal.Rptr. 817, 647 P.2d 93]; see § 1138.) Although the record does not show that the trial court advised defense counsel before sending the interview tapes to the jury, the record does show that the next day, in response to a jury request to hear testimony about where in the Hickey residence a rifle barrel had been found, the court told the jury in open court, with counsel present, that this matter was mentioned in one of the interview tapes "on the second side near the beginning." Counsel was therefore made aware by the next day at the latest that the jury had been given the interview tapes. Because counsel did not object to the court's failure to provide earlier notice or to the manner in which the court responded to the jury's request, we conclude that the defense waived the trial court's apparent error in failing to notify counsel before sending the interview tapes to the jury. (See *People* v. *Chagolla* (1983) 144 Cal.App.3d 422, 432-433 [193 Cal.Rptr. 711].)

### 3. *The Preliminary Examination Transcripts*

Defendant contends that if, as the trial court ruled, Petry's lapses of memory were genuine, the trial court should have ruled that he was unavailable as a witness and that the transcripts of Petry's preliminary hearing testimony were therefore admissible under the hearsay exception for prior testimony (Evid. Code, § 1292). This theory of admissibility was never urged at trial, and even if we assume that a total lack of memory could make a witness unavailable within the meaning of the Evidence Code (see Evid. Code, § 240), Petry's lack of recall was far from total. As the trial court remarked, Petry "has consistently cooperated in telling and retelling the same basic story." Although his memory of certain details was weak, he recalled far too much to justify a finding that he was unavailable as a witness.

### 4. *Testimony of Dr. Blinder*

During presentation of its case, the defense moved to admit the expert testimony of Dr. Martin Blinder, a forensic psychiatrist, that the killing of Hickey appeared to be a "classic crime of passion" committed by a person with a close emotional attachment to the victim. Dr. Blinder testified outside the jury's presence as an offer of proof. The court said that although defendant was entitled to have Dr. Blinder explain for the jury the domestic homicide syndrome, permitting him to relate the syndrome to the facts of the case could lead to the disclosure of otherwise inadmissible hearsay materials that Dr. Blinder had considered in forming his opinions. The court concluded that Dr. Blinder could be questioned about any evidence that was before the jury, but nothing else. The court then asked defense counsel whether this material could be presented to Dr. Blinder in the form of hypothetical questions. Defense counsel accepted this suggestion.

In his testimony to the jury, Dr. Blinder defined domestic homicide as the killing of one with whom the killer has an intimate relationship. He had studied 254 such killings. He found that in these cases the killer and victim "are locked into a special kind of love relationship" characterized by passion, anger, and masochistic dependency. A homicide was more likely to occur if an angry person was unable to feel or express anger comfortably. The victims of domestic homicide frequently rebel at the other person's controlling behavior and seek to bolster their low self-esteem by activities with persons outside the relationship. In response to hypothetical questions, Dr. Blinder testified that the following circumstances would be consistent with a domestic homicide: before the homicide, the killer had hit the victim but had denied doing so and had written passionately about his feelings for

the victim; during the homicide, the killer inflicted extensive trauma on the victim's face and inflicted puncture wounds near the victim's breasts. Defense counsel requested permission to question Dr. Blinder about two of Petry's writings that had been received in evidence, but the court denied permission, stating "I've tried to keep away from the psychoanalysis or psychiatric diagnosis of all these people specifically in this case."

Defendant contends the trial court erred both in the earlier ruling precluding mention of hearsay materials that had not been received in evidence and in the later ruling precluding questioning about two of Petry's writings that had been received in evidence, and that the errors deprived him of his Sixth Amendment right to present a defense and his Fifth and Fourteenth Amendment due process right to a fair trial. We find no error.

On direct examination, an expert may give the reasons for an opinion, including the materials the expert considered in forming the opinion, but an expert may not under the guise of stating reasons for an opinion bring before the jury incompetent hearsay evidence. (*People* v. *Coleman* (1985) 38 Cal.3d 69, 92 [695 P.2d 189].) A trial court has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay. (*Ibid.*) Here, the restrictions imposed on counsel's examination by the trial court's rulings, which permitted the main features of the case to be presented in the form of hypothetical questions, were reasonable and within the court's discretion.

### 5. *State of Mind Evidence*

During direct examination of defense witness Zelna Hunsinger, the prosecution objected to a question asking whether Hickey had ever told the witness she was afraid of Petry. The court held a hearing outside the jury's presence, during which it said that the proposed testimony was hearsay, and although it would show Hickey's state of mind, her state of mind was not at issue. The prosecution argued that the defense was being inconsistent because it had successfully objected to evidence that Hickey had said she was afraid of a man named "Curt." Defense counsel then withdrew the question, noting it would open the door to the previously excluded prosecution evidence. The court said it had made no ruling and was willing to consider any authority the defense offered on the issue.

The matter was again raised when the defense called Kenneth L. Barney, a psychotherapist who had seen Hickey on three occasions about nine months before her death. Once again the court held a hearing outside the jury's presence, after which the court ruled that it would not permit the

defense to introduce evidence of Hickey's statements to Barney expressing fear of Petry to prove that Petry rather than defendant had killed her. The court said that the defense was offering the evidence to prove Hickey's state of mind, but that Hickey's state of mind was not at issue in the case. Defendant now challenges this ruling.

Defendant argues that evidence of Hickey's fear of Petry was admissible to prove or explain her conduct in giving defendant her guns to sell on consignment. Because she was afraid of Petry, defendant argues, Hickey could leave him only if she could move far away to establish a new life. According to defendant, Hickey's urgent need for money to relocate herself and her children explains why she would entrust her guns to defendant, a relative stranger, for sale on consignment.[14] Defendant acknowledges that the defense never urged this theory in the court below (see Evid. Code, § 354 [verdict shall not be set aside for erroneous exclusion of evidence unless purpose and relevance of evidence was made known to the court]), but he argues that in a capital case technical insufficiencies in objections or offers of proof should be disregarded (see *People v. Frank* (1985) 38 Cal.3d 711, 729, fn. 3 [700 P.2d 415]),[15] and that counsel's failure to argue this theory deprived defendant of his Sixth Amendment right to the effective assistance of counsel.

Assuming for argument's sake that the issue has been preserved for appeal, the theory defendant now argues does not provide a valid basis for admitting the evidence under the state-of-mind exception to the hearsay rule (Evid. Code, § 1250). To be relevant and therefore admissible, evidence must tend to prove or disprove a "disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Here, the prosecution did not dispute that Hickey made or attempted to make some sort of business arrangement with defendant for the sale of her guns. Indeed, the prosecution introduced in evidence a note apparently written by Hickey stating "Call Curt . . . about money for guns." The prosecution theorized that defendant, despite what he may have promised Hickey, never intended to pay for the guns and killed Hickey to prevent her from protesting the lack of payment or testifying to defendant's possession of the guns. Because Hickey's attempted sale of her guns to defendant was not a disputed fact, the trial court could properly exclude as irrelevant any evidence offered to prove that Hickey had a reason to give her guns to defendant for consignment sale.

---

[14]Defendant fails to explain why Hickey could not more easily have obtained cash for the guns by taking them to a pawn shop or gun dealer.

[15]We question whether a complete failure to articulate a theory of admissibility can be excused as a "technical insufficiency." (See *People v. Carrera* (1989) 49 Cal.3d 291, 324-325 [777 P.2d 121].)

### 6. *Videotape of Hickey Children's Bedroom*

On the morning that Hickey's body was discovered, the police made a videotape showing the condition of the Hickey residence. The last portion of the tape showed the bedroom occupied by Hickey's two young children. The children were not present. The bedroom contained dilapidated mattresses and bedding. The mattresses were soaked with urine; fecal matter was smeared on the walls.

The prosecution brought a motion *in limine* to exclude the portion of the tape showing the children's bedroom. The defense argued in response that the motion was premature because the prosecution had failed to show that any portion of the videotape was admissible, but it also argued that if the court did admit any of the videotape, it should admit the portion showing the children's bedroom. The court declined to rule on the motion, saying it did not know whether the tape would be received in evidence. The court remarked that the tape would probably be admissible insofar as it showed the condition of the crime scene when the body was discovered, but that it did not see any relevance in the portion of the tape showing the children's bedroom. The court advised the parties not to mention the tape during voir dire.

Some days later, the prosecutors indicated their intention to use the videotape, edited to delete the children's bedroom, during opening statement. The defense argued that the entire tape should come into evidence. The trial court granted the prosecution's request to use the edited tape during opening statement, but it emphasized that it was not precluding the defense from establishing at a later time a basis for admission of the excluded portion of the tape.

Contrary to what defendant now argues, the court did not err in excluding the portion of the tape showing the children's bedroom. The prosecution used the videotape to show the place where Hickey was murdered and the guns were stolen. Because no part of these crimes was committed in the children's bedroom, the prosecution could reasonably omit that portion of the tape. Defendant now argues that the evidence was relevant "to dispute Petry's claim of a happy household and a loving family relationship." But Petry had not testified when the court ruled, the ruling was expressly made without prejudice, and the defense never raised the issue again. Defendant's present description of the evidence as "crucial to the defense" is an exaggeration. During the course of the trial, the defense amply established, and the prosecution effectively conceded, that the relationship between Petry and Hickey was marked by deep conflicts and unhappiness on

both sides. Defense counsel could reasonably conclude that it had sufficiently established this point and that further evidence, including the videotape showing the deplorable condition of the children's bedroom, was unnecessary.

### 7. Polygraph Evidence

Three days after the death of Elizabeth Hickey, the police gave Berlie Petry a polygraph examination. The officer who gave the examination concluded that Petry was deceptive in his responses to several questions, including a negative response to a question asking if he had killed Hickey. An investigator for the district attorney gave Petry another polygraph examination a few weeks later, with similar results.

At trial, the defense moved to admit the results of these examinations. The trial court denied the motion, relying on Evidence Code sections 351.1 (making polygraph test results inadmissible absent a stipulation for admission) and 352 (giving the trial court discretion to exclude evidence when its probative value is outweighed by the risk of undue prejudice). Because the defense did not offer to prove that the polygraph had been accepted in the scientific community as a reliable technique,[16] the ruling excluding the evidence was correct. (*People* v. *Morris, supra*, 53 Cal.3d 152, 193.)

Citing *United States* v. *Hart* (E.D.N.Y. 1971) 344 F.Supp. 522, defendant contends that proof of reliability is unnecessary when the defense seeks to use the results of a prosecution-administered polygraph examination to impeach the testimony of a prosecution witness. The *Hart* court reasoned that because the prosecution has a duty to disclose any evidence that may tend to exculpate a defendant (*Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]), the government should be required to convince the jury that the test it used to evaluate the witness's credibility was not significant. We agree with another federal court's observation that this reasoning requires an "incorrect logical leap." (*U.S.* v. *MacEntee* (E.D.Pa. 1989) 713 F.Supp. 829, 831.) Although the prosecution has a duty to inform

---

[16]During argument in the trial court, defense counsel said, "There should be a hearing to decide the reliability of it, the reliability of the people who were giving it, the circumstances under which it was conducted and the purposes for which it was to be considered to be used." Defendant construes this statement as a request for a hearing to determine the reliability of the polygraph technique used in Petry's examination. In context, however, the statement apparently referred to the state of the law when Evidence Code section 351.1 was enacted, not what counsel intended to prove in this case. Were it to be construed as an offer of proof, moreover, the statement would be inadequate because it failed to indicate that reliability would be shown according to the required standard of acceptance in the scientific community.

the defense of polygraph results that cast doubt on the credibility of a prosecution witness, the existence of this duty does not make the results admissible.

Finally, we reject defendant's contention that excluding evidence of the polygraph test results denied him his due process right to a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution. A party has no due process right to present evidence of test results if the tests used scientific techniques not generally accepted as reliable in the scientific community.

## N. *Exclusion of Other Defense Evidence*

Defendant contends that the trial court erred in excluding various items of defense evidence, and that these rulings excluding evidence denied him various rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

### 1. *Defense Expert on Prison Gangs*

At trial, the defense proposed to call Dr. Richard Korn, a social psychologist and criminologist, as an expert witness on prison gangs in general and the AB in particular. Dr. Korn testified out of the jury's presence as an offer of proof. He said the AB was the least organized of the prison gangs, that its members would not take orders and were not parliamentary, and that it had no acknowledged leaders. He said that he had reviewed the testimony of Thompson and Smith about the AB's structure and procedures and that he agreed with some parts of that testimony and disagreed with other parts. He agreed that in 1982 an attempt was made to change a relatively unstructured, inefficient organization into a criminal organization modeled on the Mafia, but he did not believe that the attempt succeeded to the extent that a vote by inmates in institutions far removed from each other was taken and tallied within a matter of weeks to determine who would be on the AB's leadership council. His opinion about the AB's structure, or lack of it, was based on interviews with self-identified AB members and former members. He would not reveal the names of these persons without their permission, and he had not obtained that permission.

The court declined to admit the testimony. It explained that Dr. Korn's opinions were not based on matters perceived or personally known to him, but that they were based instead largely on conversations with self-identified AB members whose identities Dr. Korn was unwilling to disclose, thereby substantially impairing the prosecution's ability to effectively cross-examine

him. The court also questioned whether there was "any degree of scientific reliability" to the testimony.

██ Defendant contends that the court erred in excluding this expert testimony and that the error deprived him of his Fifth, Sixth, and Fourteenth Amendment rights to present a defense and to a fair trial in accordance with due process of law.

The ruling was not error. Courts have given parties wide latitude in the cross-examination of experts to test their credibility. (*People* v. *Coleman*, *supra*, 38 Cal.3d 69, 92.) If a witness frustrates cross-examination by declining to answer some or all of the questions, the court may strike all or part of the witness's testimony. (*People* v. *Daggett* (1990) 225 Cal.App.3d 751, 760 [275 Cal.Rptr. 287].) From this rule it follows logically that if, as here, the court determines in advance that the witness will refuse to answer such questions, the court may decline to admit the testimony in the first instance. Accordingly, the trial court did not exceed its discretion when it concluded that Dr. Korn's unwillingness to reveal the names of the persons whose statements formed the basis of the opinions he proposed to give on direct examination would impair effective cross-examination to such an extent that the testimony should not be admitted.

2. *Jury View*

Prosecution witness Tina Ransbottom testified that she had been living across the street from Hickey's residence when Hickey was killed. During the two weeks before the killing, the witness saw a brown car parked nearby on about five occasions. On one of these occasions, she saw Hickey get out of the brown car and enter her apartment with a man. Another time she saw Hickey enter her apartment with the same man. The witness made all these observations between midnight and 2 a.m. She made some of them from the street as she was walking to her residence; others she made from a window of the residence. During the trial, Ransbottom was shown a photo lineup; she selected defendant's photograph and identified him as the man she had seen with Hickey.

The defense requested a jury view, between the hours of midnight and 1 a.m., of the scene where Ransbottom testified she had seen defendant with Hickey. (See § 1119.) The trial court denied the request. It stated that there was insufficient evidence of the conditions under which Ransbottom made the observations and of any changes that may have occurred since that time. ██ Defendant contends that the denial of the jury view request was an abuse of discretion and that it violated his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial, to present a defense, and to meaningfully confront the witnesses against him.

The standard of review for a trial court's decision to grant or deny a request for a jury view is abuse of discretion. (*People* v. *Keltie* (1983) 148 Cal.App.3d 773, 782 [196 Cal.Rptr. 243].) When the purpose of the view is to test the veracity of a witness's testimony about observations the witness made, the trial court may properly consider whether the conditions for the jury view will be substantially the same as those under which the witness made the observations, whether there are other means of testing the veracity of the witness's testimony, and practical difficulties in conducting a jury view. (*Ibid.*; *People* v. *Mooring* (1982) 129 Cal.App.3d 453, 460 [181 Cal.Rptr. 71].)

Although Ransbottom described in general terms the lighting at the scene and the position of the people she observed, her testimony was far from exact on these points and she was not asked about subsequent changes. Moreover, her testimony could have been tested by other means, such as by having an impartial observer view the scene at night and then testify about the ease or difficulty of making an identification under those conditions. Finally, of course, the court could properly consider the substantial inconvenience of conducting a jury view at the hour requested. We find no abuse of discretion in the court's denial of the request for a jury view.

### 3. *Inducements to Prosecution Witness*

Prosecution witness Clifford Smith testified that the prosecution had promised to protect his family if he testified against defendant. During cross-examination, defense counsel asked which family members the promise covered, whether it meant that they would be relocated to another part of the state, and whether the prosecution had paid to move any member of the witness's family. The prosecution objected to each of these questions for lack of relevance, and the trial court sustained each objection. Defendant contends that the rulings were erroneous and that they denied him his state and federal constitutional rights to confront the witnesses against him.

The rulings were erroneous. In determining the credibility of a witness, the jury may consider, among other things, "[t]he existence or nonexistence of a bias, interest, or other motive" for giving the testimony. (Evid. Code, § 780, subd. (f).) In a criminal case, therefore, the defense is entitled to explore the nature of any promises the prosecution has made or inducements it has offered to its witnesses. (*People* v. *Duran, supra*, 16 Cal.3d 282, 294.) Although trial courts retain wide latitude to impose reasonable limits on defense inquiry into the potential bias of a prosecution witness (*Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 679 [89 L.Ed.2d 674, 683, 106 S.Ct. 1431]), the trial court here erred in precluding *all* inquiry into the nature and

extent of the promised protection, particularly when the only objection made was on grounds of relevance.

But defendant was not prejudiced by the erroneous rulings. First, the jury was informed that the promise of protection was made, and Smith eventually testified that his mother had been relocated. Thus, the most essential facts were revealed. Second, the evidence had only slight value for impeachment because it is unlikely that a witness would testify falsely to obtain protection for family members when the protection is needed only because of the testimony. A promise is unlikely to be a significant inducement if its primary effect is to eliminate a negative consequence of the testimony rather than to provide a positive benefit. Here, it appears that the danger to the witness's family, against which the prosecution promised protection, was largely or even entirely a result of the witness's agreement to cooperate. Third, the defense presented evidence of other and stronger inducements. Smith testified that in exchange for his testimony he was promised immunity from prosecution for any offense related to the Barnes killing. Smith said he was then serving a sentence of 25 years to life, with his first parole hearing scheduled for 2007. Smith's mother was seriously ill with emphysema. She told Smith that she had talked to a law enforcement agent who said that AB members faced future prosecutions and that cooperating with law enforcement would provide him with his only chance to be released before she died. Smith testified that before he decided to cooperate with the prosecution, he had believed he would die within seven years, either as a result of conviction and execution for a capital crime or as a result of prison violence. Because of his decision to cooperate, Smith believed he now had "something to look forward to." Given these more substantial benefits flowing from the promise of immunity, evidence of the cost and the extent of the protection provided to the witness's family would have had only slight value for impeachment. Accordingly, we are persuaded beyond a reasonable doubt that the error was harmless. (*Delaware* v. *Van Arsdall, supra,* 475 U.S. 673, 684 [89 L.Ed.2d 674, 686-687].)

### 4. *Prior Testimony of Steven Barnes*

Outside the jury's presence, the defense informed the court that it intended to present evidence that Steven Barnes, the son of murder victim Richard Barnes, had testified in a previous case that he was not an AB member. The prosecution raised a hearsay objection, which the trial court sustained. ▄ Defendant contends that the ruling was error because the evidence was admissible under the hearsay exception for prior testimony (Evid. Code, § 1291), and that the error denied him his rights under the Fifth, Sixth and Fourteenth Amendments to a fair trial and to present a defense.

The proponent of evidence offered under the prior testimony exception to the hearsay rule has the burden of showing that the declarant is unavailable to testify in the current proceeding, and this showing must be made by competent evidence. (*People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73].) Unavailability may be established by evidence that the declarant is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) This court has not decided the standard of review for a trial court's determination on the issue of reasonable diligence (see *People* v. *Hovey* (1988) 44 Cal.3d 543, 563 [244 Cal.Rptr. 121, 749 P.2d 776]), and the Courts of Appeal are divided on this issue (see *People* v. *Robinson* (1991) 226 Cal.App.3d 1581, 1585 [277 Cal.Rptr. 504], and cases cited).

We need not determine the standard of review in this case because the defense did not present any competent evidence of due diligence, nor did it make an offer of proof. In seeking admission of the prior testimony, and in responding to the prosecution's hearsay objection, defendant's counsel did not cite the hearsay exception for prior testimony, nor did they claim they had exercised due diligence to procure Barnes's attendance at the trial. One of defendant's attorneys said, "I don't have the time to get Mr. Barnes here." The other defense attorney added, "We don't know where he is. The prosecution will not reveal that." Defendant argues that the latter statement is a sufficient showing of due diligence because it was obvious that the declarant could be located only with the assistance of the prosecution. We disagree. The record does not show that Steven Barnes was then in hiding, that he could not have been located by conventional search methods, or that the prosecution knew or should have known where Steven Barnes was then living or how he could be contacted. Defense counsel's unelaborated statements do not establish due diligence.

## O. *Admission of Prosecution Evidence*

Defendant contends that the trial court erred in various rulings admitting prosecution evidence, and he again makes boilerplate assertions that the rulings deprived him of various rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

### 1. *Defendant's October 1982 Detention*

Prosecution witness Janet Myers testified on cross-examination that defendant, after his release from prison, worked with Joseph O'Rourke in a

building maintenance and janitorial business located in the Lakewood area of Southern California. Other prosecution evidence identified Joseph O'Rourke as an AB member who sat on its governing council. Asked how long the business association continued, Myers said defendant worked in the business until O'Rourke was arrested, but she was unable to recall the date of his arrest.

Over defense objections on grounds of relevance and Evidence Code section 352, Sergeant Barnett of the Los Angeles County Sheriff's Department later testified that O'Rourke was arrested on October 12, 1982, and that on the evening of the arrest he went to O'Rourke's residence to conduct a parole search and was present when two uniformed deputies found defendant "in the back yard of the residence up near a wall amongst the bushes." Defendant, who told the officers he was waiting for O'Rourke, was allowed to leave after a brief detention. The court admonished the jury that this testimony was admitted solely to determine the credibility of other witnesses and that it was not to consider the testimony as evidence of defendant's guilt.

Barnett's testimony corroborated Janet Myers's testimony that defendant was in contact with O'Rourke after defendant's release from prison and before O'Rourke's arrest, and Barnett's testimony clarified Myers's testimony by fixing the date of O'Rourke's arrest. Because the defense itself elicited essentially the same evidence from Myers, defendant cannot complain that evidence of defendant's association with O'Rourke at the time of O'Rourke's arrest was irrelevant or unduly prejudicial. Moreover, the jury was instructed that it was not to consider the testimony as independent evidence of defendant's guilt, but only to determine the credibility of other witnesses. Under the circumstances, there was neither error nor prejudice.

### 2. *Deputy Walton's Questioning of Defendant*

The defense requested a protective order to preclude the prosecution from calling Richard Walton, a deputy sheriff for Humboldt County, to testify to his encounter with defendant on January 23, 1983. The defense argued that the evidence was irrelevant and unduly prejudicial (Evid. Code, § 352), and that it amounted to inadmissible evidence of general criminal character or propensity (*id.*, § 1101). After hearing Officer Walton's testimony out of the jury's presence, the trial court ruled that Deputy Walton could testify to his observations and could mention defendant's statement explaining why he had stopped, but that he was not to give his opinion that defendant was casing robbery targets, nor was he to name the businesses in the area or indicate the distance from defendant's vehicle to those businesses.

Officer Walton then testified before the jury that on January 23, 1983, he was on patrol duty in McKinleyville at 4:30 p.m. when he observed a brown

automobile with one occupant in the parking lot of a vacant building at the edge of a business district. The car was in the same place 30 minutes later, so Officer Walton pulled behind it and contacted the occupant, who produced a driver's license identifying him as defendant, with a Eureka address. Defendant said he was waiting because the wind was blowing too hard for him to drive. Deputy Walton had encountered no difficulty with wind resistance. There was a pair of binoculars on the front seat of defendant's car. The prosecution introduced photographs of the area showing that from the location where the brown car was parked defendant could conveniently watch a gas station and a mini-mart.

Later during the trial, over defense objection, Detective Pat Freese of the Eureka Police Department testified that he discussed this incident with defendant after defendant's arrest and that defendant said he had been watching the hillside with the binoculars when Deputy Walton contacted him. Based on this testimony by Officer Walton and Detective Freese, the trial court instructed the jury in the language of CALJIC No. 2.03 (4th ed. 1979; all references to CALJIC instructions are to this edition unless otherwise stated) that it could consider false statements by defendant as a circumstance tending to prove consciousness of guilt, and the prosecutor argued to the jury that it was "conceivable" that defendant was "checking out those two business establishments because he was thinking about another robbery."

On appeal, defendant does not contend that the evidence of Officer Walton's encounter with defendant was completely lacking in relevance. He concedes that the prosecution could use the evidence at least to establish defendant's presence in Humboldt County close to the dates on which certain charged offenses were committed. ▉ He does contend, however, that the evidence was not admissible to show that defendant was casing robbery targets, that the trial court should have excluded those portions of the testimony having no relevance other than to establish casing, that the trial court should not have permitted the prosecutors to argue to the jury that the evidence showed casing, and that the jurors should not have been permitted to infer that the statements defendant made to Deputy Walton and Detective Freese supported a finding of consciousness of guilt.

One of the charges against defendant was conspiracy. Prosecution witnesses testified that, as part of the conspiracy, AB leaders instructed defendant to go to the northern part of the state to gather weapons and money, and that they authorized him to commit robberies if necessary to accomplish these tasks. Accordingly, evidence that defendant was casing robbery targets during the time the conspiracy was alleged to have existed was relevant to

prove that defendant was following the instructions the AB leaders had given him, and thus to prove the conspiracy charge. Evidence that defendant gave Deputy Walton an implausible explanation for his presence, and that he gave Detective Freese a different and arguably inconsistent explanation, was admissible to prove defendant's consciousness of guilt—that is, that defendant was casing robbery targets as a part of a criminal conspiracy. Therefore, we reject defendant's claims of error.

### 3. *Defendant's Admission of AB Membership*

During the trial, the defense moved to bar the prosecution from introducing evidence of defendant's 1981 testimony, in another case, admitting he was an AB member. The defense argued that the evidence was unduly prejudicial (Evid. Code, § 352), and that it constituted inadmissible evidence of bad character and criminal propensity (*id.*, § 1101). The trial court denied the motion, and the prosecutor presented the evidence to the jury by reading from the transcript of defendant's prior testimony. The prosecutor told the jury that defendant gave the testimony on January 21, 1981, but he did not describe the earlier proceeding, except to say that it "took place in the Superior Court of a sister county" and that the questioner was "David Mayer, a San Francisco attorney."

Defendant contends the court erred in rejecting the defense challenge to the evidence. He argues that the evidence carried a strong risk of undue prejudice because the jury would have speculated that the prior proceeding in which he admitted AB membership must have been a criminal prosecution resulting from AB activities. He further argues that the court erred in preventing the defense from showing the context in which he made the admission, and that the probative value of the evidence was weak because he made the admission more than two years before the robberies and murders charged in this case and there was ample other evidence that defendant was an AB member.

Defendant's arguments are unpersuasive. We do not agree that the jury would engage in improper speculation as to the nature of the prior proceeding. Nor do we find any basis in the record for the assertion that the trial court prevented the defense from showing the context in which the admission was made. To avoid unnecessary prejudice to defendant, the trial court did not permit the prosecutor to read as much of the transcript as he wished to read, but the trial court made no ruling restricting use of the transcript by the defense, nor did it make any ruling excluding any other evidence offered by the defense to provide context to defendant's prior admission of AB membership. Finally, the evidence had significant probative value. Defendant's own admission was stronger evidence than any of the other forms of

evidence (primarily the testimony of Smith and Thompson) that the prosecution presented to prove defendant's AB membership. The admission occurred less than two years before the date on which, according to the prosecution, defendant accepted the assignment to kill Richard Barnes for the AB. This can hardly be regarded as remote in time, particularly in light of the testimony of Smith and Thompson that allegiance to the AB was not something lightly made or lightly abandoned.

### 4. *Clifford Smith Polygraph*

During cross-examination, prosecution witness Clifford Smith said he was removed from prison and taken to a substation in Los Angeles County immediately after he told prison authorities he would provide information about the AB. Defense counsel then asked whether Smith had stayed there for debriefing. Smith replied: "That's where I done the whole thing. I talked to Tulleners, I talked to Barnett, I took lie detector tests, I talked to the SSU, talked to the Department of Justice." Defense counsel did not move to strike the nonresponsive reference to polygraphs and continued with cross-examination. After the next recess, however, the defense moved for a mistrial on the ground that Smith's reference to having taken polygraphs had seriously prejudiced the defense case by giving Smith's testimony a false aura of credibility. ▇ The trial court denied the motion for mistrial but strongly admonished the jurors to disregard Smith's mention of polygraphs because polygraph results are both scientifically unreliable and legally inadmissible in evidence. Defendant now contends the trial court erred in denying the mistrial motion.

A trial court's ruling denying a motion for mistrial is reviewed under the deferential abuse-of-discretion standard. (*People* v. *McLain* (1988) 46 Cal.3d 97, 113 [249 Cal.Rptr. 630, 757 P.2d 569].) Applying that standard, we find no abuse of discretion. The mention of polygraphs in Smith's testimony was brief and nonresponsive. He did not state what questions he was asked or what the examiner concluded about his truthfulness. The admonition the court gave was thorough and forceful; it was sufficient to prevent any prejudice to defendant.

### 5. *Lack of Testing of Defendant's Blood Type*

During the redirect examination of prosecution witness John Boyd, a criminalist employed by the California Department of Justice, the prosecutor asked Boyd whether he had ever received a sample of defendant's blood. Defendant raised a relevance objection, which the court considered out of the jury's presence. Defense counsel argued to the court that defendant's

blood type was irrelevant because all the blood found at the Hickey murder scene was consistent with Hickey's blood type. The court observed that defense counsel in open court had previously refused to provide a sample of defendant's blood without a warrant, and that the jury could infer consciousness of guilt from this refusal. The court's only ruling, however, was that the witness would be allowed to say whether or not he had received a sample of defendant's blood. The prosecutor then asked whether the witness had ever received a specimen of blood from defendant, and the witness said he had not.

 We agree with defendant that the challenged evidence lacked relevance. Because analysis of evidence taken from the scene of the Hickey killing did not reveal the presence of any blood inconsistent with the victim's blood type, evidence of defendant's blood type could not have tended to incriminate or exonerate him. The lack of such evidence was likewise meaningless on the ultimate issue of guilt or innocence. We need not determine whether evidence of defense counsel's refusal to voluntarily provide a blood sample would have been admissible to show consciousness of guilt by defendant because no such evidence was ever presented to the jury, nor did the prosecutor urge such an inference in argument to the jury. Although evidence that the prosecution's criminalist had not received a sample of defendant's blood was not relevant, its admission did not prejudice defendant. Absent evidence that defendant was ever asked to provide a blood sample, the jury would have no reason to infer consciousness of guilt, and blood type in itself was simply not an issue in this case. Had the challenged evidence been excluded, there is no reasonable probability that the jury would have returned a verdict more favorable to defendant. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

### 6. *Impeachment of Alibi Witness*

Defense witness Rebecca Williams testified that defendant was with her at her residence in Auburn, California, close to the time when the Hickey murder was committed in Humboldt County. Apparently in anticipation of her testimony, the prosecution introduced evidence during its case-in-chief that on August 22, 1984, she had declined to discuss the case with Barry Brown, an investigator for the Humboldt County District Attorney. The prosecution also cross-examined her on her failure to volunteer her exculpatory information to the police or to testify at defendant's preliminary hearing.

Defendant contends the trial court erred in overruling defense objections to both forms of impeachment because the prosecution failed to establish the

required foundation for such evidence. Defendant relies on dictum in *People v. Ratliff* (1987) 189 Cal.App.3d 696, 701 [234 Cal.Rptr. 502], stating that before impeaching a defense witness with evidence that the witness failed to volunteer exculpatory information to the police, the prosecution must establish that the witness knew charges were pending and the information was exculpatory, had reason to make the information available, was familiar with the means of reporting it, and was not asked by the defendant or defense counsel to refrain from doing so.

We need not decide whether the factors mentioned by *Ratliff, supra,* 189 Cal.App.3d 696, are requirements for admissibility or simply matters affecting the weight to which the impeaching evidence is entitled. (See *People v. Santos* (1990) 222 Cal.App.3d 723, 737 [271 Cal.Rptr. 811].) ▮ Even assuming that the *Ratliff* factors are foundational requirements, defendant's contention fails because defense counsel did not object at trial on the specific ground urged on appeal. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1255 [270 Cal.Rptr. 451, 792 P.2d 251].)

The only objection to the testimony of prosecution witness Barry Brown was a hearsay objection to evidence that Williams declined to speak to Brown after a telephone conversation with one of the attorneys appointed to represent defendant. The trial court sustained the objection, and Brown made no mention of Williams's telephone conversation with defense counsel. And, although the defense raised various objections to the cross-examination of Williams on her failure to volunteer information to the prosecution, there was no objection for lack of foundation. Defendant may not challenge on appeal the admission of evidence on grounds not urged in the trial court.

### 7. *Length of Defendant's Prior Incarceration*

Prosecution witness Pat Freese, a detective for the Eureka Police Department, testified that he asked defendant, shortly after his arrest, where he had been on the evening of the Triplex robbery. Defendant answered that he was not sure and that "most of his days had run together" because he had been "in prison for the past eleven years." Defense counsel did not object or move to strike the answer, but counsel later moved for a mistrial. The trial court did not grant a mistrial, but it did instruct the jury that it was not to consider evidence that defendant had been in prison "in determining his guilt in this particular trial or to determine that he's a bad person." ▮ Defendant contends that the court erred in denying a mistrial and that the admonition was insufficient to cure the harm.

As we have already mentioned, a trial court's ruling denying a motion for mistrial is reviewed under the deferential abuse-of-discretion standard. (*People v. McLain, supra,* 46 Cal.3d 97, 113.) We find no abuse of discretion

here. Because of the nature of the charges, evidence was properly admitted to prove that defendant had been in prison and was an AB member. Although additional details about defendant's prior prison term were not directly relevant on the issue of guilt, the jury was entitled to consider the plausibility of the explanation defendant offered for his claimed inability to remember where he had been at the time of a charged offense. Assuming the evidence should have been excluded as being more prejudicial than probative (Evid. Code, § 352), the prejudice to defendant was not incurable by admonition or instruction. (See *People* v. *Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776].)

Defendant complains that the trial court's admonition was inadequate because it did not specifically advise the jury to disregard the length of his previous imprisonment. The criticism is unwarranted. The admonition not to consider the prior imprisonment at all to prove defendant's guilt or to prove he was a bad person necessarily included an admonition to disregard the length of that imprisonment. Defendant was not harmed by the admonition being more inclusive than it needed to be.

8. *Conduct of Mary Markley*

Beverly Lloyd, defendant's mother, testified as a prosecution witness. During redirect examination, the prosecution asked her about the time when Barry Brown, an investigator for the Humboldt County District Attorney, served her with a subpoena. Specifically, the prosecutor asked whether a woman named Mary Markley was present and whether Brown was "ordered off" her property. The trial court overruled a defense objection, and the witness answered that she did not remember that Markley ordered Brown off the property. She added, "I know she was protecting me because I was so dumb I didn't know that I didn't need to talk to him."

Defendant contends the trial court erred in admitting the evidence. He argues that Markley's conduct was irrelevant because she was not a witness and her actions had no bearing on Lloyd's credibility. We disagree. The alleged incident occurred on Lloyd's property and in Lloyd's presence. Markley could not have ordered anyone to leave without Lloyd's approval or ratification. Thus, the inquiry was proper to explore Lloyd's bias against the prosecution. In any event, the witness testified she did not remember whether Markley had ordered Brown to leave, and the incident was not mentioned again. We find neither error nor prejudice.

### 9. *AB Activities Outside California*

 Defendant contends the trial court prejudicially erred when it permitted prosecution witness Michael Thompson to testify, over defense objection, that the AB had members in prisons nationwide and that it was affiliated with certain organized crime groups. We reject the contention.

Thompson testified that beginning in 1981 AB members held meetings at Palm Hall, the adjustment center of the Chino prison, to formulate plans to restructure the AB. Without objection, he testified that in 1982, as a result of these meetings, the AB held a vote to elect a governing body. The trial court overruled a defense objection on relevance grounds to a question asking where the vote had taken place, and the witness answered that it was taken at "Palm Hall, Folsom, San Quentin, [and] federal institutions through [*sic*] the nation." Over another defense objection on relevance grounds, the witness testified that the AB was "nationwide" and that it existed in Arizona, New York, Nevada, Illinois, and Michigan. The court explained it was admitting the testimony only because Thompson had testified that a vote was taken.

The ruling was correct. Defendant was charged with a conspiracy to murder under orders of a prison gang's leadership. Evidence of the size and nature of the gang and the manner in which the leadership derived its authority was relevant to prove the charge. The trial court recognized that the subject carried a risk of undue prejudice (see Evid. Code, § 352), and when defense counsel made timely and appropriate objections, it confined the prosecution within reasonable limits. For example, the court sustained a defense objection to a question concerning the AB's membership in 1979 and instructed the prosecutor to restrict his inquiry to the time of the charged conspiracy. The trial court did not abuse its discretion when it allowed brief testimony on the distribution of the AB membership, shortly before the formation of the charged conspiracy, to explain how the AB leaders had acquired their authority.

Thompson later testified, without objection, that one of the aims of the AB reorganization was to become "more involved within the community of organized crime as opposed to a prison gang whose primary motivations were racial violence and drug abuse." He said that the leadership group adopted policies to achieve this goal. Asked for examples of the policies, Thompson said, "The Aryan Brotherhood is associated with the Mexican Mafia or the Hell's Angels or—for instance, in Federal penitentiary, we're with the Italian Mafia." Defense counsel objected belatedly and moved to strike, apparently on relevance grounds. The trial court responded: "I don't know whether we need an example of the policies. It has nothing to do with

the facts of this case. Let's get to the policies we're concerned about the facts of the case [*sic*]."

Defendant complains that the trial court should have stricken as irrelevant the testimony about the AB's affiliation with organized crime groups. We agree that the evidence had little if any relevance to the charges against defendant and that it should have been stricken, but defendant has not demonstrated prejudice. The witness had already testified, without objection, that the AB was a prison gang, that prisoners were required to shed someone's blood to become AB members, and that the AB was seeking to expand its organized crime activities, including drug dealing, extortion, and murder. The jury was also well aware that the charge in this case involved a conspiracy to murder. Under these circumstances, the jury was unlikely to be shocked or influenced by testimony that the AB had affiliated with known organized crime groups. Moreover, the trial court, although it did not strike the testimony, advised the jury that the testimony had "nothing to do with the facts of this case." Had the court stricken the challenged testimony, there is no reasonable probability that the jury would have returned a verdict more favorable to defendant. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

10. *Physical Evidence*

Defendant contends that several items of physical evidence were admitted over defense objection even though they had little or no probative value and were unduly prejudicial. ▮ We consider each such item in turn, bearing in mind that physical evidence may be admitted to substantiate and illustrate a witness's testimony (*People* v. *Madison* (1935) 3 Cal.2d 668, 679 [46 P.2d 159]; *State of Cal.* ex rel. *Dept. of Water Resources* v. *Natomas Co.* (1966) 239 Cal.App.2d 547, 561 [49 Cal.Rptr. 64]), and that we use the deferential abuse-of-discretion standard to review a trial court ruling admitting an exhibit over an objection that it is inflammatory or unduly prejudicial (*People* v. *Madison, supra,* at p. 679).

(a) *Ammunition Found in the Reno Storage Locker*

Sergeant Duane Fredrickson of the Eureka Police Department testified that he participated in the search of the ministorage unit in Reno, Nevada, during which he recovered various weapons taken from the Moore and Hickey residences. He testified that the weapons were loaded when found. Over defense objection on grounds of relevance and undue prejudice (Evid. Code, § 352), the prosecution introduced in evidence the ammunition taken from the seized guns.

▮ The testimony of Berlie Petry and Richard Moore established that the weapons had originally been unloaded. The evidence that they were

found loaded was more consistent with the prosecution's theory, that the weapons were obtained for use by the AB to commit robberies and murders, than with the defense theory, that defendant obtained the weapons for sale on consignment.[17] The defense impliedly conceded this relevance when it interposed no objection to Sergeant Fredrickson's testimony that the weapons were found loaded. The ammunition taken from the weapons was properly admitted in evidence to substantiate and illustrate this unchallenged testimony. In the context of this case, the evidence was unlikely to inflame the jury. The ruling admitting the evidence was well within the trial court's discretion.

### (b) *Shotgun Shell Bandolier*

Sergeant Fredrickson also testified, without objection, that he seized a bandolier holding shotgun ammunition from the garage of defendant's mother's residence, along with other items apparently belonging to defendant. Defense counsel did object, however, when the prosecutor moved to have the bandolier received in evidence. Defendant now contends that the trial court erred in overruling the objection.

The physical evidence substantiated and illustrated the witness's unchallenged testimony. Although the relevance of that testimony was comparatively weak, defendant's possession of shotgun ammunition at his mother's residence did have some tendency in reason to establish his possession of the shotguns seized from the Reno storage locker, and to support the prosecution's theory that the weapons were possessed for use by the AB rather than for sale. Given the other properly received evidence, the bandolier was not inflammatory. The trial court did not abuse its discretion in admitting the evidence.

### (c) *Photographs of Guns*

Robert Christansen, a firearms identification examiner for the Los Angeles County Sheriff's Department, testified about the different makes and models of guns that could have fired the bullet that killed Richard Barnes. The witness used photographs of various guns to illustrate his testimony. Over defense objection, these photographs were received in evidence.

We find no error. The photographs could properly be used to illustrate the witness's unchallenged testimony and they were not inflammatory.

---

[17]Defendant argues that loading the weapons was consistent with possession for sale because a potential buyer would probably want to test-fire a weapon. The argument is unpersuasive, however, because a potential buyer who wanted to test-fire a weapon would also want to load it, or at least to observe it being loaded.

### (d) *Bloodstained Glove*

John Boyd, a criminalist for the California Department of Justice, testified that he examined a pair of gloves for bloodstains and found a small stain on the index finger of one glove that proved to be human blood. He was unable to determine the blood type, however, or whether the stain had been applied to the inside or the outside of the glove. The trial court overruled a defense objection on grounds of relevance and undue prejudice. Sergeant Fredrickson later testified that he seized these gloves from the bottom of the closet in the bedroom defendant had occupied in his mother's residence.

 Evidence that a defendant possessed clothing stained with human blood is relevant to prove the defendant's presence at the scene of a homicide involving substantial bloodshed. (*People* v. *Burgener* (1986) 41 Cal.3d 505, 527 [224 Cal.Rptr. 112, 714 P.2d 1251].) Here the defendant's apparent possession of the bloodstained glove was relevant to the charge that he committed the bludgeon murder of Elizabeth Hickey. Because the blood type of the stain could not be determined, and because the gloves were apparently women's gloves, the relevance of the evidence was comparatively weak. The evidence was not likely to inflame the jury, however, and defendant's argument that it was unduly prejudicial is, at bottom, simply distrust of the jury's ability to accurately gauge relevance. The trial court's ruling admitting the evidence was not an abuse of discretion.

### (e) *Removal Order*

Prosecution witness Clifford Smith testified that the AB leaders arranged to have defendant brought to Palm Hall from a prison in Montana to receive the order to kill Richard Barnes. The leaders selected defendant in part because they knew he would soon be released without parole. To substantiate this testimony, the prosecution offered a court order directing the Sheriff of San Bernardino County to take temporary custody of defendant from the Montana State prison, to house him at Palm Hall, and to transport him to court to testify as a defense witness in the joint trial of two defendants whom Smith had identified as AB leaders. The prosecution also offered a letter from the warden of the Montana State Prison to California prison authorities confirming that defendant had been removed from Montana on August 24, 1982, and that he would complete his Montana term on September 10, 1982, and could be released at that time. Over defense objections on grounds of relevance and undue prejudice, the trial court received the documents in evidence.

 The documents were properly received to substantiate the witness's testimony. Although defendant maintains the documents were prejudicial,

they revealed nothing not revealed by the testimony. They did not show the offense for which defendant was imprisoned in Montana, the term of imprisonment, or his conduct as a prisoner. The trial court's ruling was not an abuse of discretion.

11. *Impeachment of Defense Witness Stinson*

Defendant contends that the trial court erred in overruling defense objections to questions the prosecutor asked of defense witness John Stinson regarding acts of misconduct Stinson had committed in prison. Defendant contends that the prosecutor violated the rule that a party may not cross-examine a witness on irrelevant matters for the purpose of eliciting something to be contradicted. (*People* v. *Lavergne* (1971) 4 Cal.3d 735, 744 [94 Cal.Rptr. 405, 484 P.2d 77].) The rule does not apply here, however, because the prosecutor's questions related directly to relevant matters raised on direct examination.

On direct examination, Stinson testified that he was an inmate of San Quentin Prison and had previously been convicted of murder, robbery, and burglary. In his opinion, the AB did not and never had existed as an organization; it was "just . . . a tag that the administration puts on people that it wishes to segregate from the general [prison] population . . . ." He said this had happened to him "several times." He was placed in the general prison population in 1984 after an administrative determination that there was insufficient evidence he was an AB member, but at the time of his testimony prison officials considered him to be an AB member.

On cross-examination, Stinson testified he was then segregated from the general prison population in a security housing unit. He said the reason for this segregation was that prison officials still linked him to the AB. Over defense objections on relevance grounds, the prosecutor then asked whether Stinson had "swung at or hit" a deputy sheriff in September 1980, whether he had been present with other reputed AB members when inmates were stabbed in separate incidents in November 1980 and February 1981, whether a six-inch knife blade had been found in his shoe in July 1981, and whether any of these incidents was responsible for his segregated prison housing.[18] The trial court properly overruled the defense objections. The questions were proper cross-examination in view of Stinson's testimony on direct examination that prison officials had used his alleged AB membership several times to justify the restrictions they imposed on him, including segregation from the general prison population. The challenge to this testimony also undermined Stinson's broader claim that the AB did not exist as an organization

---

[18]Defendant also challenges the prosecutor's reference to a 1980 incident in which Stinson received a hacksaw blade, but Stinson had already testified to this incident without objection.

but was merely a label invented by prison authorities to justify restrictions imposed on certain prisoners.

12. *The Griffen-Stinson Letter*

During cross-examination, the prosecution questioned Stinson about a two-page letter. The first page and a half, addressed to "Bobby," was signed "Blinkey." The bottom half of the second page, also addressed to "Bobby," was signed "John." The defense conceded that the two portions constituted but one letter. Stinson admitted authoring the second part of the letter. The defense did not object to this portion; on the contrary, it moved that it be received in evidence and shown to the jury. The prosecutor asked Stinson only one question about the content of the first part of the letter, and he withdrew the question when the defense objected. The prosecutor stated he intended to call further witnesses to establish the admissibility of the "Blinkey" portion of the letter.

On rebuttal, Clifford Smith testified that Robert "Blinkey" Griffen had shown him the letter in Palm Hall in July 1983. He recognized the handwriting and signature on the first part of the letter as Griffen's and the handwriting and signature on the second part of the letter as Stinson's. The purpose of the letter was to explain to Bobby Crane, as the ranking AB member at San Quentin Prison, why it had been necessary to kill Steven "Loser" Clark and to advise Crane about developments at Folsom Prison affecting the AB. The AB leaders agreed to send the letter with an inmate named Mikey Masterson, who was being transferred from Palm Hall to San Quentin. Smith had discussed the letter with John Stinson and other AB leaders before it was sent. He read and approved the letter and gave it back to Griffen. Over defense objection, the court then admitted the entire letter. Defendant contends the trial court erred because no hearsay exception was ever established for the "Blinkey" portion of the letter.[19]

The letter was not offered for the truth of the matters asserted in it (why Clark was killed and what had occurred at Folsom Prison), but rather to show that the author and the intended recipient were members of an existing organization. The letter was therefore not within the hearsay rule. (*Rogers* v. *Whitson* (1964) 228 Cal.App.2d 662, 675 [39 Cal.Rptr. 849]; *People* v. *Decker* (1957) 155 Cal.App.2d 165, 170 [317 P.2d 135].)

13. *Impeachment of Defense Witness Rowland*

Defense witness Robert Rowland, a state prison inmate, testified on direct examination that in September of 1983, while he was incarcerated in the

[19]Defendant's trial counsel cited the hearsay rule twice in objecting to the letter. We therefore reject the argument of the Attorney General that the objection based on the hearsay rule has not been preserved for appeal.

adjustment center at San Quentin, Michael Thompson gave him a zipgun and a bullet and told him to hold these items until Thompson requested their return. He said he agreed only because Thompson ran the prison yard. Two days later prison authorities searched his cell and found the gun and bullet under his pillow.

On cross-examination, Rowland denied that he was or had ever been an AB member; he said he was not aware that the AB existed as an organization. He denied he was given the gun to shoot a member of a prison gang called the Black Guerilla Family. Over defense objections, the prosecutor questioned him about incidents in which he had hidden a hacksaw blade in his lip, a knife in his rectum, and a handcuff key in a cigar. He denied each incident. The defense also objected unsuccessfully to questions asking Rowland whether he had participated in the stabbing of inmates Bob Basey, "Corky," and "Lucky" Harris. Again, Rowland denied each incident. He also testified that the zip gun had been disassembled when the officers found it in his cell.

On rebuttal, Clifford Smith testified that he and Thompson had given the zipgun to Rowland with instructions to use it to shoot a Black Guerilla Family member who had to pass Rowland's cell to reach the showers. Rowland was then a friend or associate of the AB and later was being considered for AB membership when Smith defected. Smith said he had given Rowland assignments to "hit" Basey, "Corky," and Harris. The prosecution called four San Quentin correctional officers who testified that the zipgun had been assembled when found in Rowland's cell, that an inch-long hacksaw blade had been found in Rowland's mouth, that a knife or stabbing instrument was found in Rowland's rectum, and that a handcuff key had been found in a cigar in Rowland's cell.

Defendant contends the trial court erred in permitting this impeachment of Rowland. He argues that *any* impeachment was improper because the prosecution never disputed the only material fact to which Rowland testified, which was that Thompson had given him the zipgun two days before officers found it in his cell. In addition, he argues that the prosecutor violated the rule against cross-examining a witness on irrelevant matters for the purpose of eliciting something to be contradicted. (*People* v. *Lavergne*, *supra*, 4 Cal.3d 735, 744.)

The defense called Rowland as a witness to discredit prosecution witness Thompson by showing that he had unscrupulously "set up" Rowland to win favor with law enforcement authorities and ultimately to obtain a reduction in his prison term or similar benefits. Discrediting Thompson would, in turn,

cast doubt on his testimony regarding the existence of the AB as a function-ing organization. Although it was undisputed that Thompson gave Rowland the zipgun, the prosecution did dispute other portions of Rowland's testi-mony that were material to the inferences the defense sought to draw. To impeach Rowland, the prosecution elicited the rebuttal testimony of Smith to show that Rowland was given the zipgun as part of a "legitimate" AB assignment, rather than as a setup, and that Rowland was a loyal "soldier" of the AB. The other disputed impeachment evidence was introduced to cor-roborate Smith. The prosecution argued that the most reasonable explanation for the manner in which Rowland had concealed the zipgun (under a pillow and fully assembled) was that he was keeping it ready for instant use. Evidence of other instances in which Rowland demonstrated sophistication in the concealment of contraband made it unlikely that Rowland would conceal a zipgun in an obvious place unless he had a compelling reason to do so. We find no error in the trial court rulings permitting the impeachment of Rowland.

### 14. *Comment on Failure to Call Defense Expert*

As we have mentioned, the weapon used to kill Richard Barnes was a .22-caliber handgun. Police seized a gun, known at trial as the Baca firearm, after receiving information that one of Barnes's friends had sold it the day after Barnes was killed. At the trial, Robert Christansen, the prosecution's firearms expert, testified that the Baca firearm could not have fired the bullets that killed Richard Barnes. During presentation of the defense case, the defense recalled Christansen to question him further about the basis of this opinion. During cross-examination, the prosecutor asked whether Christansen would be willing "to accompany the defense expert to the crime lab out at the college and go through the checks of bullets and stuff . . . ." On rebuttal, the prosecution called its investigator, Barry Brown, who testified that he had met Christansen, a man named Chuck Morton, and a defense investigator at a Department of Justice Crime Lab where Morton had conducted a three-hour examination of bullets test-fired from the Baca firearm and bullet fragments from the head of Richard Barnes. During argument to the jury, both prosecutors commented on the failure of the defense to call as a witness Chuck Morton, whom they identified as a defense expert. They urged the jury to infer that Morton must have con-cluded, like Christansen, that the Baca firearm could not have fired the bullets that killed Barnes.

Defendant now contends the trial court erred in permitting the prosecution to introduce evidence that revealed the defense's employment of an expert who was never called to testify. He argues that allowing evidence

and prosecutorial argument on a failure by the defense to call its own expert violates the right to counsel guaranteed by the Sixth Amendment to the federal Constitution and the parallel provision of the state Constitution. He also argues that the comment violated Evidence Code section 913 (barring comment on the exercise of a privilege).

When the prosecution offered evidence of the defense expert's examination of the bullets, defense counsel did not object on the grounds now urged, but only on the ground that it was not proper rebuttal. The lack of a specific objection on the ground now urged precludes consideration on appeal of the defendant's claim that the evidence was improperly admitted. (Evid. Code, § 353.) Also, because any prejudice from the prosecutors' comments during argument could have been cured by a timely objection and admonition, defense counsel's failure to object to the argument waives any claim that the argument was improper. (See *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1104 [259 Cal.Rptr. 630, 774 P.2d 659].)

We reject defendant's contentions that the failure to make specific and timely objections constituted ineffective assistance of counsel. A defendant seeking relief on the basis of ineffective assistance of counsel must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings. (*People* v. *Fosselman, supra,* 33 Cal.3d 572, 584; see also *Strickland* v. *Washington, supra,* 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699].) Because defendant has not satisfied the second part of the test, we need not consider whether trial counsel's performance was deficient. Christansen's qualifications as an expert are unchallenged and his expert opinion that the Baca firearm did not kill Richard Barnes was not effectively challenged at trial. The claim of ineffective assistance fails because defendant has not shown it is reasonably probable a more favorable determination would have resulted had all reference to the defense expert been excluded.

P. *Photographs of Murder Victims*

Defendant challenges trial court rulings admitting in evidence photographs of murder victims Barnes and Hickey. All photographs showed the bodies as they were found by police, except two photographs that showed the bullet holes in the back of Barnes's head after it had been shaved. Defendant contends that the photographs were irrelevant, cumulative, and unduly prejudicial, and that their admission violated these rights under the federal Constitution: the Fifth and Fourteenth Amendment right to due process, the Eighth Amendment right to a reliable verdict in a capital case, and the Sixth Amendment right to a fair jury trial.

The photographs were not irrelevant. The photographs of Richard Barnes demonstrated he was killed execution style, without a struggle, by three contact wounds to the back of the head. This supported the prosecution's theory that the killing was intended to be immediately identifiable as the work of the AB to serve as a warning to those who had defected or were considering defection from the gang. The photographs of Hickey demonstrated that she was beaten in brutal fashion, that her body was moved on the bed before she died, and that two small incisions were made below one breast after her death. This supported the prosecution's theory that the beating was done deliberately, with malice and intent to kill, that the body was moved in the process of a thorough search of the room, and that the body was cut to determine whether the victim was dead.

We have often rejected the argument that photographs of a murder victim should be excluded as cumulative if the facts for which the photographs are offered have been established by testimony. (E.g., *People* v. *Kaurish* (1990) 52 Cal.3d 648, 684 [276 Cal.Rptr. 788, 802 P.2d 278]; *People* v. *Kelly* (1990) 51 Cal.3d 931, 963 [275 Cal.Rptr. 160, 800 P.2d 516]; *People* v. *Mattson* (1990) 50 Cal.3d 826, 871 [268 Cal.Rptr. 802, 789 P.2d 983].) Because the photographic evidence could assist the jury in understanding and evaluating the testimony, we reject the argument here as well.

A trial court has broad discretion in determining the admissibility of murder victim photographs against a claim that the photographs will arouse in the jurors an excessively emotional response. (*People* v. *Wright* (1990) 52 Cal.3d 367, 434 [276 Cal.Rptr. 731, 802 P.2d 221]; *People* v. *Coleman*, *supra*, 46 Cal.3d 749, 776.) Here, the record shows that the trial court weighed the probative value of the photographs against their potential prejudicial effect before admitting them. No abuse of discretion has been demonstrated, nor has defendant demonstrated violation of any right under the federal Constitution.

Q. *Corroboration of Accomplice Testimony*

The trial court instructed the jury not to base a determination of guilt on the uncorroborated testimony of an accomplice. The court instructed the jury that prosecution witnesses Thompson and Smith were accomplices as a matter of law, and that it was to determine from the evidence whether prosecution witnesses Myers and Scarborough were also accomplices. Defendant contends: (1) the trial court's instructions erroneously defined an accomplice; (2) the trial court erred in not instructing that Myers was an accomplice as a matter of law; and (3) there was insufficient evidence to corroborate the accomplice testimony if Myers was an accomplice either as a matter of law or under a factual finding by the jury.

## 1. *Instruction Defining Accomplice*

The trial court instructed the jury on the definition of an accomplice in these words: "An accomplice is one who was subject to the [*sic*] prosecution for the identical offense charged against the defendant on trial. [¶] To be an accomplice, the person must have aided, promoted, encouraged, or instigated by act or advice the commission of such offense with knowledge of the unlawful purpose of the person who committed the offense and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense. [¶] . . . Merely assenting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator is not criminal, and a person so assenting to or aiding or assisting in the commission of a crime without such knowledge is not an accomplice in the commission of such crime."

▮▮▮ Defendant contends that these instructions are incomplete because they fail to explain the rule of vicarious criminal liability, under which a person who conspires to commit or aids and abets another in the commission of an offense is guilty not only of that offense but also of any reasonably foreseeable offense committed by a coconspirator or by the person aided and abetted.[20] (*People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392]; *People* v. *Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198]; see *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 761 [230 Cal.Rptr. 667, 726 P.2d 113].) Under this principle, defendant argues, Myers was an accomplice in the murder of Barnes if the murder was a natural and probable consequence of any illegal activity she intentionally aided. He contends that the failure to instruct on the principle of vicarious liability denied him his rights to jury trial and due process of law guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution.

Defendant did not ask the trial court to instruct on the vicarious liability principle; he maintains the trial court was required to do so sua sponte. A trial court is required to instruct sua sponte only on those general principles of law that are closely and openly connected with the facts before the court and necessary for the jury's understanding of the case. (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].) The question, then, is whether the evidence before the jury plainly would have supported a finding that Myers intentionally aided the commission of an offense of

---

[20]Although the trial court did not instruct the jury on the vicarious liability of aiders and abettors, it did instruct the jury on vicarious liability as applied to conspiracy, in these words: "Every person who joins a criminal conspiracy and its formation and to adopt its purposes and objects is liable for and bound by the acts and declarations of other members of a conspiracy done and made during the time that he is a member and in pursuance and furtherance of the conspiracy."

which a crime such as the Barnes murder was a natural and probable consequence.

Defendant relies, first, on evidence that Myers assisted the AB by smuggling drugs and knives into state prisons and by carrying messages. This evidence shows, at most, that Myers aided and abetted illegal drug activity and in-prison violence; the killing of an AB defector's relative, outside of prison, is not a natural and probable consequence of such crimes. Defendant also relies on evidence that Myers knew that defendant, a convicted felon, was in possession of a revolver and sawed-off shotgun while he stayed at her house. Assuming without deciding that Myers was guilty of aiding and abetting defendant's illegal weapons possession (see §§ 12020-12021), there was no substantial evidence that Myers knew or should have known that defendant had agreed to commit a murder or was otherwise likely to use the illegally possessed weapons to commit a murder in the near future, and therefore the murder of Barnes was not a natural and probable consequence of permitting him to stay temporarily at her residence with the weapons. Because the evidence before the jury did not plainly support a finding that Myers was vicariously liable for Barnes's murder, the trial court did not err in failing to instruct on the principle of vicarious criminal liability.

## 2. *Accomplice as a Matter of Law*

■ Defendant argues that Myers was an accomplice as a matter of law because the prosecution's own evidence established that the murder of Barnes was a reasonably foreseeable consequence of illegal activity that she knowingly and intentionally aided. Thus, defendant relies on the same theory of vicarious liability that we have already determined to be unsupported by the evidence. Because the evidence failed to provide substantial support for this theory, much less prove it as a matter of law, the trial court did not err in failing to instruct the jury that Myers was an accomplice as a matter of law.

## 3. *Corroboration of Accomplice Testimony*

■ Defendant maintains that the evidence corroborating the testimony of Myers, Smith, and Thompson was legally insufficient to connect him to the conspiracy and Barnes murder offenses. To the contrary, we conclude that the evidence was sufficient to corroborate the testimony of these witnesses.

A conviction "cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the

defendant with the commission of the offense . . . ." (§ 1111.) ■ Evidence of corroboration is sufficient if it connects the defendant with the crime, even though it is slight and would be entitled to little consideration when standing by itself. (*People* v. *Garrison* (1989) 47 Cal.3d 746, 773 [254 Cal.Rptr. 257, 765 P.2d 419].) The required corroboration must come from a source other than another accomplice. (*People* v. *Tewksbury* (1976) 15 Cal.3d 953, 958 [127 Cal.Rptr. 135, 544 P.2d 1335].) The existence of a conspiracy may be proved by uncorroborated accomplice testimony; corroboration of accomplice testimony is needed only to connect the defendant to the conspiracy. (*People* v. *Cooks* (1983) 141 Cal.App.3d 224, 312 [190 Cal.Rptr. 211].)

■ Here, the testimony of prosecution witnesses Smith and Thompson was competent to establish the existence of a conspiracy to murder Richard Barnes in revenge for his son's defection from the AB and testimony against an AB member. To connect defendant to the conspiracy, and to the Barnes killing, the prosecution presented evidence that defendant had admitted being a member of the AB, that he was brought from a Montana prison to Palm Hall to testify as a defense witness in the trial of two defendants whom Smith identified as AB members, and that he was present in Palm Hall at the time of the alleged conspiracy. The prosecution also presented evidence that after his release from prison, defendant was seen at the home of AB member O'Rourke; that he then went to Humboldt County; and that he returned to Los Angeles County (where Richard Barnes lived) shortly before the Barnes killing and left immediately afterward. Richard Barnes was killed in his home in a professional, execution-style manner. Nothing of significant value was taken from the home, suggesting that revenge, and not gain, was the motive. Richard Barnes's home address was found among defendant's personal effects. Defendant told his mother that the weapons he possessed were "Brand" business. "Brand" was another name for the AB. This evidence connected defendant to the conspiracy and Barnes murder and thereby supplied the required corroboration for the testimony of Smith, Thompson, and Myers.

## R. *Instruction and Evidence Concerning Witness Immunity*

Defendant contends that the trial court erred in permitting an order granting immunity to be received in evidence and in giving two instructions to the jury concerning witness immunity. He asserts that in so doing the trial violated these rights granted him under the federal Constitution: the Eighth Amendment right to a reliable guilt determination, the Fifth and Fourteenth Amendment right to due process of law, and the Sixth Amendment rights to confrontation and jury trial.

## 1. *The Immunity Order*

The prosecution offered in evidence an order granting immunity to prosecution witness Thompson. The defense did not object and the trial court admitted the order as an exhibit. The prosecutor read the order to the jury during opening statement and again during closing argument, and it was available to the jury during deliberations. Defendant contends that the order was inadmissible because it included a statement that the court had found the grant of immunity was "not contrary to the public interest." Defendant contends this statement was prejudicial to the defense because a reasonable juror might conclude that the judge, before granting immunity to Thompson, had reviewed Thompson's proposed testimony and found it to be credible.

Defendant recognizes that a claim of error in the admission of evidence is generally not cognizable on appeal in the absence of a specific and timely objection in the trial court on the ground urged on appeal. (Evid. Code, § 353.) He contends that his trial counsel's failure to object constituted ineffective assistance of counsel and should be reviewed as such.

Proof that Thompson was testifying under a grant of immunity gave the defense a ground for attacking his credibility because it showed he had made a deal with the prosecution and would suffer no adverse penal consequences from any self-incriminating statements he made during his testimony. The order was direct evidence that Thompson had been granted immunity. Therefore, it is understandable that the defense did not object to the order itself. The defense could have sought to sanitize the order by removing the language noted by defendant, but we are of the view that the failure to do so did not constitute ineffective assistance. A reasonable juror would be unlikely to view the statement that immunity was "not contrary to the public interest" as an endorsement of Thompson's credibility. The prosecutor did not urge the jurors to view it this way, and the trial court instructed the jury that the testimony of an accomplice "ought to be viewed with distrust" and that Thompson was an accomplice as a matter of law. The court also told the jury, "You are the sole judges of the believability of a witness and the weight to be given to the testimony of each witness."

## 2. *Instruction to Disregard Nonprosecution of Other Perpetrators*

The trial court instructed the jury, in a modified version of CALJIC No. 2.11.5, as follows: "You must not discuss or give consideration as to why those persons who have not testified or who have testified in the trial are not being prosecuted in this trial or whether they will be or will not be

prosecuted." ▮▮▮ Defendant contends that this instruction erroneously told the jurors they could not discuss or consider the fact that prosecution witnesses had been granted immunity from prosecution for any of the charges against defendant, including conspiracy and the Barnes murder.

▮▮▮ "In determining whether an instruction interferes with the jury's consideration of evidence presented at trial, we must determine 'what a reasonable juror could have understood the charge as meaning.' [Citation.] While the initial focus is on the specific instruction challenged [citation], we must also review the instructions as a whole to see if the entire charge delivered a correct interpretation of law. [Citation.]" (*People* v. *Garrison*, *supra*, 47 Cal.3d 746, 780.) ▮▮▮ When the challenged instruction is considered in light of the entire charge, we are persuaded a reasonable juror would not have understood it as precluding the jury from considering the immunity granted to prosecution witnesses in assessing the credibility of those witnesses.

The purpose of the challenged instruction is to discourage the jury from irrelevant speculation about the prosecution's reasons for not jointly prosecuting all those shown by the evidence to have participated in the perpetration of the charged offenses, and also to discourage speculation about the eventual fates of unjoined perpetrators. (*People* v. *Cox* (1991) 53 Cal.3d 618, 668 [280 Cal.Rptr. 692, 809 P.2d 351].) When the instruction is given with the full panoply of witness credibility and accomplice instructions, as it was in this case, a reasonable juror will understand that although the separate prosecution or nonprosecution of coparticipants, and the reasons therefor, may not be considered on the issue of the charged defendant's guilt, a plea bargain or grant of immunity may be considered as evidence of interest or bias in assessing the credibility of prosecution witnesses. (*People* v. *Sully*, *supra*, 53 Cal.3d 1195, 1219.) Although the instruction should have been clarified or omitted (see *People* v. *Cox*, *supra*, at p. 667; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1313 [248 Cal.Rptr. 834, 756 P.2d 221]), we cannot agree that giving it amounted to error in this case.

3. *Instruction That Testimony of Single Witness Sufficient to Prove Any Fact*

The trial court instructed the jury: "Testimony which you believe given by one witness is sufficient for the proof of any fact." ▮▮▮ Defendant contends that this instruction, in the language of CALJIC No. 2.27, conflicted with the instruction requiring corroboration of accomplice testimony, and that the jury may have concluded that corroboration of accomplice testimony was not required. He argues that the risk that the jury would reach

this erroneous conclusion was great in this case because the court, after instructing in the language of CALJIC No. 2.27, gave a number of other instructions before it instructed on the accomplice corroboration requirement.

As we have frequently explained, when the detailed instructions on the requirement that an accomplice's testimony be corroborated have been given along with the "single witness" instruction, a reasonable juror would understand that the corroboration requirement for accomplice testimony is an exception to the more general "single witness" principle. (*People* v. *Andrews* (1989) 49 Cal.3d 200, 217 [260 Cal.Rptr. 583, 776 P.2d 285]; *People* v. *Adcox* (1988) 47 Cal.3d 207, 241 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Chavez* (1985) 39 Cal.3d 823, 830-832 [218 Cal.Rptr. 49, 705 P.2d 372].) We are persuaded this is true whether the instructions are given in immediate succession or are separated by other, unrelated instructions. Although it would have been better practice to modify CALJIC No. 2.27 to expressly note the exception for testimony requiring corroboration (*People* v. *Chavez*, *supra*, at p. 831), the charge to the jury, considered as a whole, was not erroneous.

### S. *Prosecutorial Misconduct*

Defendant contends that the prosecutors in this case committed prejudicial misconduct during jury selection, during the presentation of evidence, and during closing argument to the jury at the guilt phase.

▮ In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury. (*People* v. *Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672]; accord *People* v. *Haskett*, *supra*, 30 Cal.3d 841, 866.) But the defendant need not show that the prosecutor acted in bad faith or with appreciation for the wrongfulness of the conduct, nor is a claim of prosecutorial misconduct defeated by a showing of the prosecutor's subjective good faith. (*People* v. *Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396].) ▮ To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct. (*People* v. *Wharton* (1991) 53 Cal.3d 522, 591 [280 Cal.Rptr. 631, 809 P.2d 290].)

### 1. *Jury Selection*

Defendant contends that the prosecutors committed misconduct during jury selection by repeatedly violating a trial court guideline against speaking

objections, by making baseless objections, and by making statements in the presence of prospective jurors that imputed improper motives to defense counsel.

Before jury selection began, the court gave all counsel written "guidelines" for the trial. The guidelines advised counsel, among other things, to state objections concisely and to refrain from argument after an objection unless the court requested it. Defendant cites more than a dozen incidents in which the prosecutors violated this guideline during the course of jury selection.

■ Having carefully reviewed each of the incidents that defendant cites, we conclude that the prosecutors' occasional use of speaking objections does not constitute prejudicial misconduct. Jury selection in this case took four and one-half months, and scores of prospective jurors were examined on voir dire. During this lengthy process, some deviation from the court's stricture against speaking objections was virtually inevitable. One reason for this, apart from the argumentative propensities of attorneys generally, is that the rules governing voir dire are not as specific or as well established as the rules governing the admissibility of evidence; thus, they do not as readily lend themselves to concise objections. As defendant notes, the trial court's reminders to avoid speaking objections were invariably effective for a time. We think this shows that the prosecutors were striving in good faith to abide by the rule, and that the lapses were inadvertent.

■ Defendant next contends that the prosecutors committed misconduct by making objections that were clearly without foundation. The point is not well taken. Prosecutorial misconduct implies a deceptive or reprehensible method of persuading the court or jury. (*People* v. *Strickland, supra*, 11 Cal.3d 946, 955.) Absent conduct likely to persuade, there can be no misconduct. Thus, the making of meritless objections is not *by itself* prejudicial misconduct.

A prosecutor's baseless objection or other statement made in the presence of a juror can amount to misconduct if it imputes improper motives to defense counsel. (See *People* v. *Bell* (1989) 49 Cal.3d 502, 538 [262 Cal.Rptr. 1, 778 P.2d 129] [it is misconduct to resort to personal attacks on the integrity of opposing counsel].) Of course, it is not misconduct to challenge the propriety of opposing counsel's question to a witness or prospective juror, for this is the purpose of virtually all trial objections. Objections constitute misconduct only if they go beyond the charge of legal or procedural violation and directly or by clear inference question the motives or integrity of opposing counsel. With this distinction in mind, we

proceed to examine some of the claimed instances of such misconduct during jury selection.

On July 10, 1985, during the death-qualification voir dire of the first prospective juror, defense counsel asked this question: "[D]o you understand that if you were sitting on the jury and . . . we were in the penalty phase, that you would have the option of deciding for yourself whether or not the punishment should be life imprisonment without parole, or death, that choice, the Court would tell you, if you were on the jury, is yours." The prosecutor objected that the question was ambiguous, adding, "If [defense counsel] wants to ask questions about the appropriate legal standards or he wants jurors to be instructed in the applicable law, then I would ask that the Court do the instruction and not [defense counsel], so we can get perhaps a clearer statement of what it is." Defense counsel then asked whether the prospective juror would "automatically choose death" if the evidence showed a planned and intentional killing. The prosecutor objected that the question asked the juror "to prejudge a certain set of facts." Referring to *People* v. *Williams* (1981) 29 Cal.3d 392 [174 Cal.Rptr. 317, 628 P.2d 869], the prosecutor added: "That question was improper before *Williams* and it's improper after *Williams*." The trial court did not rule on the objection and shortly thereafter defense counsel asked what things the juror would consider in deciding whether to impose the death penalty for a planned and intentional killing. The prosecutor again objected that the question went to matters not relevant to the death-qualification voir dire. The prosecutor commented: "The purpose of this is not to allow either side really to pack the jury or get them to commit themselves one way or the other."

The prosecutor's objections were well grounded in the law. Counsel may not use voir dire to instruct the jury in matters of law, to educate jurors about the facts of the case, or to compel them to commit themselves to vote a certain way. (*People* v. *Williams, supra*, 29 Cal.3d 392, 408; see also, *People* v. *Clark* (1990) 50 Cal.3d 583, 597 [268 Cal.Rptr. 399, 789 P.2d 127] [death qualification voir dire "seeks to determine only the views of the prospective jurors about capital punishment in the abstract"].) Although the prosecutor's objections were strongly worded, it is understandable that counsel would want to make his points forcefully while the ground rules for the voir dire were being established. We are satisfied that a reasonable juror would not understand the objections as questioning defense counsel's motives or integrity.

The next incident occurred some days later, on July 17, 1985. Prospective jurors were asked to complete a questionnaire, one of the questions being: "Do you believe the State should kill everyone who for any reason intentionally kills another human being?" This prospective juror had answered: "I

don't understand if this means every time." After reciting the question and the response, defense counsel asked: "Now, do you believe that the State should kill everyone where it's been proved beyond a reasonable doubt that the person intentionally killed another person? What's your feeling?" The prosecutor objected that the question was ambiguous, explaining that defense counsel did not "indicate whether that should occur every time or whether or not it depends on the evidence that's presented in a particular case." Asked to reframe the question, defense counsel again recited the question exactly as it appeared on the questionnaire and added: "How do you feel about that? What is your general feeling? Like the judge said, there are no right or wrong answers." The prosecutor renewed his objection, noting that the juror had found the question ambiguous. He added: "I certainly don't think [defense counsel] has cleared up that area of confusion by the question. All he's doing is regurgitating that."

Defendant complains that by these remarks the prosecutor "openly accused defense counsel of trying to confuse the juror." We disagree. The remarks merely reveal the prosecutor's frustration with defense counsel's apparent inability to understand or to clear up an ambiguity that was apparent to both the juror and the prosecutor. There was no imputation of improper motive.

Two days later, on July 19, 1985, defense counsel requested a protective order against facial gestures by the prosecutors—including eye rolling, wincing, and head shaking—during questioning of prospective jurors by the defense. The court stated it had observed some such facial expressions by the prosecutors and ordered all counsel to refrain from such conduct. There were no further complaints by defense counsel, so apparently the court's prompt action was effective.

The next incident occurred on July 31. Defendant charges that on that day the prosecutor's repeated objections on relevance grounds imputed improper motives to defense counsel. The record does not support the charge. The prosecutor asserted that defense counsel's *questions* were improper, but there was no imputation of improper *motive*.

We need not recite the remaining incidents. We have reviewed each of them and find no statement by the prosecutor imputing an improper motive or unethical behavior to defense counsel. Although the tone of the objections was sharp, the trial court imposed reasonable limits and the incidents were relatively infrequent in the context of the lengthy voir dire in this case.

## 2. *Presentation of Guilt Phase Evidence*

### (a) *Disregard of Trial Court Rulings*

 Defendant contends that the prosecutors committed misconduct during the evidentiary portion of the guilt phase by eliciting inadmissible evidence in violation of clear trial court rulings. (See *People* v. *Bonin* (1988) 46 Cal.3d 659, 689 [250 Cal.Rptr. 687, 758 P.2d 1217.)

The first claimed instance occurred during the testimony of prosecution investigator Barry Brown. As we have previously mentioned, Brown had contacted defense witness Rebecca Williams at her home but she had declined to be interviewed. The trial court excluded evidence that Williams had telephoned defense counsel after Brown arrived at her residence and before she declined to speak with him. After the court made this ruling, the prosecutor asked Brown, in the jury's presence, whether Williams had made what appeared to be a long distance call before she reached her final decision not to be interviewed. Defense counsel's objection on relevance grounds was sustained and the prosecutor asked no further questions. Defendant was not prejudiced by this incident. The question did not suggest who Williams might have called, and the objection was immediately sustained.

The next claimed instance occurred during the testimony of Detective Freese, as Freese was describing events shortly after defendant's arrest. The prosecutor inquired whether another detective had asked defendant for consent to search his car. The trial court sustained a defense objection on relevance grounds. The prosecutor asked to be heard on the matter and the trial court said he could be heard at the break, adding "Go on and ask him some more questions." The prosecutor then asked, "What was Mr. Price's response when he was asked to sign the consent?" The court again sustained a relevance objection. The prosecutor's inquiry into a subject the court had ruled irrelevant was improper, but defendant suffered no prejudice as the questions did not suggest the answers and the defense objections were sustained before the witness could answer.

Shortly thereafter, on cross-examination, defense counsel asked Freese whether he had ever directed other officers to detain defendant. The prosecutor objected on relevance grounds. The trial court overruled the objection on the ground that Freese had apparently concluded, after reviewing the robbery witnesses' responses to the composites and photographic lineups, that there was insufficient cause to arrest, and that this opinion was "relevant to the identification issue." The witness then answered that on the morning when defendant was arrested by Detective Douglas, Freese did not think he had "enough to arrest."

On redirect, the prosecutor began to ask Freese whether his opinion would be altered by knowledge of additional facts. Defense counsel immediately objected and the prosecutor withdrew the question. We find no misconduct and no prejudice. The question was withdrawn before it was completed and, contrary to defendant's assertion on appeal, we do not find any earlier statement by the court that clearly precluded the prosecutor from asking such a question. We further note that the prosecutor's original objection on relevance grounds was well taken: whether Detective Freese believed he had sufficient evidence to arrest was not relevant to any issue before the jury.

As we have previously mentioned, the police found a suitcase in the garage of defendant's mother's residence. The suitcase contained a blond wig and a Charter Arms revolver. The prosecutor asked defendant's mother whether she "would be surprised to learn" that the revolver had been stolen in Flint, Michigan. The trial court sustained the defense objection on relevance grounds. A week later, in response to a question by defense counsel, Sergeant Fredrickson testified that the gun found in the suitcase did not match the make and model of any of the guns taken from the Moore or Hickey residences. Outside the jury's presence, the court said it was concerned about this question and answer because they raised a question about why the officer had seized the gun, which had not been described in the search warrant. The prosecutor said the officer had seized it because it was "reported stolen out of Flint, Michigan." The court commented that the officer "didn't know that when he was searching" and asked why the officer had seized it. The prosecutor answered: "Because he knew [defendant] was a convicted felon and he had information——." Before the prosecutor could finish, the court interrupted, saying: "That's fine. That's a proper answer. I'll allow that. [¶] I think he's entitled to explain why he took it." Later, in the jury's presence, the prosecutor asked Sergeant Fredrickson: "Where was the Charter Arms reported stolen out of?" The trial court sustained the defense objection and instructed the jury to disregard the question.

We do not agree that the prosecutor's question was clearly contrary to the court's ruling. The court had ruled that the witness could explain why he seized the weapon, and particularly that he had seized it because it was illegal for defendant, a convicted felon, to possess a firearm. Although the trial court evidently believed that the officer did not know the gun was stolen when he seized it, it appears that the prosecutor was attempting to dispute this assumption when the court cut him off. If the officer knew the weapon was stolen when he seized it, it is not clear that the court's ruling was intended to exclude evidence of this fact. In any event, defendant suffered no prejudice. There is no evidence that defendant was ever in Flint, Michigan, or that he knew the gun was stolen, and the jury was instructed to disregard the question.

When the prosecutor asked Michael Thompson how long he had known defendant, the defense objected on relevance grounds and the prosecutor requested leave to argue the point. Out of the jury's presence, Thompson testified he had met defendant in 1979 at San Quentin. Defense counsel said the defense objected to evidence that showed how long defendant had been imprisoned. The trial court asked: "Is there any problem with just simply saying he's known him since 1979 without going into all the facts and circumstances about where he met him?" The trial court eventually ruled that evidence would be excluded if it showed that defendant "had been in prison for a long period of time." In the jury's presence, the prosecutor asked Thompson: "Can you tell me simply the year that you met the defendant, Curtis Price?" The trial court overruled an objection to this question, thereby indicating that the prosecutor had correctly interpreted its somewhat ambiguous ruling. Contrary to defendant's assertion on appeal, this incident does not show disregard of a court ruling.

The evidence against defendant included credit card receipts defendant had signed for gasoline purchases. The license plate number on some of the receipts was for a vehicle then registered to Michelle Scarborough. During cross-examination of Paul Tulleners, defense counsel asked, out of the jury's presence, that the witness be instructed not to refer to a transfer of this vehicle from Scarborough to Tami Shinn in 1985. Tulleners readily agreed. On redirect, the prosecutor asked whether the vehicle had been transferred to Shinn. The trial court sustained an objection to this question. On recross, defense counsel elicited testimony that none of the vehicles shown on the credit card receipts had been registered to Tami Shinn in 1983. On redirect, the prosecutor began to ask a question about selling or transferring vehicles. The court interrupted the question and excused the jury. The court told the prosecutors there had been a ruling forbidding any mention of the transfer to Shinn, and that the prosecutors had twice attempted to violate the ruling. The court cautioned that "pretty soon somebody is going to be held in contempt here." This strong action by the trial court succeeded in preventing any further reference to the transfer of ownership. The transfer had little or no relevance to the issues in the case and we conclude that defendant was not prejudiced by this incident.

Having reviewed each incident during the lengthy guilt phase that defendant has cited, we do not find that the prosecutors frequently or systematically disregarded trial court rulings. The charge of prejudicial misconduct by violation of trial court rulings is not supported by the record.

(b) *Impugning Character of Defendant and of Defense Counsel*

While addressing the jury during opening statement, the prosecutor made this remark: "You're going to be spending a good deal of time in Mr. Price's

presence while he plays his 'Gee willikers, golly shucks,' role and probably rarely misses a chance to hold [defense counsel] Ms. Klay's chair. But during the evidentiary portion of this case, which we will shortly embark upon, you're going to have the opportunity to meet some other people who have had contact with Mr. Price." ▪ Defendant maintains that this was improper comment on defendant's nontestimonial courtroom behavior. We disagree.

The prosecutor's remark did not urge the jury to draw any adverse inference from defendant's courtroom behavior. On the contrary, it advised the jury, in effect, to ignore defendant's courtroom demeanor and to determine his guilt or innocence on the basis of the evidence. The comment was not improper.

▪ The defense objected when the prosecutor asked Janet Myers, on direct examination, whether she had ever seen defendant "mad enough to kill." The trial court sustained the objection. The prosecutor then asked if the witness had seen defendant "violently mad" during the time he had been staying at her house. The court again sustained a defense objection. Out of the jury's presence, the prosecutor explained that the purpose of the questions was to support the witness's credibility by showing that she was testifying against defendant despite a justifiable fear of him. The trial court remarked that the evidence might become relevant on redirect. The trial court then instructed the jury to disregard the questions. We find no misconduct and no prejudice.

▪ The prosecutor asked Clifford Smith if he was "personally aware of whether or not the Aryan Brotherhood membership is doing anything right now to assist the defendant Curtis Price in his defense of this case." The trial court sustained the defense objection before the witness answered. The question implied, at most, that defendant was an AB member. Given the jury's awareness of defendant's admission, by prior testimony in another case, that he was an AB member, this implication was hardly prejudicial.

▪ During cross-examination of Sergeant Fredrickson, defense counsel asked about a wood chip the police had found in the search of defendant's car. Fredrickson testified that the police had found the chip in a manual for an AR-7 rifle, and that the Department of Justice laboratory had later reported that the chip did not match wood in the Hickey apartment. Defense counsel then asked: "Has there been any sort of investigation of the department to see if an officer placed it there in the pamphlet?" The prosecutor did not object and the witness answered in the negative. On redirect, the prosecutor prefaced his first question with this remark: "[P]erhaps we can eliminate [defense counsel's] sleazy . . . information right up front." The

trial court sustained the objection and admonished the jury to disregard the implication that there had been anything "sleazy."

The prosecutor's remark was plainly improper, but this was an isolated incident in a very long trial and we are persuaded that the trial court's prompt and vigorous admonition was effective to cure any prejudice.

■■■ Jim Robison, a police officer for the City of Arcata, testified that he was dispatched to the Triplex Theater to investigate a report of a suspicious person. When the prosecutor began to question the officer about the description of this person that appeared on a dispatch card, defense counsel stated in the jury's presence that he had never received a copy of the card and asked to approach the bench. At the bench, defense counsel represented that he had asked for the card during discovery and had been told it was lost or destroyed. The prosecutor responded: "Tell them you got it . . . don't lie to him anymore. If he says he hasn't had it, that's a fucking lie."

The trial court immediately excused the jury and informed counsel that any further outbursts of the sort would result in contempt citations. The prosecutor apologized to both the court and defense counsel, admitting that his conduct had been "inexcusable." The court admonished the jurors that if any of them had overheard the remark counsel had made at the bench, they were to disregard it. The court said it had explained to counsel that such comments were not acceptable and noted that it might have been attributable to the cumulative stresses of the trial which, including jury selection, had then continued for "seven and three-quarters months." The prosecutor later explained that his records showed that the defense had received discovery of the dispatch card. Out of the jury's presence, prosecution investigator Barry Brown testified that he had given a copy of the dispatch card to defense counsel. The court apparently found this testimony credible, but it nonetheless excluded as cumulative all evidence relating to the dispatch card.

As the prosecutor conceded, his remarks at the bench were inexcusable misconduct. We are unable to conclude, however, that defendant suffered prejudice. Assuming that the jury was able to overhear the prosecutor's remark, the trial court's prompt and forceful response was sufficient to prevent any reasonable juror from being influenced by the remark in a manner adverse to defendant or his trial counsel. The evidence that prompted the dispute was excluded, and there were no further incidents of this kind.

■■■ While questioning defendant's mother on redirect, the prosecutor asked whether defendant had returned to live with her because defendant's brother and his wife, with whom defendant had been living, "threw him out

of their house." The trial court sustained a defense objection on the ground that the question exceeded the scope of cross-examination. Defendant contends that the question constituted misconduct because it had no legitimate purpose and tended to impugn his character. We disagree.

Defendant's brother testified that defendant had been living with him but had left following a disagreement. The brother said he later gave defendant, as a peace offering, a radio he had purchased. The prosecution disputed this testimony, arguing that the radio found among defendant's possessions had not been purchased by defendant's brother, but instead had been taken from the Hickey apartment. In support of this position, the prosecution argued that it was improbable that defendant's brother would have given defendant an expensive present soon after a serious disagreement. Therefore, defendant's relationship with his brother was a legitimate subject of inquiry.

■■■ Witnesses to the Triplex robbery used a device called an "Identi-Kit" to prepare composites of the robber's facial features. The original composites were disassembled after being photocopied, but the copies were apparently unsatisfactory. The prosecution called Ronald Waters, a police officer for the City of Eureka, to testify to the manner in which he had recreated the composites. The defense objected on relevance grounds, noting that Waters had not prepared the original composites. The prosecutor explained that the witness "redid the composites," and he added that defense counsel had "already introduced two of those in evidence." After a hearing out of the jury's presence, the court ruled the evidence admissible. In the jury's presence, the prosecutor asked the witness if he was "aware that the only composites that [defense counsel] didn't want the jury to see were those by [names of three of the Triplex robbery witnesses]." Defense counsel did not object or request an admonition. Defendant contends on appeal that the question was improper because it implied that defense counsel was attempting to conceal evidence from the jury.

We conclude that the point is not preserved for review. Had defense counsel objected and requested an admonition, the court could have averted any possible prejudice by instructing the jury that defense counsel had raised a routine trial objection addressed to the reliability of the evidence, and that it was not to draw any adverse inference from the making of such objections.

(c) *Attacks on Defense Expert Witnesses*

■■■ Defendant has several complaints about the prosecution's treatment of Dr. Martin Blinder, the defense expert who testified about the domestic homicide syndrome.

We reject defendant's claim that the prosecutor committed misconduct by questioning Dr. Blinder about the fee he was receiving for his testimony. "The compensation and expenses paid or to be paid to an expert witness by the party calling him [or her] is a proper subject of inquiry by any adverse party as relevant to the credibility of the witness and the weight of his [or her] testimony." (Evid. Code, § 722, subd. (b); see *People* v. *Rich* (1988) 45 Cal.3d 1036, 1100-1101 [248 Cal.Rptr. 510, 755 P.2d 960].)

We also reject the contention that the prosecutor committed misconduct when he asked Dr. Blinder whether he was retained by and testified for the defense "in the Dan White case," and again when he commented on the expert's connection with the Dan White case in argument to the jury. Because the defense did not object or request an admonition in either instance, the point is not preserved for appeal. Moreover, an expert's testimony in prior cases involving similar issues is a legitimate subject of cross-examination. Here, the witness testified that he had discussed the Dan White case in his book on the domestic homicide syndrome.

Defendant raises similar issues regarding the testimony of Robert Shomer, a defense expert on eyewitness identifications. Defendant contends the prosecutor committed misconduct by asking about the fee the defense was paying Shomer for his testimony, and by asking about Shomer's testimony in other cases. The defense did not object or request an admonition when most of these questions were posed, and to this extent our review is procedurally barred. Those claims not procedurally barred we reject on the merits: it is not misconduct to question an opponent's expert witness about payment for services or about the expert's testimony in prior cases involving similar issues.

### (d) *Revealing Inadmissible Evidence*

During cross-examination of prosecution witness Clifford Smith, defense counsel asked whether Smith's decision to defect from the AB and testify against defendant had been motivated by a promise that in return his mother would not be prosecuted for smuggling drugs to him in prison. Smith denied that any such promise had been made and that his mother had ever smuggled drugs to him. On redirect, Smith again denied that his mother had ever smuggled drugs to him. The prosecutor then asked: "Where would this come—where did this come from. Do you have any idea at all?" Smith answered: "Um, come from Curtis Price. Well—I'm assuming." The defense objected and the court struck the testimony and instructed the jury to disregard it. Defendant was not prejudiced by this incident. The point was peripheral at best, the witness admitted he was speculating, and the court instructed the jury not to use the testimony in any way in deciding the case.

Shortly thereafter, the prosecutor asked Smith about the risks he was taking in testifying against defendant. Smith testified that the AB leaders had "pretty long memories" and that there were "a whole lot" of people on the AB "hit list." When the prosecutor asked Smith if he could name some of the people the AB leaders intended to kill, the court sustained the defense's relevancy objection. The prosecutor then asked: "Do you know whether or not [Department of Justice investigator] Paul Tulleners is on the Aryan Brotherhood hit list?" The trial court again sustained a defense relevancy objection. Defendant contends that the incident demonstrates misconduct because the prosecutor knew from the sustaining of the first objection that the topic was impermissible, because Smith could not have had current knowledge about AB decisions, and because the questions had no legitimate purpose. We disagree.

The danger the AB posed to witnesses testifying against an AB member had a significant bearing on the credibility and motives of those witnesses. For this reason, the defense raised no objection to questions about Smith's fears for his own safety. The prosecutor could reasonably conclude that the trial court sustained the first defense objection because the names of persons unconnected with this case would have no relevancy. Because Tulleners had testified, the prosecutor could have believed that inquiry about his status as an AB target would be permitted as bearing on his credibility. Although Smith had defected from the AB, he had done so only after the preliminary hearing in this case, and thus he possessed reasonably current information on the decisions of the AB leadership. No misconduct is shown.

During the redirect examination of Michael Thompson, the prosecutor asked about prior statements Thompson had made about the various crimes charged against defendant. The prosecutor then asked how Thompson had obtained information about the Moore burglary and the Hickey murder. Thompson said he had obtained it from Stinson. The prosecutor then asked Thompson if he knew how Stinson had obtained the information. Thompson answered, "Yes, Curtis Price." The trial court sustained a defense hearsay objection and instructed the jury to disregard the testimony. Defendant cites the incident as misconduct. He asserts that the question clearly called for inadmissible hearsay and that the defense was severely prejudiced because the answer implied that defendant had confessed to the Hickey murder. We find no prejudicial misconduct.

The assertion of severe prejudice is unfounded. No reasonable juror would interpret the statement as an implied confession to the Hickey murder. There was no suggestion that, for example, the information Stinson provided to Thompson included facts about the murder that had not been made public.

Indeed, defendant asserts elsewhere in his appellate brief that "Thompson was thoroughly inaccurate in *every* detail he supplied about the Hickey killing." (Original italics.) The stricken testimony showed at most that defendant was aware of the crime, had some knowledge of the circumstances, and realized that the police had or might connect it to the AB. It was undisputed that defendant was acquainted with Hickey, that he had obtained weapons from her in some manner, and that the police had seized these weapons after arresting defendant. Even if defendant had been entirely innocent of the Hickey murder, he certainly knew at the time in question, after his arrest, that Hickey had been killed, that he was at least a suspect, and that the AB would be implicated. Thus, the stricken testimony told the jury nothing it did not already know or could not reasonably have inferred.

Defense witness Rebecca Williams testified, on cross-examination, that she had inherited a .22-caliber Jennings semiautomatic pistol from her grandfather before 1975, that she had shown the pistol to defendant, that defendant had suggested she take it to a gunsmith to have it cleaned, that she had done so, and that the gunsmith had refused to work on it because the gun had no serial number. On rebuttal, a police officer for the City of Auburn testified that under his questioning Williams said that defendant had asked her to have the pistol cleaned for him and had told her he would pick it up later. Also on rebuttal, the owner of the corporation that manufactured the pistol testified it was made in 1981 or 1982. The defense lodged a relevance objection and requested an offer of proof when the prosecutor asked this witness to disassemble the pistol. The prosecutor responded: "I think he will be able to testify that somebody apparently modified this weapon in the mistaken belief they could turn it into an automatic weapon." The court ruled that the witness could testify that the weapon was inoperable to explain why it was taken to be repaired, without speculating as to the intended purpose of the modification that made it inoperable. Defendant contends that the prosecution committed misconduct by stating in open court that someone had attempted to convert the pistol into an automatic weapon.

We find no misconduct. Evidence that someone had tampered with the gun's mechanism was admissible to impeach the testimony of Williams, who claimed to have no understanding of guns and to have never fired this weapon. Although the apparent purpose of the modification may have been irrelevant, the court's action in sustaining the objection was sufficient to avert any possible prejudice on this minor point.

(e) *Other Allegedly Improper Conduct*

Defendant invites our attention to two final incidents that he maintains constitute misconduct.

In one incident, the defense objected on relevance grounds to a question the prosecutor posed to a witness. The prosecutor admitted he could not identify any theory of relevancy, remarking that he was "simply curious." The trial court sustained the objection and the prosecutor abandoned the topic. Asking questions about irrelevant matters is improper. Defendant concedes, however, that the incident resulted in no significant prejudice.

On a Friday during the trial, the defense asked for a list of the witnesses the prosecution intended to call the next week. One of the prosecutors said they had not yet determined which witnesses to use and offered to provide the information on the following Monday. The trial court indicated that the testimony would begin on Tuesday with the completion of one witness's testimony and instructed the prosecutors to name the witness who would follow. The prosecutors then named three witnesses.

We reject the contention that this incident shows misconduct. Defendant claims the prosecutors' ability to name three witnesses shows that the prosecutor lied when he said he could not provide a list of the witnesses to be called. We see no inconsistency. The prosecutors apparently knew the witnesses they intended to call first, but not the witnesses for the full week. In any event, no prejudice resulted.

### 3. *Argument to the Jury*

We need not decide whether the prosecutors committed misconduct during argument because the defense did not object at trial to the prosecutors' statements or seek an admonition. (*People* v. *Medina, supra,* 51 Cal.3d 870, 895.) In each of the cited instances, any prejudice could have been averted by an admonition.

The prosecutor argued that flight from the scene of a crime was evidence of consciousness of guilt. Defendant maintains that the argument was improper because the prosecutor had apparently withdrawn his request for a flight instruction after defendant objected. Assuming the argument was improper, an admonition that the principle had no application in this case would have eliminated any prejudice.

In discussing the testimony of defense witness Wendell Norris, the prosecutor noted that a court had reduced his murder conviction from first degree to second degree and his kidnapping-for-ransom conviction to a conviction for escape. Any conceivable prejudice from these remarks could have been prevented by an admonition that in judging Norris's credibility the jury should disregard his invalidated convictions.

In discussing the robbery identification evidence, the prosecutor three times mentioned that defendant was not present in the courtroom when these witnesses testified. Defendant contends it was misconduct to suggest in this manner that defendant remained away from the trial to avoid identification, when in fact he did so to avoid being shackled in the courtroom. The contention assumes, erroneously we believe, that the prosecutor was required to accept at face value defendant's stated reason for boycotting the trial. In any event, the prosecutor's remarks were mild and an admonition to draw no inference from defendant's absence would have cured any prejudice.

In the course of a long discussion on the credibility of defense witness Rebecca Williams, the prosecutor remarked in passing that she had been subpoenaed by the prosecution to testify at the trial and thereafter she "all of a sudden, comes up sick or something." Having testified that her grandfather had given her before 1975 a gun that the manufacturer testified was made only in 1981 or 1982, Williams was a witness whose credibility was clearly suspect. An admonition to disregard the prosecutor's brief and mild reference to her apparent illness would have averted any prejudice.

The prosecutor remarked that in criminal cases discovery was "a one way street" because "[w]e don't get advance discovery of the defense." The prosecutor did not elaborate and did not suggest that the prosecution's ability to prove its case had been hampered by lack of discovery. An admonition would have cured any conceivable prejudice from this fleeting reference to discovery rules.

The prosecutor had presented testimony that defendant's mother had agreed to meet with a prosecution investigator to search her residence for a calendar on which she had made notations in 1981 and 1982, and that the investigator later had been unsuccessful in making arrangements with defendant's mother to conduct the search. Referring to this incident, the prosecutor said: "And this, of course, is just minor. There probably was a real calendar. She probably does keep one, but we didn't get to see it nor did we get to see the other one. I remember that she was going to bring that in and then refuses to give it to us out in the hallway." To the extent this remark reflected facts not in evidence, an admonition would have averted any prejudice to defendant.

Referring to the testimony of Clifford Smith, the prosecutor said: "God what a great witness. That's my opinion. If you don't feel that way, you think that Clifford Smith was a lying whatever, that's fine because you are now the judges." Defendant contends it was improper for the prosecutor to vouch for the credibility of a prosecution witness. The remark appears to have been

properly based on facts and inferences in the record (see *People* v. *Anderson* (1990) 52 Cal.3d 453, 479 [276 Cal.Rptr. 356, 801 P.2d 1107]), but, assuming it was improper, an admonition that the prosecutor's opinion was irrelevant would have avoided any possible prejudice. (See *People* v. *Bell, supra,* 49 Cal.3d 502, 538.)

### 4. *Conclusion*

Whether considered separately or cumulatively, the incidents defendant cites do not establish prejudicial misconduct by the prosecutors at the guilt phase.

### T. *Sufficiency of Evidence of Hickey Residence Burglary*

 Defendant contends the evidence is insufficient to support his conviction for burglary of the Hickey residence. More particularly, he argues that the evidence does not sufficiently establish that he formed the intent to commit theft before rather than after he entered the residence.

 Defendant's contention requires that we determine whether a rational trier of fact could have found the element of intent beyond a reasonable doubt. In making this determination, we examine the entire record in the light most favorable to the prosecution, presuming in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.[21] (*People* v. *Jackson* (1989) 49 Cal.3d 1170, 1199-1200 [264 Cal.Rptr. 852, 783 P.2d 211]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].)

 "Although the People must show that a defendant charged with burglary entered the premises with felonious intent, such intent must usually be inferred from all of the facts and circumstances disclosed by the evidence, rarely being directly provable. [Citations.] When the evidence justifies a reasonable inference of felonious intent, the verdict may not be disturbed on appeal. [Citations.]" (*People* v. *Matson* (1974) 13 Cal.3d 35, 41 [117 Cal.Rptr. 664, 528 P.2d 752].)

The prosecution presented evidence that AB leaders had instructed defendant to gather firearms to be used by the AB to commit crimes. Defendant

---

[21]The trial court gave the familiar jury instruction that a defendant may not be convicted on circumstantial evidence unless the facts and circumstances are not only consistent with guilt, but also inconsistent with any other reasonable conclusion. Defendant urges us to apply this standard on appeal and to overrule our earlier decisions holding that it is primarily for the guidance of the trier of fact. (See, e.g., *People* v. *Bean* (1988) 46 Cal.3d 919, 932-933 [251 Cal.Rptr. 467, 760 P.2d 996]; *People* v. *Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253].) We decline the invitation.

told his mother that the weapons later found in the Nevada storage locker, including weapons taken from the Hickey residence, were "Brand business" (that is, intended for the AB). ▮▮▮ The jury could reasonably infer that defendant went to Hickey's apartment to obtain the weapons and that he intended to obtain them by theft, rather than by purchase, because he could not afford to leave a witness who could connect him to the weapons and who had no loyalty to the AB. Accordingly, the evidence presented at trial, although circumstantial, was sufficient to support the conviction for burglary of the Hickey residence.

Defendant contends that if the evidence of burglary is insufficient, then the verdict for the first degree murder of Hickey and both of the special circumstance findings must fall. Because we have concluded that sufficient evidence supports the burglary conviction, we need not consider these related contentions.

U. *Claims Relating to Charge of Receiving Stolen Property*

Defendant attacks on multiple grounds his conviction for receiving stolen property. This conviction related to defendant's possession of guns taken from the Moore residence. Defendant contends: (1) the evidence does not show that defendant possessed the guns on the date and at the place specified in the information; (2) the evidence does not show that someone other than defendant stole the guns; and (3) the jury was not instructed on the principle that one who steals property may not be convicted of receiving the same property.

In the information, the prosecution alleged that "on or about" February 28, 1983, in Humboldt County, defendant did "receive, conceal, . . . [and] withhold" the firearms stolen from Richard Moore. Defendant observes that most of these firearms were recovered from the Nevada storage locker and that the evidence shows defendant took them to Nevada no later than February 19, 1983. ▮▮▮ From these facts, defendant concludes that there was no evidence that defendant possessed the weapons in Humboldt County on or about the date charged.

We need not decide whether the conviction could properly be based on defendant's possession of the weapons found in the storage locker. Moore testified that the weapons taken from him included three shotguns, two of which were found in the locker. The third was a featherweight shotgun of the same make and model as one found in defendant's mother's garage in Humboldt County. Moore could not be certain that this shotgun was his because part of the barrel and stock had been sawed off, but the jury could

reasonably infer, from defendant's possession of Moore's other firearms, that this was indeed Moore's missing featherweight shotgun, and that defendant had possessed it in Humboldt County on or about the date alleged in the information.

■ Defendant next contends that he could not be convicted of receiving stolen property because the prosecution's evidence did not exclude the possibility that defendant himself had stolen the Moore weapons. The contention is based on a misunderstanding of the law.

With certain limited exceptions, a defendant may not be convicted of stealing and receiving the same property. (*People v. Jaramillo* (1976) 16 Cal.3d 752, 757 [129 Cal.Rptr. 306, 548 P.2d 706].) This does not mean, however, that when the prosecution has charged only receiving, it must establish by affirmative proof that someone other than the defendant stole the property. (*People v. Taylor* (1969) 2 Cal.App.3d 979, 984 [83 Cal.Rptr. 119]; *People v. Williams* (1967) 253 Cal.App.2d 952, 958 [61 Cal.Rptr. 238].) A conviction for receiving stolen property may be based on evidence "that the property in question was stolen, that the defendant was in possession of it, and that the defendant knew the property to be stolen" (*People v. Anderson* (1989) 210 Cal.App.3d 414, 420 [258 Cal.Rptr. 482]), even though the evidence also strongly suggests that it was the defendant who stole the property. (*People v. Briggs* (1971) 19 Cal.App.3d 1034, 1036 [97 Cal.Rptr. 372].) Under these authorities, the evidence in the present case amply supported defendant's conviction for receiving stolen property.

■ The trial court was not required to instruct sua sponte on the principle that a person may not be convicted of both stealing and receiving the same property. Such an instruction is required only when the defendant is charged with two mutually exclusive offenses. (See, e.g., *People v. Lawrence* (1980) 111 Cal.App.3d 630, 639 [169 Cal.Rptr. 245].)

## V. *Failure to Instruct on Manslaughter*

■ Defendant contends that the evidence would support a conclusion that he was guilty of no more than voluntary manslaughter for the Hickey killing, and that the trial court therefore erred in failing to instruct the jury on the elements of voluntary manslaughter as a lesser included offense of murder. We need not decide whether the failure to give manslaughter instructions was error because any error was necessarily harmless in light of the jury's special circumstance finding that defendant killed Hickey in the perpetration of burglary. Under this finding, the Hickey killing was necessarily felony murder. (See *People v. Edelbacher, supra,* 47 Cal.3d 983, 1028.)

W. *Cumulative Impact of Guilt Phase Errors*

▇▇▇ Defendant contends that the guilt phase errors, considered individually or collectively, cannot be deemed harmless. We have concluded that few errors occurred, and that none was prejudicial. We likewise conclude that when these errors are considered together, their cumulative effect did not result in substantial prejudice to defendant. Defendant received a fair trial of the guilt issues. We perceive no basis for reversal of the guilt verdicts or the special circumstance findings.

### III. PENALTY ISSUES

A. *Jury Coercion*

The jury began its penalty deliberations at 10:41 a.m. on Tuesday, July 1, 1986. It deliberated until 4:55 p.m. that day and from 9 a.m. until 4:38 p.m. on the following day. On Thursday, July 3, the jury again began deliberating at 9 a.m. At 1:55 p.m., the foreperson sent the court a note that stated: "We seem to have reached an impasse in making a unanimous decision. Any suggestions?" In the courtroom, at 2:33 p.m., the court asked whether there was a reasonable probability that further deliberations would produce a verdict. The foreperson replied: "When I wrote the note, I was not sure. Since sending the note, we have taken another vote and the numbers have changed. So we may not be at an impasse." The jury returned to the jury room and deliberations continued.

Less than an hour later, the foreperson sent the court a note stating that the jury was deadlocked. The jury returned to the courtroom at 4:03 p.m. In response to the court's inquiries, the foreperson said that the vote was seven to five, that it had not changed during the last four ballots, and that she did not think the votes were likely to change. Asked whether they shared the view that further deliberations would probably not result in a verdict, 10 of the 11 remaining jurors responded in the affirmative. The 11th juror was unsure. The court then consulted briefly with counsel at the bench. The prosecution favored further deliberations; defense counsel said they were satisfied there was a deadlock.

The court addressed the jury: "Ladies and gentlemen, at a time like this, the law is in an odd position in a way. The law's clear that there can be no force or coercion applied to a jury to reach a verdict. You're asked to give your individual opinion and, apparently, you certainly have. And, of course, on the other side of that coin, there's a desire of everyone, I'm sure yourselves, to conclude this once and for all.

"So, my comments at this point are not to be in any way an attempt to change anyone. All I'm saying, at this point in time, everyone here—I think everyone who hasn't been in the jury room can't imagine what you've struggled with. We know you've been here for the last year struggling with everyone else to get through the case.

"And on the other hand, everyone here would like to see it over with. I think they would also like to see—well, without going any more, we would all like to see it end today, of course. I think what I'd like to do, although I have reservations, I see things both ways.

"I think what I'll do is recess until Monday and let you meet again Monday morning and discuss it. And if you feel the same way you feel now, then we'll reassemble just like we are now. So at this point I'm going to give you the admonition. [Court gives usual admonition not to discuss the case.]

"If you can, please have a pleasant Fourth of July weekend. Try to forget about the problem that faces you. And please do not take my continuing this to Monday as any attempt to coerce you in any way. I just want to give you time to get away from it for a while, come back and approach it fresh. If you still have the same mind, there's no one here going to force you to do anything you don't want to abide by."

A juror then inquired, "I presume I can't ask a question?" The court replied, "Please, not now."

The jury resumed deliberations at 9:30 a.m. on July 7. At 10 a.m., the foreperson sent the court a note requesting seven items of evidence. During the remainder of that day and the next, the jurors requested several additional items of evidence, which were provided to them. At 3:40 p.m. on July 8, the jury announced it had reached a verdict. On being polled, each juror affirmed unequivocally that the verdict imposing the death penalty was the individual verdict of that juror.

 Defendant contends that the trial court erred in failing to accept the jurors' opinion that they had reached an impasse, in inquiring as to the jury's numerical division, in implying that a verdict would have to be reached at some point, and in declining to permit a juror to ask a question. Defendant contends that the combined effect of these alleged errors was to improperly coerce the jury to reach a verdict, in violation of defendant's rights under the federal Constitution to trial by an impartial jury, due process of law, and a reliable determination of penalty in a capital case. We find no error and no coercion.

A jury that has deliberated may be discharged without reaching a verdict when, "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." (§ 1140.) Whether the jury has had sufficient time to deliberate, and whether there is no reasonable probability of a verdict, are determinations committed to the sound discretion of the trial court. (*People* v. *Haskett* (1990) 52 Cal.3d 210, 241 [276 Cal.Rptr. 80, 801 P.2d 323]; *People* v. *Sheldon* (1989) 48 Cal.3d 935, 959 [258 Cal.Rptr. 242, 771 P.2d 1330].) Here, because the penalty trial had lasted over three weeks and the entire trial (excluding jury selection) over seven months, the trial court could reasonably determine that the jury had not deliberated sufficiently on the voluminous evidence presented to it, and that a finding of deadlock would be premature. We find no abuse of discretion in this determination.

When a jury indicates it has reached an impasse, a trial court that directs further deliberations must exercise great care to avoid the impression that jurors should abandon their independent judgment "in favor of considerations of compromise and expediency." (*People* v. *Carter* (1968) 68 Cal.2d 810, 817 [69 Cal.Rptr. 297, 442 P.2d 353]; accord *People* v. *Miller* (1990) 50 Cal.3d 954, 994 [269 Cal.Rptr. 492, 790 P.2d 1289].) Here, the trial court in its remarks to the jury properly stressed that it was not attempting to coerce the jury in any way and that if the weekend respite did not provide a fresh perspective, the jury should feel free to again report an impasse. The jurors correctly understood that the court's intent was to provide an opportunity for them to enhance their understanding of the case rather than to coerce them to abandon the exercise of individual judgment. This understanding is shown by the jury's immediate requests, after the weekend break, to review various items of evidence. (See *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 775-776.) The jury remained focused on the evidence during its deliberations, and its penalty verdict was not the result of trial court coercion.

We decline defendant's request that we overrule past decisions permitting a trial court to inquire about the numerical division of a jury. (See, e.g., *People* v. *Morris, supra,* 53 Cal.3d 152, 227; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 776, fn. 14.) Defendant gives us no persuasive reason to reconsider these decisions.

We conclude, finally, that the trial court did not err in declining to entertain a juror's question on Thursday, July 3, after it had already announced its intention to recess for the weekend and had given the admonition that normally marked the end of the jury's daily routine. Both the form of the question ("I presume I can't ask a question?") and the content of the

answer ("Please, not now.") demonstrate that the problem was with the timing. A reasonable juror would not interpret the reply as precluding timely inquiries.

B. *Jury Inquiry During Deliberations*

During the penalty deliberations, the jury foreperson sent the court a note requesting, among other items, "Writings &/or testimony re. 'Take her to the country' or 'Took girl to the country.'" After discussing the matter with counsel, the court had the court reporter read to the jury portions of the guilt phase testimony of Clifford Smith and Michael Thompson and part of defendant's penalty phase testimony.

In the portion of his testimony read to the jury, Smith had said that to "take someone to the country" meant to kill that person. He explained that the phrase had originally referred to a particular killing of a woman by a former AB member but had since become AB slang for any killing. Michael Thompson, in the testimony read to the jury, said he understood "sent a girl to the country" to mean that "the girl in question has been killed and dumped." Asked whether he had ever seen that phrase written, he said that he had. He then testified that he had received letters or cards from defendant after defendant was released from prison but before his arrest, and that he had seen letters or notes that defendant had written during the same time period to other AB members, including Bob Curl, John Stinson, Clifford Smith, Robert Griffen, and Bobby Schmidt. He was not asked, however, whether the phrase "sent a girl to the country" appeared in any of the letters or cards written by defendant that he had seen.

In the testimony of defendant that was read to the jury, defendant was asked what the phrase "took her to the country" meant to him and whether he had ever used that phrase in reference to Elizabeth Hickey in a letter or card written to a state prison inmate. Defendant appeared to have difficulty understanding the question, asking repeatedly for clarification. Finally, he testified that the only time he ever wrote about Hickey was in a letter to Michael Thompson in which he discussed the case solely in terms of what the prosecution was alleging. He did not say whether he had used the phrase "took her to the country" in this letter.

Later the same day, after the court reporter had read this testimony to the jury, the foreperson sent two more notes. The first requested "any/all post-cards in evidence." The second stated that the jury wanted to see "the writing, postcard or whatever evidence it was that led to the prosecution's questions about the phrase 'took a girl to the country.'" Out of the jury's

presence, the court said: "It's my recollection that that postcard was not retained by Mr. Thompson or anyone that either side is aware of; is that correct?" Defense counsel replied: "According to the discovery provided in the logs of Agent Tulleners . . . Frank Wirshup told Agent Tulleners he put it in a baby lotion bottle that was in his cell at the time his cell was fire bombed and destroyed . . . ."

The court then gave this answer to the jury: "[T]o advise you about your last note which speaks of a postcard which gave rise to the prosecution's questions about the phrase 'Take a girl to the country,' everyone here agrees that postcard was never physically present nor marked in this case. We could all speculate, I think, individually and perhaps collectively as to what may have happened to it, but no one here really knows. It's never been before the Court as far as I know and certainly is not marked and is not in evidence." At the bench, defense counsel expressed concern that this admonition suggested that there was a postcard in existence, although it had not been produced.

The court addressed the jury again: "Ladies and gentlemen, I don't recall the exact wording that I gave you about the postcard. Whatever I said is not meant to infer that necessarily there was ever such a postcard in existence. All I'm trying to convey to you clearly is that there is certainly not one marked. There is not one in evidence, and it may be or it may not be, and no one here really knows because we—we haven't seen it, and I don't want you to be inferring that there was necessarily one in existence at any given time. That's something that you should treat along with the other evidence and make your determination on if there is enough evidence for to make a determination on that issue, if it's important to you. [¶] We do not have one marked. We do not have one in evidence. And anything I am saying here is not to infer or cause you to believe that I have some inside information that one did indeed exist at any given time. I don't know that."

Defendant contends that the jury's notes indicate a mistaken belief that evidence had been presented at the guilt phase that defendant had used the phrase "take a girl to the country" in connection with the Hickey killing, and had thereby confessed to the killing. He maintains that this evidence of mistaken understanding requires reversal of all the guilt verdicts. He further contends that the trial court's response to the jury's notes exacerbated the problem by suggesting there was evidence from which the jury might infer that defendant had made such a damning admission. Requesting reversal of the penalty verdict as well, defendant invokes his rights under the federal Constitution to a fair jury trial, due process of law, and a reliable penalty determination.

Defendant cites no authority for the proposition that a jury's inquiries at the penalty phase may be used to attack the verdict it rendered at the guilt phase. Assuming for argument's sake that such an attack could be successful in a proper case, we conclude that it cannot succeed here. The jury's penalty phase inquiries do not show that evidence concerning the phrase "take a girl to the country" had played any role in the guilt verdicts. On the contrary, the inquiries reflect interest in a topic that had assumed significance only at the penalty phase. Moreover, the inquiries do not reveal a mistaken understanding of the guilt phase evidence. The jury asked for "the writing, postcard or whatever evidence it was that led to the prosecution's questions"; it did not ask for or refer to any writing mentioned in the testimony of Smith or Thompson.

Nor do we find any error in the admonition the court gave. The court properly stressed that there was no exhibit in evidence corresponding to the jury's inquiry and that such a writing might never have existed. The court did not err in suggesting that the jury might infer the existence of a writing that prompted the prosecutor's questions. Thompson testified that he received letters from defendant and that he had seen the phrase "sent a girl to the country" in a letter, but he did not testify that he seen the phrase in a letter from defendant. When asked about this, defendant replied evasively, admitting finally that he had written to Thompson about the Hickey killing, although in the context of the prosecution's allegations. He did not affirm or deny that he used the phrase "took a girl to the country" in reference to the charges against him. From all this testimony, the jury could properly infer, at the least, that some writing had once existed that had prompted the prosecutor's questions.

## C. Improper Aggravating Evidence

Defendant contends that several forms of improper aggravating evidence were erroneously admitted or argued. He asserts that the errors denied him his rights to due process of law and a reliable penalty determination under the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution.

### 1. Prior Conviction for Marijuana Possession

Over defense objection, the prosecution introduced evidence of defendant's 1967 felony conviction in this state for possession of marijuana. Defendant contends that this prior conviction could not be used in aggravation under section 190.3, factor (c) ("The presence or absence of any prior felony conviction"), because at the time of trial the offense of marijuana possession was no longer punishable as a felony and because any

record of a marijuana possession conviction cannot be considered "accurate, relevant, timely, or complete for any purposes" if the record is more than two years old (Health & Saf. Code, § 11361.7, subd. (a)). The latter provision makes any record falling within its terms " 'useless and for all intents and purposes nonexistent.' " (*People* v. *Boyd* (1979) 24 Cal.3d 285, 293 [155 Cal.Rptr. 367, 594 P.2d 484] [record of prior felony conviction for marijuana possession will not support a charge of possession of a firearm by an ex-felon].)

Defendant is correct that the evidence was inadmissible, but there is no reasonable possibility that the error affected the penalty verdict. (*People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].) In his penalty phase testimony, defendant admitted both possession and sale of marijuana, and the offense of marijuana possession is insignificant in light of "the evidence of far more serious violent offenses committed by defendant" (*People* v. *Heishman* (1988) 45 Cal.3d 147, 191 [246 Cal.Rptr. 673, 753 P.2d 629]). Because the erroneously admitted evidence was inconsequential in the context of the evidence properly received, the error did not deprive defendant of any right under the federal Constitution.

2. *Prior Conviction for LSD Possession*

 The documentary evidence the prosecution introduced to prove defendant's 1967 felony conviction for marijuana possession also showed that defendant had been convicted and sentenced at the same time for the misdemeanor offense of possession of lysergic acid diethylamide (LSD). Although evidence of this misdemeanor offense was not admissible, the error was harmless beyond a reasonable doubt. Nothing in the jury instructions or the arguments of counsel suggested to the jury that it could or should consider this conviction in determining penalty, and the evidence was insignificant in light of defendant's record of violent behavior, including the offenses proved in this case.

3. *Lack of Remorse*

During argument to the jury, the prosecution commented on the defense efforts to portray defendant in a sympathetic light, contrasting these efforts with the prosecution's evidence of defendant's out-of-court behavior that showed him in a less favorable light. During this argument, the prosecutor said, "You know, the least you can do is look remorseful. Ask you people to spare his life." The defense did not object to this remark or request an admonition. Defendant contends that the remark was improper because it is unfair to expect an expression of remorse from one who denies

guilt, and also because lack of remorse is not one of the statutory aggravating factors.

In words applicable to this case, we recently said: "While an argument asking the jury to return a death verdict because the defendant had failed to confess or had maintained his [or her] silence would be improper [citations], the argument here did not ask this. The prosecutor is entitled to counter the argument that the jury should spare defendant's life out of pity for him [or her], and we have said that the jury may consider lack of remorse in fixing penalty. [Citations.] When comments on lack of remorse do no more than suggest the inapplicability of a potentially mitigating factor, they are appropriate." (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1270-1271 [278 Cal.Rptr. 640, 805 P.2d 899].)

### 4. *Double Counting of Montana Incident*

Under section 190.3, factor (b) (prior criminal activity involving violence), the prosecution introduced evidence of the December 1971 incident in Montana in which defendant escaped from custody and used motorist John Digalis as a hostage. Under section 190.3, factor (c) (prior felony conviction), the prosecution introduced evidence of defendant's 1972 Montana conviction resulting from the same incident. ▮▮▮ Defendant contends that the manner in which these two items were presented to the jury caused an unacceptable risk that the jury would "double count" these separate but related circumstances.

As defendant acknowledges, we have held that when a capital defendant's prior violent criminal conduct has resulted in a felony conviction, the prosecution is not required to choose between factors (b) and (c) of section 190.3 but may present evidence and argument to establish both factors, and the jury may properly consider both factors in making its penalty determination. (*People* v. *Melton* (1988) 44 Cal.3d 713, 764 [244 Cal.Rptr. 867, 750 P.2d 741].) Defendant argues that this holding does not control here because it presupposes the jury's understanding that the prior felony conviction is based on the criminal conduct described in the testimony. The error here, he asserts, is that the prosecution presented and argued the evidence in a manner that improperly suggested there were two separate incidents.

Having reviewed the record, we find no significant risk of juror confusion on this issue. The prior conviction was proved by documentary evidence. Among the documents was the Montana information, which charged that the incident occurred on December 29, 1971, and that John Digalis was the victim. No reasonable juror could have concluded that John Digalis's testimony, which described his encounter with defendant on December 29, 1971, related to some other incident.

## D. *The Prosecution's Cross-examination and Rebuttal*

### 1. *Cross-examination of Defendant's Sister*

Sheila Yates, defendant's sister, testified as a defense witness. On direct examination, she said she did not want defendant to be given the death penalty because she believed his life was worth saving. Asked to explain, she said, among other things, that she loved him, that she did not believe he was guilty, and that he could provide valuable counselling for younger prison inmates. On cross-examination, the prosecution began to ask about a statement the witness had made to Sergeant Fredrickson in March 1983 after defendant's arrest. The defense objected and the court held a hearing outside the jury's presence.

At the hearing, the witness testified that after defendant was arrested she became concerned, as a result of conversations with her sister-in-law, that her mother might get into trouble for attempting to conceal or move certain evidence at defendant's direction. She contacted the police and was referred to Sergeant Fredrickson, who came to her house. Fredrickson told her that defendant had killed Hickey and had been involved in a number of other illegal activities. The witness believed these statements and was badly frightened by them. A few days later she gave a statement that was taken by a court reporter. In this statement, she said, among other things, that she believed defendant was "up to no good," that she did not trust him, and that she had heard he had bragged to her sister-in-law about killing six people. The witness said she had since formed the opinion that much of what Sergeant Fredrickson told her about her brother was untrue. The trial court ruled that the prosecution could ask questions designed to show that in March 1983 the witness's opinion of defendant was different from the one she had given on direct examination. The trial court did not rule on specific questions but said it would proceed question by question and rule on objections as they were raised.

In the jury's presence, the witness testified that she had contacted the police and had discussed with Sergeant Fredrickson her concern that defendant was attempting to involve family members in the destruction or concealment of evidence. She admitted she then had been of the opinion that her brother was "up to no good" and that before she contacted the police she had received some information about defendant that had caused her concern.

▮ Defendant contends that the court erred in ruling that Yates could be asked about her opinion of defendant in 1983 as reflected in her statement to Sergeant Fredrickson. He argues that the ruling was error because the

prosecution could have attacked Yates's credibility by other means. He also argues that the record does not sufficiently establish that the trial court weighed the probative value of the evidence against the risk of undue prejudice to defendant. These arguments are unpersuasive.

The credibility of a witness may be challenged with evidence of prior statements by the witness that are inconsistent with the witness's testimony at the trial. (Evid. Code, § 780, subd. (h).) Here, Yates's testimony on direct examination implied an opinion of defendant that was inconsistent with the opinion she had expressed to Sergeant Fredrickson in 1983. Evidence of the 1983 statement was therefore admissible for impeachment. This was all that the trial court ruled. The court deferred other issues, including objections on hearsay grounds and on the ground of undue prejudice (Evid. Code, § 352), for resolution question by question. After this ruling, the defense made a number of objections, particularly on hearsay grounds, and the trial court sustained many of these objections. The defense did not object on the ground of undue prejudice, however, so the question whether the trial court conducted the required weighing process is not presented. (Evid. Code, § 353.)

### 2. *Cross-examination of Joseph O'Rourke*

Another defense witness was Joseph O'Rourke. On direct examination, he testified that he met defendant and formed a favorable opinion of him in 1978 when they were both inmates at San Quentin. Defendant contacted him in September 1982 when defendant was released from the prison in Chino. Defendant had no transportation and no money. O'Rourke arranged for defendant to stay with a friend and gave defendant a job in O'Rourke's handyman business. Defendant worked for O'Rourke until O'Rourke's arrest on October 12, 1982.

On cross-examination, the prosecution inquired about the events that led to O'Rourke's arrest. The defense objected that the question was beyond the scope of direct examination. After a conference at the bench, the court ruled that the prosecution could inquire about the circumstances leading to the arrest, but not about O'Rourke's subsequent conviction. Defendant assigns error to this ruling. The ruling was correct.

A witness "may be cross-examined upon any matter within the scope of the direct examination." (Evid. Code, § 773.) Here, O'Rourke's involvement in illegal activities was relevant to probe the value of the opinions he had expressed. His testimony on direct examination gave the impression that defendant, after his release from prison, had made efforts to reform by engaging in lawful employment. He had also testified that defendant was a

person who would discourage other inmates from acts of violence. The incident which led to O'Rourke's arrest, in which he agreed and attempted to furnish an illegal firearm (a sawed-off shotgun), was legitimate impeachment of O'Rourke's testimony. The evidence was not offered to prove defendant's involvement in this criminal activity, but rather to cast doubt on O'Rourke's ability to fairly judge defendant's rehabilitation and propensity for violence.

### 3. *Testimony of Ricky Carpenter and Evidence of 1971 Robbery*

 Defendant contends that the trial court erred in permitting the prosecution to call Ricky Carpenter as a rebuttal witness and to cross-examine defendant about a 1971 robbery.

In January 1985, before the guilt trial commenced, the prosecution notified the defense of its intent, if there was a penalty phase, to present evidence that defendant had fatally stabbed inmate Leroy Banks at San Quentin in 1978. The prosecution provided the names of correctional officers it intended to call for this purpose, and provided a copy of defendant's prison file, or C-file, which contained reports about the incident.

Ricky Carpenter was an inmate who was present when defendant stabbed Banks. At the time, he had declined to discuss the matter with law enforcement authorities. After the jury returned its guilt verdicts in this case on May 9, 1986, Paul Tulleners, a Department of Justice investigator who worked with the prosecution in this case, contacted Carpenter, who was then on parole. On May 27, 1986, Carpenter met with Tulleners and gave a statement explaining how and why defendant had killed Banks. On May 29, 1986, the prosecution informed the defense for the first time that it would call Carpenter as a penalty witness. The defense sought a protective order to preclude him from testifying, claiming it had received inadequate notice. The court ruled that Carpenter could not testify during the prosecution's case-in-chief, but that he could testify in rebuttal if the defense questioned, challenged, or refuted the testimony of the correctional officer about defendant's involvement in the Banks killing.

The penalty trial began on June 9, 1986. During the prosecution's case-in-chief, Rodney Perryman testified that he was working as a correctional officer in San Quentin on May 29, 1978, when he saw defendant with his arms around Banks making jabbing motions and then saw a knife drop from defendant's hand. When he arrived at the scene defendant was drenched with blood. Perryman was impeached with evidence that in his report describing the incident he had not mentioned seeing defendant make jabbing motions or drop a knife.

During the defense case, defendant testified on direct examination that he was never prosecuted for stabbing Banks, although the correctional authorities did place him in the adjustment center for three years as a result of the incident. Defendant also testified that he did not kill Hickey. He explained: "I—I'm not personally capable of doing what—whoever did that to Elizabeth. I couldn't have done that."

Thereafter, the trial court ruled that, in light of the cross-examination of Perryman about omissions in his report and defendant's testimony that he was not charged with stabbing Banks, and in light also of defendant's denial that he was capable of a brutal murder, the prosecution could use Carpenter in rebuttal. Carpenter then testified, on June 25, 1986, that defendant told him he would kill Banks for "disrespecting" another AB member, and that he then saw defendant stab Banks 10 to 15 times.

The trial court did not err in admitting Carpenter's testimony on rebuttal. Section 190.3, fourth paragraph, generally bars the prosecution from presenting evidence in aggravation at the penalty phase if it did not give the defendant notice of the evidence within a reasonable time before trial. But nothing in the language of the provision requires exclusion of evidence that the prosecution became aware of only after the trial began. As we have explained: "Such a construction would be inconsistent with the purpose of section 190.3 that the jury be made aware of all of the factors bearing on the penalty decision." (*People* v. *Jennings* (1988) 46 Cal.3d 963, 987 [251 Cal.Rptr. 278, 760 P.2d 475].)

Because defendant had been notified before the guilt trial that the Banks killing would be used in aggravation at the penalty phase, because the prosecution gave the defense prompt notice when it first became aware that Carpenter would be a witness, and because the defense had sufficient additional time to prepare to meet Carpenter's testimony, defendant was not denied any rights under the notice provision of section 190.3, and the trial court should have permitted the prosecution to use Carpenter's testimony during its case-in-chief. This error by the trial court did not prejudice the defense. The ruling put the defense on notice that Carpenter was a likely witness in rebuttal, and it gave the defense additional time to prepare to meet that evidence.

On cross-examination of defendant, the prosecution inquired about a robbery defendant had committed in Humboldt County in 1971. Defendant contends that the trial court erred when it overruled an objection to this question as being beyond the scope of direct examination. We find no error. Having placed his capacity for violence in issue by his testimony on direct

examination that he was incapable of the murder of Hickey, defendant may not complain about cross-examination on specific instances of violent behavior. Although a robbery is admittedly violence of a different order than a brutal murder, this consideration goes to weight rather than admissibility. We find no abuse of the broad discretion vested in the trial court to control the scope of relevant cross-examination. (*People* v. *Wissenfeld* (1951) 36 Cal.2d 758, 765 [227 P.2d 833].)

### 4. *Cross-examination About Stolen Gun*

As we have noted, the prosecution presented evidence at the guilt phase that Rebecca Williams attempted to have a gunsmith repair a pistol that lacked a serial number, and that she later told a police officer she had been acting for defendant. The owner of the company that manufactured the gun testified that it must have been stolen from the factory before it was imprinted with a serial number. During the penalty phase cross-examination of defendant, the prosecutor asked defendant where he had obtained this stolen gun. The trial court overruled a defense objection that the question exceeded the scope of direct examination, and defendant answered that he had obtained it from Janet Myers in Los Angeles in December 1982.

Defendant contends that the court erred in overruling the defense objection because defendant did not mention the gun on direct examination and because his possession of an apparently stolen firearm was not relevant to any aggravating factor. The trial court did not err in its ruling. On direct examination, defendant made general claims of innocence and rehabilitation. For example, he testified that when he was released from prison in 1982, his plan had been to reintegrate himself into society. Referring to his emotions as he listened to the testimony of the witnesses about the Montana incident, he said: "It made me feel like I had been insensitive and less than I'd like to be." Defendant flatly denied he was guilty of the crimes he had been convicted of. This claim of innocence encompassed a claim that he was not guilty of a conspiracy with AB leaders to assassinate Richard Barnes and to accumulate guns for the AB. To challenge these claims of rehabilitation and innocence, the prosecution could properly cross-examine defendant about his illegal possession (see § 12021 [a convicted felon's possession of a firearm is a felony]) of an apparently stolen firearm shortly after his release from prison in September 1982. (Evid. Code, § 773.)

### 5. *Highway Sign Evidence*

Defendant testified that a man named Kenny gave him the guns from the Hickey residence on February 18, 1983, in Lakeport. He said he drove from

Rebecca Williams's residence in Auburn to Redding on February 17 to meet Kenny, but Kenny was not there. He said he then called Hickey, who told him Kenny had been delayed by road and weather conditions and would meet him the following morning in Lakeport, which he did. On cross-examination, the prosecutor asked defendant about a Texaco credit card receipt showing he had purchased gasoline in Upper Lake on February 18, 1983. Defendant testified that he drove from Redding past the Lakeport turnoff to the gas station, then doubled back and proceeded to Lakeport.

On rebuttal, investigator Paul Tulleners testified that he had reviewed Department of Transportation records containing photographs of the signs at the Lakeport turnoff. After the trial court overruled a defense objection on hearsay and best-evidence-rule grounds, Tulleners testified about the size and appearance of the signs as shown in the records. Defendant contends the trial court erred in this ruling. The point is trivial. Assuming error, defendant could not have been prejudiced.

The size and condition of the signs at the Lakeport turnoff was never an issue. Defendant admitted that he went out of his way to purchase gasoline, but he never claimed he did so because inadequate signs caused him to miss the turnoff. Rather, his testimony plainly implied that he intentionally detoured from the most direct route to patronize a gas station that would accept his Texaco credit card. Finally, defense counsel later testified to his own personal observations of the signs, which were apparently consistent with the testimony of Tulleners.

E. *Prosecutorial Misconduct*

1. *Opinions of Montana Crime Victims*

Gerald O'Bresley, a sheriff's officer from Montana, testified as a prosecution witness to the December 1971 incident in which defendant, while being transported in Montana with other prisoners, disarmed O'Bresley and William Farago, another officer, and forced them into the trunk of their patrol car. On redirect, the prosecutor asked: "Now, sometime after that, did you have occasion to draft a letter to the parole authorities in Montana recommending that they not release this particular man?" Defense counsel objected that the question exceeded the scope of cross-examination, and the trial court sustained the objection. The prosecutor did not pursue the matter with O'Bresley.

The next witness was William Farago. On redirect examination, the prosecutor asked: "[I]n 1974, did you have occasion to express an opinion to

the Board of Pardons concerning whether or not the man who had done this to you should be paroled from the Montana State prison?" Defense counsel objected that the question was beyond the scope of cross-examination. The trial court sustained the objection, and the prosecutor did not pursue the matter.

 Defendant contends that the prosecutor should have known that the questions were improper as calling for an opinion on future dangerousness or an emotional reaction from a crime victim. Defendant contends further that the sustaining of the objection to the question asked of O'Bresley placed the prosecutor on notice that it would be improper to ask essentially the same question of Farago.

At the penalty phase, the prosecution may introduce evidence of the emotional effect of defendant's prior violent criminal acts on the victims of those acts. (*People* v. *Benson* (1990) 52 Cal.3d 754, 797 [276 Cal.Rptr. 827, 802 P.2d 330]; *People* v. *Clark, supra,* 50 Cal.3d 583, 629; *People* v. *Karis* (1988) 46 Cal.3d 612, 641 [250 Cal.Rptr. 659, 758 P.2d 1189].) To the extent the prosecutor sought an "emotional reaction" from O'Bresley and Farago, the questions were not so plainly improper as to constitute misconduct. Nor did the questions plainly call for a prediction of future dangerousness; they could be understood as merely an assessment of the seriousness of defendant's criminal conduct. Finally, the sustaining of the first objection, on the ground that the question exceeded the scope of cross-examination, did not put the prosecutor on notice that he could not ask the same question of a different witness subjected to different cross-examination.

### 2. *Characterizing Banks Killing as Murder*

During cross-examination of Rodney Perryman, the correctional officer who testified to his observation of the fatal prison stabbing of African-American inmate Leroy Banks, defense counsel asked about racial tensions in the prison that day. "Well, there was tension just because a murder in that housing unit," Perryman answered. Defense counsel asked the court to strike the word "murder." One of the prosecutors interjected, "I don't know what else it could be characterized as." Defense counsel suggested it might be self-defense. The trial court struck the word "murder," admonished the jurors that they were to determine what had happened, and suggested that the incident be referred to as an assault. Later, on redirect, the prosecutor in a question referred to "this assault as the judge called it."

 Defendant contends that the prosecutors should have known it was improper for them to characterize a homicide as "murder" and that the

reference to "this assault as the judge called it" was an improper use of sarcasm to remind the jury of their personal belief that the Banks killing was in fact murder. Although it would be improper for a prosecutor to use the term "murder" in questioning a witness about an unadjudicated killing, a prosecutor is of course free to argue to the jury, after all the evidence had been presented, that it should find that a killing was murder. Here, the prosecutors never used the term "murder" in questioning Perryman about the Banks homicide. Although the prosecutor's suggestion that the killing could only be murder was premature, and should have been reserved for argument, defendant was not prejudiced. The testimony of Perryman and Carpenter plainly supported a finding of murder, and the defense, while attacking the credibility of the prosecution's witnesses, did not present any affirmative evidence to support a finding that the killing was self-defense or manslaughter.

### 3. *Reference to 1971 Montana Attempted Robbery*

Before the guilt trial began, the trial court had ruled that defendant's 1971 Montana attempted robbery conviction was constitutionally infirm. The infirmity of the conviction did not preclude the prosecution from introducing evidence of the offense itself at the penalty phase as a circumstance in aggravation (§ 190.3, factor (b)), but the defense later moved to preclude such use on the ground it had not received sufficient notice (§ 190.3, 4th par.). In a written ruling, the trial court said it seemed very unlikely that the defense had been prejudiced by the lack of notice, but that "[t]o assure avoidance of error this shall be saved for rebuttal."

The first reference to the Montana attempted robbery occurred during the prosecution's cross-examination of defense witness Rogers Larry, a San Quentin correctional officer who testified that defendant had been a respectful and well-behaved prisoner. He testified that he knew defendant at San Quentin for "about three years" at some time between 1971 and 1975. On cross-examination, the prosecutor asked a series of questions challenging the testimony that defendant was at San Quentin during this time. He asked whether the witness would be surprised to learn that defendant was released on parole in March 1971 and did not return to San Quentin until 1975. The witness continued to maintain that defendant had been at San Quentin for three years between 1971 and 1975.

The prosecutor then asked the witness if he could explain how defendant could have been arrested in Montana in April 1971 "with a gun, high-speed chase and everything." The witness answered "no," and defense counsel requested permission to approach the bench.

At the bench, the court offered to admonish the jury to disregard the reference to defendant's arrest after a high-speed chase. Defense counsel moved for mistrial, and the court denied the motion. The prosecutor argued that the question was proper because evidence of the incident would be presented on rebuttal, in accordance with the court's earlier ruling. The trial court indicated that although evidence of the arrest might well be admissible in rebuttal, it should not be mentioned before that time. Defense counsel said he would consider the court's offer to admonish the jury, but he never accepted the offer.

Later, during cross-examination of defendant, the court ruled that the prosecutor could ask defendant about the 1971 Montana attempted robbery. Defendant then admitted that he had used a pistol during an attempt to rob a man at a grocery store, and that he had been arrested after a four- or five-mile pursuit by officers of the Montana Highway Patrol.

▆▆▆▆ Defendant contends that the prosecutor's reference to the Montana arrest in the question to Officer Larry was misconduct because the relevance of the matter was clearly outweighed by the risk of prejudice and because the reference clearly violated the court's earlier ruling. The question was not a violation of the court's ruling, which only affected admissibility of evidence of the criminal conduct during the prosecution's penalty phase case-in-chief. The ruling did not bar reference to the incident during otherwise proper cross-examination of defense witnesses, as shown by the court's later ruling during cross-examination of defendant. In any event, defendant could not have been prejudiced by the reference in the question to Officer Larry because defendant later testified fully to the events in question.

### 4. *Failure to Prove Facts Implied by Questions*

▆▆▆▆ It is misconduct for a prosecutor to ask a witness a question that implies a fact harmful to a defendant unless the prosecutor has reasonable grounds to anticipate an answer confirming the implied fact or is prepared to prove the fact by other means. (*People* v. *Warren* (1988) 45 Cal.3d 471, 480 [247 Cal.Rptr. 172, 754 P.2d 218].) But if the defense does not object, and the prosecutor is not asked to justify the question, a reviewing court is rarely able to determine whether this form of misconduct has occurred. (*People* v. *Bittaker, supra,* 48 Cal.3d 1046, 1098.) Therefore, a claim of misconduct on this basis is waived absent a timely and specific objection during the trial. (*People* v. *Carrera, supra,* 49 Cal.3d 291, 317.)

▆▆▆▆ Defendant cites five instances in which a prosecutor's question to a witness implied the existence of a fact harmful to defendant, the witness's

answer did not confirm the existence of the fact, and the prosecutor offered no evidence to prove the fact. In four of the instances, the defense either did not object at all, or objected on grounds unrelated to the one urged on appeal. In these instances, the issue of prosecutorial misconduct is not preserved for review.

The remaining instance occurred during cross-examination of defendant. The prosecutor asked, "Why did you tell Rebecca Williams to lie about the Jennings .22 caliber semiautomatic pistol?" Defense counsel objected that the question was argumentative and assumed facts not in evidence. Impliedly sustaining the objection, the trial court directed the prosecutor to ask defendant if he had told Williams to lie. Defendant denied that he had done so, but his answers effectively admitted that he had invented the false story that the gun was a gift from a grandfather and that he had urged Williams to use the story when she retrieved the gun from the gunsmith. The prosecutor asked a few more questions along this line, but defense counsel made no further objections.

We find no evidence of prosecutorial misconduct in this incident. The trial court sustained the only objection raised by defense counsel, and defendant effectively admitted that he had indeed urged Williams to lie about the gun.

### 5. Improper Offer of Proof

Patricia Sewell testified as a defense witness about her acquaintance with defendant while he was an inmate at the prison in Montana. Later, defense witness Fred Perry, who had been one of defendant's fellow inmates in prisons in Montana and Idaho, testified about the poor living conditions and mistreatment of inmates at those prisons. On cross-examination, the prosecutor asked if he knew Sewell. The defense objected on relevance grounds and the court asked for an offer of proof. The prosecutor said, "I'm going to ask him if he finds it strange that she didn't mention that these people . . . ." Defense counsel interrupted and requested that the prosecutor make the offer of proof out of the jury's presence. At the bench, the prosecutor said that Sewell's testimony had not indicated that she had seen any injuries to defendant, that he had complained to her about beatings or living conditions, or that she had taken any steps to publicize the deplorable prison environment that Perry had described. The court noted that this might be a proper subject for argument, but that it would be improper to ask Perry to explain omissions in Sewell's testimony.

Defendant argues that the prosecutor committed misconduct because the proposed questions were clearly improper for two reasons. First, as

the trial court noted, Perry could not be expected to explain omissions in Sewell's testimony. Second, any attempt by the defense to show that defendant had complained to Sewell about prison conditions would have been barred by the hearsay rule. We agree that the proposed examination of Perry was improper, although we note that Sewell herself could have been asked whether she personally observed any injuries to inmates or other signs of mistreatment. We also conclude, however, that the trial court's ruling sustaining the defense objection avoided any conceivable prejudice. The improper questions were never asked.

Defendant also argues that the prosecutor acted improperly by attempting to make his offer of proof in front of the jury. The prosecutor's conduct was neither improper nor prejudicial. The trial court requested an immediate offer of proof and did not ask counsel to approach the bench. In any event, the prosecutor's offer in the jury's hearing was interrupted and completed at the bench. The portion of the offer that the jury heard, consisting of a single incomplete sentence, contained nothing prejudicial to the defense.

### 6. *Cross-examination of Defendant About Banks Killing*

On direct examination, defendant testified that he was not prosecuted for the killing of inmate Leroy Banks, although he received administrative punishment, and that his counsel had advised him not to discuss the matter during his testimony in this trial. On cross-examination, the prosecution asked whether defendant's motive for stabbing Banks was that Banks had made disparaging remarks about another inmate. Defense counsel objected and a hearing was held outside the jury's presence. At the conclusion of the hearing, the court said it needed additional time to think about the matter and directed the prosecutor to proceed with cross-examination "with the exception of that area."

After a five-day break in the proceedings, the prosecutor resumed cross-examination of defendant, during which he asked: "Let's talk about the Banks incident. May 29th, 1978, in San Quentin Prison. Why did you stab inmate Banks twenty, thirty times to death?" At defense counsel's request, a hearing was held at the bench. The court decided to defer a ruling on the matter and instructed the prosecution to proceed on other topics.

Defendant contends that the prosecution's second inquiry into the Banks matter was a deliberate violation of a court ruling and therefore misconduct. The record provides little support for this view. The prosecutor explained during the bench hearing that he had understood that questioning on the Banks matter had been deferred only to give defense counsel additional time to discuss with defendant whether he should answer the questions

or assert his privilege against self-incrimination and thereby risk having his entire testimony stricken. The trial court apparently accepted this as a plausible interpretation of its ruling. In any event, there is no reasonable possibility of prejudice. Defendant explained on direct examination that he was not discussing the Banks incident on advice of counsel. The allegedly improper questions did no more than illustrate this fact.

### 7. *Argumentative Questions Addressed to Defendant*

 Defendant complains that on five occasions during the lengthy cross-examination of defendant the prosecutor committed misconduct by asking argumentative questions. In two instances, the trial court sustained defense counsel's objections to the questions as argumentative. In two other instances, the trial court anticipated objection and directed the prosecution to ask a nonargumentative question. In the final instance, the point was waived by failure to interpose any objection. None of the argumentative questions stated or implied the existence of facts not otherwise before the jury. None of the arguments contained in the questions would have been improper if made to the jury at the appropriate time. Although the prosecutor should have refrained from argumentative questions, defendant suffered no prejudice.

### 8. *Argument to the Jury*

During the arguments to the jury, after referring to the killings of Hickey, Barnes, and Banks, the prosecutor said, "The defendant should die for any one of those murders." The defense objected that this misstated the law. The court responded, "The jury is instructed on the law. They'll follow the law. They know what the facts are."

 Defendant contends that the argument constituted misconduct because it invited the jurors to impose the death penalty if they believed it was warranted for the Banks murder, even though they might not believe it was warranted for the Hickey or Barnes murder. We do not believe a reasonable juror would understand the argument as an invitation to focus on one of the crimes to the exclusion of the others. Rather, the prosecutor was commenting on the heinous character of each of the homicides defendant had committed. The jury was entitled to consider the seriousness of each of those crimes in determining penalty.

Fred Filyau, a correctional officer at the Humboldt County jail where defendant was incarcerated before and during the trial in this case, was a prosecution witness at the penalty phase. He testified that defendant had threatened to "visit" Filyau after he got out. The prosecutor mentioned this

incident during argument to the jury, and then added: "Well, you know, in this business . . . we get threatened all the time. And every time I've been threatened—" The defense objected that the statement assumed facts not in evidence, and the trial court sustained the objection. ▮▮▮ Defendant contends the remark was improper because it suggested that the prosecutor might have been threatened in this case.

Although defense counsel objected, he did not request an admonition. Because an admonition would have cured any harm, the point is not preserved for review. (*People* v. *Miller, supra,* 50 Cal.3d 954, 1001.)

▮▮▮ At one point during the argument, the prosecutor said: "Give me something, Mr. Price, to show this jury why they should not render a verdict of death."[22] Defendant contends the remark was improper because he was not permitted to speak during the prosecutor's argument, and so could not have responded to the question. We are confident the jury understood the statement for what it was, a rhetorical device. In any event, the point was waived by failure to object or request an admonition.

### F. Exclusion of Defendant's Writings and Testimony About Carpenter's Parole Status

Defendant asserts error in two unrelated rulings by the trial court excluding evidence offered by the defense. He contends these rulings violated his rights to present a defense and to receive a reliable penalty verdict under the Sixth and Eighth Amendments to the federal Constitution.

### 1. Exclusion of Defendant's Writings

The defense offered a number of defendant's writings as evidence in mitigation to show his sensitivity, compassion, and writing ability. These writings were: (1) a two-page short story entitled "Shorty and the Apple Orchard" about a child's experience with a horse; (2) a seventeen-page description of life in prison, entitled "Chapter Two: San Quentin State Prison 1970-1971"; (3) a three-page essay entitled "A Boxcar Realization" discussing how prison inmates repress their emotions to avoid appearing vulnerable and how this causes them to dismiss or ignore the emotional trauma suffered by crime victims; (4) a two-page letter of apology, apparently addressed to

---

[22]The transcript indicates a pause after this statement. Defendant interprets this to mean that the prosecutor waited dramatically for defendant to answer the question. On the preceding page of the transcript, however, the reporter has indicated two other pauses. After one, the prosecutor said, "See, I'm jumping around and now I come across the notes . . . ." Thus, it may be that the prosecutor stopped momentarily not to permit defendant to answer, or as if expecting an answer, but merely to consult his notes and compose his thoughts.

the defense investigator; (5) a seven-page letter of advice to a friend facing imprisonment for the first time; (6) a five-page autobiographical sketch, entitled "Incorrigible," about defendant's experiences with the juvenile justice system in Oregon; (7) a five-page essay entitled "The Kind of Juror I Would Like"; and (8) twenty-three pages of notes and letters addressed to the trial judge protesting the shackling order and jail conditions during the trial. The trial court admitted all of these exhibits except the last, which the court excluded as hearsay containing an incomplete and misleading account of the justification for the shackling order.

 Defendant maintains that the ruling is erroneous because the letters and notes to the trial judge were not offered for the truth of the matters stated but merely to demonstrate defendant's capacity for self-expression. We find no error in the court's ruling. Given the large volume of defendant's writings that were received in evidence, the writings in question were properly excluded as cumulative on the issue of defendant's ability to express himself in writing. (See *People* v. *Redmond* (1981) 29 Cal.3d 904, 912 [176 Cal.Rptr. 780, 633 P.2d 976].)

### 2. *Impeachment of Ricky Carpenter*

. The defense sought to impeach the testimony of Ricky Carpenter, the former inmate who described how he assisted defendant in the stabbing of Leroy Banks. Carpenter admitted on direct examination that he was on parole, that he had been granted immunity for the Banks killing, and that he had received some $800 to relocate his family. On cross-examination, Carpenter admitted using heroin in January 1986, but he said he had not used it since. He denied that tests in April and June of 1986 had detected illegal drugs in his system. He said six or seven months remained on his parole period, and that the prosecution had not offered to reduce this period.

Testifying as a defense witness on rebuttal, Carpenter's parole officer said that Carpenter had tested positive for morphine in drug tests he took in May and June of 1986, and that he had admitted heroin use. She testified further that Carpenter's use of heroin was a parole violation but that revocation proceedings had not yet been instituted. Defendant contends the court erred in excluding evidence that Carpenter's parole officer had been unable to verify Carpenter's employment. We find no error in the ruling.

Evidence about the status of a prosecution witness's parole is admissible to show the witness's potential bias resulting from concern about possible revocation. (See *Davis* v. *Alaska* (1974) 415 U.S. 308, 318 [39 L.Ed.2d 347, 354-355, 94 S.Ct. 1105].) For this reason, the trial court properly admitted

the evidence that Carpenter was on parole and that he could face revocation as a result of his use of illegal drugs. But evidence about the parole officer's inability to verify his employment had no comparable relevance. When the parole officer was asked about this matter, outside the jury's presence, she testified that maintaining gainful employment was not a condition of Carpenter's parole. Although she said she had not yet verified Carpenter's employment, she did not say this would affect in any way the likelihood of parole revocation. Thus, the proposed testimony had no value for impeachment.

## G. *Excluded Testimony of Defendant's Dietician and Counselor*

Defendant asserts error in three trial court rulings restricting the testimony of the dietician and the counselor whom the court had appointed to assist defendant. He contends that these rulings violated his right to a reliable penalty determination under the Eighth Amendment to the federal Constitution.

The defense asked Helen Vatcher, the state-licensed counselor who counseled defendant during the trial, whether she had ever seen defendant cry. The prosecution objected on relevance grounds and the trial court sustained the objection. Defendant was not prejudiced by the ruling, however, because the witness answered "yes" to the question and the trial court did not strike the answer. When defense counsel asked the witness, a short time later, whether she had ever seen defendant "express extreme emotional pain," the witness answered: "Yes. He cried with me."

Patricia Manuel, a dietician, testified as a defense witness about defendant's diet in jail during the trial and the effect of poor nutrition on defendant's physical and emotional health. Before she testified, the prosecution requested an offer of proof. Defense counsel said, among other things, that the witness's testimony would help to explain why defendant "felt he could not come to court." The trial court remarked that "[w]hether [defendant] came to court is irrelevant." Yet the trial court ruled that the proposed testimony was admissible to counter the prosecution's evidence about defendant's violent encounters with officers at the jail.

Defendant contends the court erred in precluding testimony about the effect of nutrition on his decision not to be present in the courtroom during the guilt trial. We disagree. Defendant testified fully about his decision not to attend the guilt trial. The court's ruling permitted the dietician to describe defendant's diet during the trial and to explain its probable effect on defendant's emotional and physical health. How the diet

affected any particular decision defendant made was beyond the scope of the witness's expertise and would necessarily involve some degree of reliance on hearsay. It was a proper subject for argument, but not for testimony by this witness.

Defendant also complains of the trial court's ruling sustaining an objection to a question asking the dietician why defendant was a vegetarian. The witness testified without objection that defendant was a vegetarian but the trial court correctly observed that his reasons for being a vegetarian were not relevant to the opinions the witness expressed about the adequacy of his diet and its effects on his health. Defendant argues that his reasons for being a vegetarian were relevant to show "his sensitivity and the uniqueness of his character." The issue is not preserved for review because defendant made no offer of proof. (Evid. Code, § 354.) Moreover, as the trial court's ruling implied, the proper way to present such evidence was by defendant's own testimony. In fact, defendant did explain briefly, and without objection, that as a result of the stresses he experienced during the trial he "got to where [he] couldn't eat meat . . . couldn't eat oily things, greasy things."

### H. *Failure to Instruct on Residual Doubt*

 Defendant contends the trial court erred in not instructing sua sponte that jurors could consider residual doubt about defendant's guilt in determining penalty. The trial court instructed the jurors that in fixing penalty they could consider any circumstance "that extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspects of a defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." The jurors were instructed to "disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." These instructions on the scope of mitigating circumstances were sufficient to encompass the concept of residual doubt about defendant's guilt. (*People* v. *Sully, supra,* 53 Cal.3d 1195, 1245; *People* v. *Murtishaw* (1989) 48 Cal.3d 1001, 1018 [258 Cal.Rptr. 821, 773 P.2d 172].) The trial court was under no obligation to give a more specific instruction on residual doubt as a mitigating circumstance. (*People* v. *Cox, supra,* 53 Cal.3d 618, 676-678.)

After the jury returned its guilt verdicts, one of the jurors was replaced by an alternate. Defendant contends that this development required the court to instruct the jury sua sponte that in making the penalty determination the substituted juror could consider doubts about defendant's guilt, that the substituted juror could explain the basis for those doubts to the other jurors,

and that the other jurors could consider residual doubts raised after discussing the guilt evidence with the substituted juror. The trial court was not required to so instruct.

The trial court instructed the jurors that they were "entitled to review all the evidence admitted during the guilt phase" and that they might "discuss that evidence and questions [the substituted juror] may have to it during your deliberations on penalty." Moreover, as we have already concluded, the instructions given adequately conveyed the message that the jury could consider lingering doubts about guilt. Nothing more was required. (See *People* v. *Kaurish, supra,* 52 Cal.3d 648, 708; *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1234-1236 [275 Cal.Rptr. 729, 800 P.2d 1159].)

I. *Instructions Relating to Banks Homicide*

 Defendant contends that in explaining to the jury the law applicable to the Banks homicide, the trial court erred in instructing on first degree murder and assault with a deadly weapon but not second degree murder or manslaughter, and also in instructing on the felony-murder doctrine. We reject these contentions.

When the prosecution has introduced evidence at the penalty phase of other violent criminal activity by the defendant (§ 190.3, factor (b)), a trial court is not required, absent a request, to instruct on the elements of specific crimes that this evidence tends to prove. (*People* v. *Clark, supra,* 50 Cal.3d 583, 627.) "This rule recognizes that a defendant for tactical considerations may not want the penalty phase instructions overloaded with a series of lengthy instructions on the elements of alleged other crimes, perhaps because he [or she] fears that such instructions could result in the jury placing undue significance on such other crimes rather than on the central question of whether he [or she] should live or die." (*People* v. *Phillips* (1985) 41 Cal.3d 29, 73, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].) Because defendant did not request instructions on second degree murder or manslaughter, the trial court was under no duty to instruct on those offenses.

In instructing the jury, the trial court stated that the crime of murder included an unlawful killing during the commission or attempted commission of an inherently dangerous felony. As defendant correctly observes, this part of the instruction was not applicable to the Banks homicide, because the evidence did not show defendant killed Banks in the course of committing an inherently dangerous felony. We conclude, however, that defendant was not prejudiced by the inapplicable instruction. The only homicide offense fully defined for the jury was first degree murder by premeditation and

deliberation. If the jurors believed Carpenter's testimony, defendant was necessarily guilty of this offense, and the finding of premeditation and deliberation would necessarily include a finding of intent to kill. If the jurors rejected Carpenter's testimony and did not find premeditation and deliberation, then the instructions became irrelevant because they did not define second degree murder or manslaughter. In that event, the jury would make its own evaluation of the aggravating force of defendant's conduct without regard to its legal label.

## J. *Challenges to Death Penalty Law and Denial of Modification Motion*

To preserve issues for collateral review in federal courts, defendant challenges our death penalty law on various grounds under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. He concedes this court has previously rejected each of these challenges. Thus, we have held that the jury may consider, as a circumstance in aggravation at the penalty phase, evidence of the defendant's prior unadjudicated criminal activity. (*People* v. *Medina, supra,* 51 Cal.3d 870, 906-907, and cases cited.) The prosecution may rely on evidence of prior unadjudicated criminal activity even though prosecution for those acts would be barred by the statute of limitations. (*People* v. *Robertson, supra,* 48 Cal.3d 18, 42-44.) The jury need not employ the beyond-a-reasonable-doubt standard in determining whether or not aggravating circumstances other than violent criminal conduct (see *People* v. *Caro* (1988) 46 Cal.3d 1035, 1057 [251 Cal.Rptr. 757, 761 P.2d 680]) are present or whether death is the appropriate penalty. (*People* v. *Bell, supra,* 49 Cal.3d 502, 553; *People* v. *Williams, supra,* 45 Cal.3d 1268, 1322.) The jury is not required to make written findings or to agree unanimously on the presence of individual aggravating circumstances. (*People* v. *Duncan* (1991) 53 Cal.3d 955, 979 [281 Cal.Rptr. 273, 810 P.2d 131].) The trial court need not clarify the standard jury instruction (CALJIC No. 8.84.1) to explain that the circumstances of the crime in the present proceeding (§ 190.3, factor (a)) and criminal activity involving violence (§ 190.3, factor (b)) are mutually exclusive factors. (*People* v. *Duncan, supra,* at p. 979.) The jury may use defendant's commission of a felony to elevate a killing to first degree murder, to find a special circumstance, and as a factor in aggravation. (*Id.* at p. 980.) He provides no persuasive reason to reconsider these holdings.

▪ Defendant also urges us to set aside the trial court's ruling denying defendant's automatic motion to modify the penalty verdict (§ 190.4, subd. (e)) because the court considered various documents revealed at hearings during the trial, a presentence report, and a statement by the mother of murder victim Elizabeth Hickey. We disagree.

The record shows that the victim's mother made her statement after the court had denied the modification motion; that statement could not have influenced the trial court's ruling. Although the court was exposed during the course of trial to documents and testimony that were ultimately not received in evidence, the record does not rebut the presumption that the court understood and fulfilled its obligation to decide the modification motion solely on the basis of the evidence presented to the jury. The court mentioned, before it denied the modification motion, that it had considered the presentence report, but it did not allude to the report or its contents, or to anything not presented to the jury, during the detailed explanation it gave for denying the modification motion. Under these circumstances, we presume that the court considered the presentence report only for the purpose of sentencing on the noncapital offenses, and that it did not influence the court's decision to deny the modification motion. (*People* v. *Lang, supra*, 49 Cal.3d 991, 1044.)

## K. *Cumulative Effect of Guilt and Penalty Phase Errors*

We reject defendant's contention that the cumulative effect of asserted errors at the guilt and penalty phases requires reversal of the judgment of death. We have rejected nearly all of defendant's assignments of error. When we have found error, we have concluded that defendant was not prejudiced. Whether considered singly or collectively, the errors were inconsequential.

## L. *Sentencing on the Noncapital Offenses*

The trial court sentenced defendant to the upper term of five years for the Triplex robbery (§ 213), with a two-year enhancement for gun use (§ 12022.5). The court imposed consecutive terms of eight and sixteen months for possession of the stolen Moore weapons (§ 496) and burglary of the Hickey residence (§ 461). The court added a one-year enhancement for a prior prison term (§ 667.5, subd. (a)), for a total determinate term of ten years. The court made this determinate term consecutive to an indeterminate sentence of 25 years to life for the murder of Richard Barnes (§ 190).

Defendant contends that the court relied on improper reasons for imposing the upper term for the Triplex robbery. The trial court gave seven reasons for this sentence choice. Defendant contends that three of these reasons are invalid and that two others overlap. Respondent concedes that one of the court's reasons is invalid and declines to dispute defendant's argument regarding a second reason, but he argues that the remaining five reasons adequately support the court's sentencing choice.

When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper. (*People* v. *Avalos* (1984) 37 Cal.3d 216, 233 [207 Cal.Rptr. 549, 689 P.2d 121].) Here, the trial court stated three very powerful reasons for selecting the upper term for the Triplex robbery: the planning and sophistication of the crime (including defendant's use of a wig and makeup, and his actions in casing the theater before the crime) showed premeditation (Cal. Rules of Court, rule 421(a)(8)); the amount of money defendant stole ($7,000) was substantial (*id.*, rule 421(a)(10)); and defendant had engaged in a pattern of violent conduct which indicates a serious danger to society (*id.*, rule 421(b)(1)). Given these reasons, which defendant concedes are valid, and the absence of circumstances in mitigation, it is not reasonably probable the court would have chosen a lesser sentence had it known that some or all of the reasons for selecting the upper term were improper.

Respondent concedes that the trial court erred under section 654 in imposing punishment for both the murder of Elizabeth Hickey and the burglary of her residence, both offenses being part of a single indivisible transaction. We agree. (See *People* v. *Milan* (1973) 9 Cal.3d 185, 197 [107 Cal.Rptr. 68, 507 P.2d 956].) We will stay execution of sentence on the burglary count.

■■■■ We reject defendant's contention that section 654 precludes punishment for both the Barnes murder and the Hickey murder because the Barnes murder was used as a special circumstance for the Hickey murder. Section 654 does not preclude separate punishment for crimes of violence committed against separate victims. (*People* v. *Beamon* (1973) 8 Cal.3d 625, 638, fn. 10 [105 Cal.Rptr. 681, 504 P.2d 905].) Moreover, defendant will be required to serve the sentence for the Barnes murder only in the event the death sentence for the Hickey murder is set aside.

## IV. ISSUES CONCERNING APPELLATE RECORD

During the trial, the defense sought discovery of all statements made to law enforcement authorities by Michael Thompson, Clifford Smith, and Janet Myers, and all Department of Corrections records concerning the AB. The prosecution asserted that much of the requested material was either irrelevant or protected by the statutory privileges for official information (Evid. Code, § 1040) and the identity of confidential informants (*id.*, § 1041). The trial court held a series of closed hearings, from which the defense was excluded (see *id.*, § 915, subd. (b)), to rule on the prosecution's

objections to disclosure. Transcripts of these hearings, and documents that the trial court ruled not subject to discovery, are part of the appellate record and have been provided to this court under seal.

On September 19, 1989, defendant's appellate counsel submitted a motion asking this court to review the sealed materials and determine whether any portions could be released to the defense. In response to the motion, this court released some 400 pages of reporter's transcripts of the hearings, after deletion of confidential material disclosed during the course of the hearings. Thereafter, on June 27, 1990, appellant sent us a letter requesting clarification of our ruling. We deemed the letter a motion for reconsideration and denied it on August 15, 1990.

Defendant maintains, first, that he cannot determine whether in camera hearings have been held for which transcripts do not exist or for which transcripts exist but have not been released by this court. This court has released to appellate counsel redacted copies of all reporter's transcripts in the appellate record that have not previously been provided to the defense. After lengthy proceedings in the trial court, in which appellate counsel participated, the superior court clerk certified the record as complete. (See Cal. Rules of Court, rules 35(c), 39.5.) We find no reason to question that certification.

Second, defendant maintains that this court must release the documents that the trial court found to be not subject to discovery on grounds of relevance or privilege so that appellate counsel can decide whether those rulings were properly made. We may not do so. Evidence that the trial court has found to be privileged may not be released without the consent of the holder of the privilege. (Evid. Code, § 915, subd. (b).) Nor do we find any authority requiring the disclosure of information held nondiscoverable on relevance grounds. In many instances the court did not reach the prosecution's claims of privilege because the material had no conceivable relevance. To disclose such material now could reveal privileged information.

Parties who challenge on appeal trial court orders withholding information as privileged or otherwise nondiscoverable "must do the best they can with the information they have, and the appellate court will fill the gap by objectively reviewing the whole record." (*People* v. *Collins* (1986) 42 Cal.3d 378, 395, fn. 22 [228 Cal.Rptr. 899, 722 P.2d 173].) ■■■ Based on the transcripts we have released, defendant argues that certain of the trial court's rulings were prejudicially erroneous, but defendant is mistaken in each instance.

The trial court ruled that the polygraph operators' opinions about the veracity of Michael Thompson were not discoverable because they were not

admissible evidence (Evid. Code, § 351.1). Although the prosecution has a duty to inform the defense of polygraph results that cast doubt on the credibility of a prosecution witness (*U.S.* v. *MacEntee, supra,* 713 F.Supp. 829, 831), defendant could not have been prejudiced because polygraph results are inadmissible and the defense was well aware of many other grounds to question Thompson's credibility. A memorandum written by Department of Justice Investigator Paul Tulleners, noting disagreements with coworkers and supervisors about which materials should be disclosed to the defense and expressing his personal feelings about these disputes, contains nothing of legitimate use to the defense; all such disputes were resolved ultimately by the court's rulings. The trial court's remark on February 26, 1985, that it had not reviewed Michael Thompson's entire "C-file," does not mean the court never did so. On the same page of the transcript the court said that it would "look at it and see what's in there." The trial court properly ruled on February 28, 1985, that material would not be disclosed because it was not severable from privileged material. When the prosecutor on March 4, 1985, said one entry was "being hidden," he was referring to the name and address of a person who was a relative of a potential witness and who could be endangered by disclosure, and not to any material relevant to this case. Having carefully reviewed the whole record, we find no prejudicial error in the trial court's rulings denying discovery. We reject defendant's claims that the trial court's rulings, or the methods employed by this court to review those rulings, denied defendant any of his federal constitutional rights under the Fifth, Sixth, Eighth, or Fourteenth Amendments.

## V. CONCLUSION

Execution of sentence for the crime of burglary is stayed. In all other respects, the judgment is affirmed.

Lucas, C. J., Mosk, J., Panelli, J., Arabian, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied February 19, 1992.